WRIGHT, FINLAY & ZAK, LLP
Edgar C. Smith, Esq.
Nevada Bar No. 05506
Rock K. Jung, Esq.
Nevada Bar No. 10906
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 475-7964; Fax: (702) 946-1345
esmith@wrightlegal.net
rjung@wrightlegal.net
*Attorneys for Plaintiff,*
*PROF-2013-S3 Legal Title Trust,*
*by U.S. Bank National Association,*
*as Legal Title Trustee*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE<br><br>        Plaintiff,<br><br>   vs.<br><br>FLYING FROG AVENUE TRUST, a Nevada Limited Liability Company; DOE Individual I-X inclusive; and ROE Business Entities XI-XX inclusive;<br><br>        Defendants. | Case No.:  2:17-cv-01933-JCM-GWF<br><br><br>**STIPULATION AND ORDER TO ALLOW PLAINTIFF TO AMEND ITS COMPLAINT TO ADD PARTIES** |

///

///

///

///

///

///

///

COMES NOW, Plaintiff, PROF-2013-S3 Legal Title Trust, by U.S. Bank National Association, as Legal Title Trustee (hereinafter "Plaintiff" or "U.S. Bank"), by and through its attorney, ROCK K. JUNG, ESQ., of the law firm of Wright, Finlay & Zak, LLP, and Defendant, Flying Frog Avenue Trust (hereinafter "Frog" or "Defendant"), by and through its counsel of record, Michael F. Bohn, Esq. and Adam R. Trippiedi, Esq. of the Law Offices of Michael F. Bohn, Esq., Ltd., and hereby stipulate and agree as follows:

1. On July 14, 2017, Plaintiff filed the instant action concerning claims to the real property commonly known as 8970 Flying Frog Avenue, Las Vegas, NV 89148, APN# 176-05-813-041 (hereinafter the "Property").

2. On August 8, 2017, Defendant filed its Motion to Dismiss.

3. On August 22, 2017, Plaintiff filed it Opposition to Defendant's Motion to Dismiss.

4. On August 28, 2017, Defendant filed its Reply in support of its Motion to Dismiss.

5. On August 30, 2017 the parties submitted their Proposed Joint Discovery Plan and Scheduling Order.

6. On September 14, 2017 Plaintiff propounded discovery to Defendant.

7. The parties have exchanged their initial disclosures.

8. At this time, the parties agree that Venezia Community Association (hereinafter "HOA") and Red Rock Financial Services (hereinafter "HOA TRUSTEE") are necessary parties to the instant action and agree that Plaintiff should be permitted to amend its complaint to assert claims against the HOA and HOA TRUSTEE.

IT IS HEREBY STIPULATED AND AGREED that Plaintiff. shall have leave to amend its pleadings in the form of a First Amended Complaint a copy of which is attached as Exhibit 1.

IT IS FURTHER STIPULATED AND AGREED that Plaintiff shall file its First Amended Complaint within seven (7) days of entry of the order approving this stipulation.

///

IT IS SO STIPULATED.

**WRIGHT, FINLAY & ZAK, LLP**

**LAW OFFICES OF MICHAEL F. BOHN, ESQ., LTD.**

_/s/ Rock K. Jung, Esq._

EDGAR C. SMITH, ESQ.
Nevada Bar No. 05506
E-Mail: esmith@wrightlegal.net
ROCK K. JUNG, ESQ.
Nevada Bar No. 10906
E-Mail: rjung@wrightlegal.net
7785 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117
_Attorneys For:_
_PROF-2013-S3 Legal Title Trust,_
_U.S. Bank National Association, as Legal_
_Title Trustee_

_/s/ Michael F. Bohn, Esq._

MICHAEL F. bohn, ESQ.
Nevada Bar No. 1641
E-Mail: mbohn@bohnlawfirm.com
ADAM R. TRIPPIEDI, ESQ..
Nevada Bar No. 12294
E-Mail: atrippiedi@bohnlawfirm.com
376 East Warm Springs Road, Suite 140
Las Vegas, NV 89119
_Attorneys For:_
_Flying Frog Avenue Trust_

**ORDER**

**IT IS SO ORDERED.**

UNITED STATES DISTRICT JUDGE

DATED: November 7, 2017

# **Exhibit 1**

# **Exhibit 1**

# **Exhibit 1**

WRIGHT, FINLAY & ZAK, LLP
Edgar C. Smith, Esq.
Nevada Bar No. 05506
Rock K. Jung, Esq.
Nevada Bar No. 10906
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 475-7964; Fax: (702) 946-1345
esmith@wrightlegal.net
rjung@wrightlegal.net
*Attorneys for Plaintiff,*
*PROF-2013-S3 Legal Title Trust, by*
*U.S. Bank National Association, as*
*Legal Title Trustee*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE<br><br>Plaintiff,<br><br>vs.<br><br>FLYING FROG AVENUE TRUST, a Nevada Limited Liability Company, VENEZIA COMMUNITY ASSOCIATION, RED ROCK FINANCIAL SERVICES, LLC, DOE Individual I-X inclusive; and ROE Business Entities XI-XX inclusive;<br><br>Defendants. | Case No.:   2:17-cv-01933-JCM-GWF<br><br>**[PROPOSED] FIRST AMENDED COMPLAINT FOR QUIET TITLE AND DECLARATORY RELIEF** |

COMES NOW Plaintiff,  PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE (hereinafter "Plaintiff" or U.S. Bank), by and through its attorneys of record, Edgar C. Smith, Esq., and Rock K. Jung, Esq., of the law firm of Wright, Finlay & Zak, LLP, and hereby files this civil action against the Defendants.

**PARTIES, JURISDICTION AND VENUE**

**1.**     The real property at issue is known as 8970 Flying Frog Avenue, Las Vegas, Nevada 89148, APN: 176-05-813-041 (hereinafter, the "Property").

**2.**     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as all Plaintiff are "citizens of different States" from all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has original federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff is asserting civil claims arising under the Constitution, laws, or treaties of the United States.

**3.**     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1)-(2) because Defendant resides in this district; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district; and the Property that is the subject of this action is situated in this district, in Las Vegas, Clark County, Nevada.

**4.**     Plaintiff is a national banking association, with its principal place of business in Ohio, organized and existing under the laws of the United States.

**5.**     Plaintiff is now and at all times relevant herein, the assigned Beneficiary under a Deed of Trust signed by Michael Moyer (hereinafter "Moyer"), and recorded on April 1, 2009, (hereinafter "Deed of Trust"), which encumbers the Property and secures a promissory note.

**6.**     Upon information and belief, Flying Frog Avenue Trust (hereinafter "Buyer"), is an entity of unknown form and claims to be the current titleholder of the Property.

**7.**     Upon information and belief, Venezia Community Association (hereinafter the "HOA") is a Nevada domestic non-profit Corporation, licensed to do business in the State of Nevada, and was the HOA that foreclosed on the Property.

**8.**     Upon information and belief, Red Rock Financial Services (hereinafter "HOA Trustee") is a foreign limited-liability company licensed to do business in the State of Nevada, and acted as the foreclosure trustee, which allegedly mailed and served the foreclosure notices, if any, and cried the foreclosure sale  for the HOA.

9.  In accordance with NRS Chapter 38.310, Plaintiff has filed a Nevada Real Estate Division Alternative Dispute Resolution (hereinafter, "NRED") claim and already named both the HOA and the HOA Trustee as Respondents.

## GENERAL ALLEGATIONS

10.  On or about July 31, 2008, Moyer purchased the Property.[1]

11.  The Deed of Trust executed by Moyer identified Taylor, Bean & Whitaker Mortgage Corp. as the Lender, Mortgage Electronic Registration Systems, Inc. ("MERS") as the Beneficiary, and Noble Title as the Trustee, securing a loan in the amount of $164,607.00 (hereinafter the "Moyer Loan").[2]

12.  The Moyer Loan is insured by the Federal Housing Administration ("FHA"), an agency of the United States of America.

13.  FHA's case number on the Deed of Trust is 332-4825340-703.

14.  On September 8, 2010, a Corporate Assignment of Deed of Trust was recorded in which MERS as nominee for Taylor, Bean & Whitaker Mortgage Corp. assigned all beneficial interest in the Deed of Trust to BAC Home Loans Servicing, LP fka Countrywide Home Loans Servicing, LP.[3]

15.  On May 29, 2014, an Assignment of Deed of Trust was recorded in which Bank of America, N.A., Successor by Merger to BAC Home Loans Servicing, LP fka Countrywide Home Loans Servicing, LP assigned all beneficial interest in the Deed of Trust to Secretary of Housing and Urban Development.[4]

///

///

---

[1] A true and correct copy of the Grant, Bargain and Sale Deed recorded in the Clark County Recorder's Office as Book and Instrument Number 20080731-0001575 is attached hereto as **Exhibit 1**.  All other recordings stated hereafter are recorded in the same manner.

[2] A true and correct copy of the Deed of Trust recorded as Book and Instrument Number 20090401-0000659 is attached hereto as **Exhibit 2.**

[3] A true and correct copy of the Assignment recorded as Book and Instrument Number 201009080004810 is attached hereto as **Exhibit 3.**

[4] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20140529-0000122 is attached hereto as **Exhibit 4.**

16.     On July 1, 2014, an Assignment of Deed of Trust was recorded in which Secretary of Housing and Urban Development assigned all beneficial interest in the Deed of Trust to U.S. Bank National Association, as trustee for SROF-2013-S3 REMIC Trust I.[5]

17.     On July 20, 2015, an Assignment of Deed of Trust was recorded in which U.S. Bank National Association, as trustee for SROF-2013-S3 REMIC Trust I assigned all beneficial interest in the Deed of Trust to USROF III Legal Title Trust 2015-1, by U.S. Bank National Association, as Legal Title Trustee.[6]

18.     On December 15, 2016, an Assignment of Deed of Trust was recorded in which U.S. ROF III Legal Title Trust 2015-1, by U.S. Bank National Association, as Legal Title Trustee assigned all beneficial interest in the Deed of Trust to PROF-2013-S3 Legal Title Trust, by U.S. Bank National Association, as Legal Title Trustee.[7]

19.     On June 6, 2011, a Notice of Delinquent Assessment ("HOA Lien") was recorded against the Property by the HOA Trustee, on behalf of the HOA.[8]

20.     On July 26, 2011, a Notice of Default and Election to Sell Pursuant to the Lien for Delinquent Assessments was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of July 21, 2011 was $2,531.40.[9]

///
///
///
///
///

---

[5] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20140701-0002454 is attached hereto as **Exhibit 5.**

[6] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20150720-0000603 is attached hereto as **Exhibit 6.**

[7] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20161215-0001912 is attached hereto as **Exhibit 7.**

[8] A true and correct copy of the Lien for Delinquent Assessments recorded as Book and Instrument Number 201106060002360 is attached hereto as **Exhibit 8.**

[9] A true and correct copy of the Notice of Default and Election to Sell Pursuant to the Lien for Delinquent Assessments recorded as Book and Instrument Number 201107260000731 is attached hereto as **Exhibit 9.**

**21.** On or about August 17, 2011, Bank of America, N.A., as successor by merger to BAC Home Loans Servicing, LP ("BANA"), the prior beneficiary/servicer, through prior counsel Miles, Bauer, Bergstrom & Winters, LLP (hereinafter "MBBW"), sent correspondence to the HOA Trustee requesting super-priority payoff information.[10]

**22.** On or about August 30, 2011, the HOA Trustee in response sent MBBW an accounting ledger for the Property.[11]

**23.** On or about September 16, 2011, in response to the payoff ledger received from the HOA Trustee, MBBW tendered not less than the super-priority lien amount to the HOA Trustee.[12]

**24.** MBBW's tender, on behalf of BANA satisfied the statutory super-priority lien amount that could be claimed against the Property by the HOA.

**25.** The HOA Trustee refused to accept BANA's super-priority lien amount.

**26.** The HOA had no legal right to reject the tender of the super-priority amount by Plaintiff's predecessor, BANA.

**27.** Despite tender of the super-priority portion of the lien, the HOA Trustee and the HOA proceeded with a non-judicial foreclosure sale.

**28.** On September 10, 2012, a Notice of Foreclosure Sale was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of the initial publication of the Notice of Sale was $4,359.13.[13]

**29.** Upon information and belief, pursuant to the Foreclosure Deed, a non-judicial foreclosure sale occurred on February 4, 2013 (hereinafter, the "HOA Sale"), whereby Buyer

---

[10] A true and correct copy of the MBBW correspondence to the HOA Trustee requesting super-priority information is attached hereto as **Exhibit 10.**

[11] A true and correct copy of the HOA Trustee's accounting ledger to MBBW is attached hereto as **Exhibit 11.**

[12] A true and correct copy of the MBBW correspondence to the HOA Trustee and copy of the tender check in the amount of $450.00 is attached hereto as **Exhibit 12.**

[13] A true and correct copy of the Notice of Foreclosure Sale recorded as Book and Instrument Number 201209100001419 is attached hereto as **Exhibit 13.**

1    acquired its interest, if any, in the Property for $6,002.00.[14]

2        30.    The Foreclosure Deed Upon Sale did not state the amount of unpaid debt at the

3    time of the HOA Sale.

4        31.    A homeowner's association sale conducted pursuant to NRS Chapter 116 must

5    comply with all notice provisions as stated in NRS 116.31162 through NRS 116.31168 and NRS

6    107.090.

7        32.    A lender or holder of a beneficial interest in a senior deed of trust, such as

8    Plaintiff and its predecessors-in-interest in the Deed of Trust, has a right to cure a delinquent

9    homeowner's association lien in order to protect its interest.

10       33.    Reasonable notice of delinquency to all lien holders on the Property are required

11   pursuant to the Declaration of Covenants, Conditions, and Restrictions for Venezia

12   ("CC&Rs").[15]

13       34.    Upon information and belief, the HOA and its agent, the HOA Trustee, did not

14   comply with all mailing and noticing requirements stated in NRS 116.31162 through NRS

15   116.31168, or as required by the CC&Rs.

16       35.    A recorded notice of default must "describe the deficiency in payment."

17       36.    The above-identified Notice of Default did not properly "describe the deficiency

18   in payment" in violation of NRS Chapter 116.

19       37.    The HOA assessment lien and foreclosure notices included improper fees and

20   costs in amount demanded.

21       38.    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents,

22   servicers or trustees, what proportion whether any amount of the HOA lien included a super-

23   priority amount.

24   ///

25   ///

26

27   _____

[14] A true and correct copy of the Foreclosure Deed recorded as Book and Instrument Number 201302140001444 is attached hereto as **Exhibit 14.**

28   [15] A true and correct copy of the CC&R's recorded as Book and Instrument Number 20020806.01138 is attached hereto as **Exhibit 15**.

**39.**    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents, servicers or trustees, whether the HOA was foreclosing on the "super-priority" portion of its lien, if any, or under the non-super-priority portion of the lien.

**40.**    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents, servicers or trustees, of a right to cure the delinquent assessments and the super-priority lien, if any.

**41.**    The HOA Sale violated Plaintiff's rights to due process because Plaintiff was not given proper, adequate notice and the opportunity to cure the deficiency or default in the payment of the HOA's assessments and the super-priority lien, if any.

**42.**    The HOA Sale was an invalid sale and could not have extinguished Plaintiff's secured interest because of defects in the notices given to Plaintiff, or its predecessors, agents, servicers or trustees, if any.

**43.**    Under NRS Chapter 116, a lien under NRS 116.3116(1) can only include costs and fees that are specifically enumerated in the statute.

**44.**    A homeowner's association may only collect as a part of the super priority lien (a) nuisance abatement charges incurred by the association pursuant to NRS 116.310312 and (b) nine months of common assessments which became due prior to the institution of an action to enforce the lien.

**45.**    Upon information and belief, the HOA Foreclosure Notices included improper fees and costs in the amount demanded.

**46.**    The attorney's fees and the costs of collecting on a homeowner's association lien cannot be included in the super-priority lien.

**47.**    Upon information and belief, the HOA assessment lien and foreclosure notices included fines, interest, late fees, dues, attorney's fees, and costs of collection that are not properly included in a super-priority lien under Nevada law and that are not permissible under NRS 116.3102 et seq.

///

///

**48.** The HOA Sale did not comply with NRS 116.3102 et seq. because none of the aforementioned notices identified above identified what portion of the claimed lien were for alleged late fees, interest, fines/violations, or collection fees/costs.

**49.** The HOA Sale deprived Plaintiff of its right to due process because the foreclosure notices failed to identify the super-priority amount, to adequately describe the deficiency in payment, to provide Plaintiff notice of the correct super-priority amount, and to provide a reasonable opportunity to satisfy that amount.

**50.** Alternatively, the sale itself was valid but Buyer took its interest subject to Plaintiff's first position Deed of Trust.

**51.** The HOA Sale is unlawful and void because the "opt-in" provision in NRS 116.3116 does not satisfy Constitutional Due Process safeguards under the 5th and 14th Amendment to the United States Constitution, nor Clause 1, Section 8, of the Nevada Constitution, so that the statute is unconstitutional on its face.

**52.** The HOA Sale is unlawful and void because the statutory scheme set forth in NRS 116.3116, et seq. constitutes a regulatory taking of private property without adequate compensation.

**53.** NRS Chapter 116 is unconstitutional on its face as it lacks any express requirement for the HOA or its agents to provide notice of a foreclosure to the holder of a first deed of trust or mortgage.

**54.** NRS Chapter 116 is unconstitutional on its face as it lacks any express requirement for the HOA or its agents to provide notice of the super-priority amount, if any, to the holder of a first deed of trust or mortgage to accept tender of the super-priority amount or any amount from the holder.

**55.** NRS Chapter 116 is unconstitutional on its face due to vagueness and ambiguity.

**56.** The HOA Sale Plaintiff of its right to due process because the foreclosure notices failed to identify that an attempt to pay the super-priority amount had been made.

**57.** A homeowner's association sale must be done in a commercially reasonable manner.

**58.**     At the time of the HOA Sale, the amount owed on the Moyer Loan exceeded $162,579.00

**59.**     Upon information and belief, at the time of the HOA Sale, the fair market value of the Property exceeded $120,000.00.

**60.**     The amount paid at the HOA Sale allegedly totaled $6,002.00.

**61.**     The HOA Sale was not commercially reasonable, and the HOA Sale was not done in good faith, in light of the sale price, and the market value of the Property, and the errors alleged above.

**62.**     The circumstances of the HOA Sale of the Property breached the HOA's obligations of good faith under NRS 116.1113 and its duty to act in a commercially reasonable manner.

**63.**     The HOA Sale by which Buyer took its interest was commercially unreasonable if it extinguished Plaintiff's Deed of Trust.

**64.**     In the alternative, the HOA Sale was an invalid sale and could not have extinguished Plaintiff's secured interest because it was not a commercially reasonable sale.

**65.**     Without providing Plaintiff, or its predecessors, agents, servicers or trustees, notice of the correct super-priority amount and a reasonable opportunity to satisfy that amount, including its failure to identify the super-priority amount and its failure to adequately describe the deficiency in payment as required by Nevada law, the HOA Sale is commercially unreasonable and deprived Plaintiff of its right to due process.

**66.**     Pursuant to NRS 116.31162(1) an association may only proceed with foreclosure under NRS 116.31162-116.31168 if the declaration or CC&Rs so provide.

**67.**     Upon information and belief, the HOA and HOA Trustee failed to comply with all requirements set forth in the CC&Rs, including any mortgage protection provisions.

///

///

///

///

**68.**     Upon information and belief, because the recorded CC&Rs contained a Mortgagee Protection Clause, and because Plaintiff, or its predecessors, agents, servicers or trustees, were not given proper notice that the HOA intended to foreclose on the super-priority portion of the dues owe, Plaintiff did not know that it had to attend the HOA Sale to protect its security interest.

**69.**     Upon information and belief, because the recorded CC&Rs contained a Mortgagee Protection Clause, and because proper notice that the HOA intended to foreclose on the super-priority portion of the dues owing was not given, prospective bidders did not appear for the HOA Sale, making the HOA Sale commercially unreasonable.

**70.**     Defendants knew that Plaintiff would rely on the Mortgagee Protection Clause contained in the recorded CC&Rs which are of public record, and knew that Plaintiff would not know that HOA was foreclosing on super-priority amounts because of the failure of HOA and HOA Trustee to provide such notice.  Plaintiff's absence from the HOA Sale allowed Buyer to appear at the HOA Sale and purchase the Property for a fraction of market value, making the HOA Sale commercially unreasonable.

**71.**     Defendants knew that prospective bidders would be less likely to attend the HOA Sale because the public at large believed that Plaintiff was protected under the Mortgagee Protection Clause in the CC&Rs of public record, and that the public at large did not receive notice, constructive or actual, that the HOA was foreclosing on a super-priority portion of its lien because HOA and HOA Trustee improperly failed to provide such notice.  The general public's belief therefore was that a buyer at the HOA Sale would take title to the Property subject to Plaintiff's Deed of Trust.  This general belief resulted in the absence of prospective bidders at the HOA Sale, which allowed Buyer to appear at the HOA Sale and purchase the Property for a fraction of market value, making the HOA Sale commercially unreasonable.

**72.**     The circumstances of the HOA Sale of the Property breached the HOA's and the HOA Trustee's obligations of good faith under NRS 116.1113 and their duty to act in a commercially reasonable manner.

///

**73.**     Upon information and belief, Buyer is in the business of buying and selling real estate and/or is otherwise a professional property purchaser, and either knew or should have known of defects with the HOA Sale based on the sales price, among other factors.

**74.**     The circumstances of the HOA Sale of the Property and Buyer's status as a professional property purchaser prevents Buyer from being deemed a bona fide purchaser for value.

**75.**     Upon information and belief, Buyer had actual, constructive or inquiry notice of Plaintiff's first Deed of Trust, and the CC&Rs including the Mortgage Protection Clause which prevents Buyer from being deemed a bona fide purchaser or encumbrancer for value.

**76.**     Upon information and belief, Buyer knew or should have known that it would not be able to obtain insurable title to the Property as a result of the HOA Sale.

**77.**     As a direct and proximate result of the foregoing, Buyer is not entitled to bona fide purchaser protection.

**78.**     In the event Plaintiff's interest in the Property is not reaffirmed nor restored, Plaintiff suffered damages in the amount of the fair market value of the Property or the unpaid balance of the Moyer Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater, as a proximate result of Defendant's acts and omissions.

### FIRST CAUSE OF ACTION
**(Quiet Title/Declaratory Relief Pursuant to 28 U.S.C. § 2201,
NRS 30.010 et seq., and NRS 40.010)**

**79.**     Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**80.**     Pursuant to 28 U.S.C. § 2201, NRS 30.010 et seq., and NRS 40.010, this Court has the power and authority to declare Plaintiff's rights and interests in the Property and to resolve Defendant's adverse claims in the Property.

**81.**     Further, pursuant to NRS 30.010 et seq., this Court has the power and authority to declare the rights and interests of the parties following the acts and omissions of the HOA and HOA Trustee in foreclosing the Property.

///

**82.** Plaintiff's Deed of Trust is the first secured interest on the Property as intended by and whose priority is protected by NRS 116.3116(2)(b).

**83.** Upon information and belief, Buyer claims an interest in the Property through a Foreclosure Deed Upon Sale recorded in the Clark County Recorder's Office as Book and Instrument Number 201302140001444 that is adverse to Plaintiff's interest.

**84.** Plaintiff is the current beneficiary under the Deed of Trust and the Moyer Loan and is entitled to enforce its interest and first position status in the chain of title against Buyer, or any successor in interest, for the reasons alleged herein.

**85.** Because the CC&Rs and the Mortgage Protection Clause did not provide the HOA with authority to foreclose on the Property, the HOA Sale could not have extinguished the Deed of Trust or displaced it from its first position status in the chain of title, such that Buyer took subject to the Deed of Trust. Or in the alternative, the HOA Sale is void, invalid and/or should be set aside.

**86.** Because, upon information and belief, the HOA and the HOA Trustee failed to provide proper, adequate and sufficient notices required by Nevada law and the CC&Rs, the HOA Sale could not have extinguished the Deed of Trust or displaced it from its first position status in the chain of title, such that Buyer took subject to the Deed of Trust. Or in the alternative, the HOA Sale is void, invalid and/or should be set aside.

**87.** Based on the adverse claims being asserted by the parties, Plaintiff is entitled to a judicial determination regarding the rights and interests of the respective parties to the case.

**88.** A justiciable controversy exists between Plaintiff and Defendant and Plaintiff has a legally protectable interest in the controversy. The issue is ripe for judicial determination.

**89.** Upon information and belief, the Moyer Loan is insured by the Federal Housing Administration ("FHA").

**90.** Title or a mortgage interest in real property held by a federal agency is federal property that is protected by the U.S. Constitution.

**91.** The Property Clause of the U.S. Constitution applies and prevents Plaintiff's interest through its Deed of Trust from being divested by the HOA Sale.

92.     The Supremacy Clause of the U.S. Constitution applies and prevents Plaintiff's interest through its Deed of Trust from being divested by the HOA Sale.

93.     Applying NRS Chapter 116 or other state law in a manner that extinguishes Plaintiff's Deed of Trust would violate the Property and Supremacy Clauses of the United States Constitution.

94.     Since the Moyer Loan is a FHA loan, it is a federally protected property interest that cannot be divested by the actions of the Nevada Legislature through NRS Chapter 116.

95.     For all the reasons set forth above and in the Factual Background, Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS 40.010, that Plaintiff is the beneficiary of a first position Deed of Trust which still encumbers the Property.

96.     Based upon the foregoing, Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS 40.010, that the purported HOA Sale did not extinguish the Deed of Trust because it was conducted in violation of NRS 116.3116 *et seq.* and the CC&Rs.

97.     Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS 40.010, that Plaintiff's secured interest by virtue of its Deed of Trust is superior to the interest, if any, acquired by Buyer through the Trustee's Deed Upon Sale and all other parties, if any.

98.     In the alternative, if it is found under state law that Plaintiff's interest could have been extinguished by the HOA Sale, for all the reasons set forth above and in the Factual Background, Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS 40.010, that the HOA Sale was void, invalid and/or should be set aside and conveyed no legitimate interest to Buyer.

99.     Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

///

///

**SECOND CAUSE OF ACTION**
**(Declaratory Relief Under Amendments V and XIV**
**to the United States Constitution – Against All Defendants)**

**100.**     Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**101.**     Pursuant to 28 U.S.C. § 2201, this Court is empowered to declare the rights and legal relations of the parties in this matter, both generally and in relation to the foreclosure sale and the Property.

**102.**     On its face, NRS 116.3116 *et seq.*, prior to its amendment effective October 1, 2015, violated Plaintiff's constitutional rights to due process secured by the Fifth and Fourteenth Amendments to the United States Constitution.  *See Bourne Valley Court Trust v. Wells Fargo Bank*, *N.A.*, 832 F.3d 1154 (9th Cir. 2016).

**103.**     Any purported notice provided was inadequate, insufficient, and in violation of Plaintiff's rights to due process.

**104.**     An actual and justiciable controversy exists between Plaintiff and Defendants regarding the purported HOA Sale and the rights associated with the HOA Sale.

**105.**     Without declaratory relief interpreting the constitutional validity of NRS 116.3116 *et seq.* prior to its amendment effective October 1, 2015, Plaintiff's rights will be adversely affected.

**106.**     Plaintiff is entitled to a declaration that the purported HOA Sale conducted under NRS 116.3116 *et seq*. did not extinguish the Deed of Trust, which continued as a valid encumbrance against the Property.

**107.**     Based upon the foregoing, Plaintiff requests an order declaring that the purported HOA Sale did not extinguish the Deed of Trust because it was conducted under NRS 116.3116 *et seq.* prior to its amendment effective October 1, 2015, which on its face violated Plaintiff's rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

**108.**     Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

**THIRD CAUSE OF ACTION**
**(Quiet Title Under the Amendments V and XIV**
**to the United States Constitution – Against Buyer)**

**109.**   Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**110.**   Pursuant to 28 U.S.C. § 2201 and NRS 40.010, this Court is empowered to declare the rights and legal relations of the parties in this matter, both generally and in relation to the foreclosure sale and the Property.

**111.**   The Deed of Trust is a first secured interest in the Property.  Plaintiff owns the Deed of Trust and is beneficiary of record of the Deed of Trust.

**112.**   Buyer claims an interest in the Property through the Trustee's Deed Upon Sale which is adverse to Plaintiff's interest.

**113.**   On its face, NRS 116.3116 *et seq.*, prior to its amendment effective October 1, 2015, violated Plaintiff's constitutional rights to due process secured by the Fifth and Fourteenth Amendments to the United States Constitution and thus did not extinguish the Deed of Trust. *See Bourne Valley Court Trust v. Wells Fargo Bank*, *N.A.*, 832 F.3d 1154 (9th Cir. 2016).

**114.**   Any purported notice provided was inadequate, insufficient, and in violation of Plaintiff's rights to due process under the Fifth and Fourteenth Amendment to the United States Constitution.

**115.**   Based on the adverse claims being asserted by the parties, Plaintiff is entitled to a judicial determination that the Deed of Trust continues to encumber the Property after the HOA Sale and subsequent transfer via the Trustee's Deed Upon Sale.

**116.**   Plaintiff is entitled to a determination that the HOA Sale (and any subsequent transfers) did not convey the Property free and clear of the Deed of Trust to the Buyer at the HOA Sale, and thus that any interest acquired by Buyer is subject to the Deed of Trust.

**117.**   Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

///

## FOURTH CAUSE OF ACTION
### (Permanent and Preliminary Injunction versus Buyer)

**118.**     Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

**119.**     As set forth above, Buyer may claim an ownership interest in the Property that is adverse to Plaintiff.

**120.**     Any sale or transfer of the Property, prior to a judicial determination concerning the respective rights and interests of the parties to the case, may be rendered invalid if Plaintiff's Deed of Trust still encumbered the Property in first position and was not extinguished by the HOA Sale.

**121.**     Plaintiff has a reasonable probability of success on the merits of the Complaint, for which compensatory damages will not compensate Plaintiff for the irreparable harm of the loss of title to a bona fide purchaser or loss of the first position priority status secured by the Property.

**122.**     Plaintiff has no adequate remedy at law due to the uniqueness of the Property involved in the case.

**123.**     Plaintiff is entitled to a preliminary injunction and permanent injunction prohibiting Buyer, its successors, assigns, and agents from conducting any sale, transfer or encumbrance of the Property if it is claimed to be superior to Plaintiff's Deed of Trust or not subject to that Deed of Trust.

**124.**     Plaintiff is entitled to a preliminary injunction requiring Buyer to pay all taxes, insurance and homeowner's association dues during the pendency of this action.

**125.**     Plaintiff is entitled to a preliminary injunction requiring Buyer to segregate and deposit all rents with the Court or a Court-approved trust account over which Buyer has no control during the pendency of this action.

**126.**     Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

///

<div align="center">

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment versus Defendants)**

</div>

127.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

128.    Plaintiff has been deprived of the benefit of its secured deed of trust by the actions of Buyer.

129.    Defendants have benefitted from the unlawful HOA Sale and nature of the real property.

130.    Defendants have benefitted from Plaintiff and its predecessor's payment of taxes, insurance or homeowner's association assessments since the time of the HOA Sale.

131.    Should Plaintiff's Complaint be successful in quieting title against Buyer or setting aside the HOA Sale, Defendants will have been unjustly enriched by the HOA Sale and usage of the Property.

132.    Plaintiff will have suffered damages if Defendants are allowed to retain their interest in the Property.

133.    Plaintiff will have suffered damages if Defendants are allowed to retain their interest in the Property and the benefit of Plaintiff and its predecessor's payment of taxes, insurance or homeowner's association assessments since the time of the HOA Sale.

134.    Plaintiff is entitled to general and special damages.

135.    Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

<div align="center">

**SIXTH CAUSE OF ACTION**

**(Wrongful/Statutorily Defective Foreclosure versus the HOA and the HOA Trustee)**

</div>

136.    Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

137.    Plaintiff, by and through its predecessors-in-interest and agent, paid the super-priority lien amount, which was rejected by the HOA and HOA Trustee, prior to the HOA Sale.
///

<div align="center">

Page 17 of 24

</div>

**138.** The HOA and HOA Trustee improperly proceeded with the HOA Sale or at the least to any extent the super-priority portion of the HOA's lien was claimed to be part of the HOA Sale.

**139.** Upon information and belief, the HOA and HOA Trustee did not comply with all mailing and noticing requirements stated in NRS 116.31162 through NRS 116.31168.

**140.** The HOA and HOA Trustee failed to provide notice pursuant to Nevada law and assure due process.

**141.** Because the HOA Sale was wrongfully conducted and violated applicable law, the Court should set aside the HOA Sale to the extent that it purports to have extinguished the first Deed of Trust and delivered title to the Property to Saticoy Bay free and clear of that Deed of Trust.

**142.** Because the HOA and HOA Trustee did not give Plaintiff, or its agents, servicers or predecessors-in-interest, the proper, adequate notice of the sale and the opportunity to cure the deficiency or default in the payment of the HOA's assessments required by Nevada statutes, the CC&Rs, and Due Process, the HOA Sale should be set aside.

**143.** The HOA assessment lien and foreclosure notices included improper fees and costs in the amount demanded, and thus, the HOA Sale was wrongfully conducted and should be set aside.

**144.** As a direct and proximate result of the HOA and HOA Trustee's wrongful/statutorily defective foreclosure of the Property by the HOA Sale, as more particularly set forth above and in the General Allegations, Plaintiff suffered general and special damages in an amount not presently known.  Plaintiff will seek leave of court to assert said amounts when they are determined.

///
///
///
///
///

**145.**    If it is determined that the Deed of Trust has been extinguished by the HOA Sale as a proximate result of HOA and HOA Trustee's wrongful/statutorily defective foreclosure of the Property by the HOA Sale, Plaintiff has suffered special damages in the amount equal to the fair market value of the Property or the unpaid balance of the Lake Loan, plus interest, at the time of the HOA Sale, whichever is greater, in an amount not presently known or liquidated, and according to proof at trial.

**146.**    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## SEVENTH CAUSE OF ACTION

### (Negligence versus the HOA and HOA Trustee)

**147.**    Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

**148.**    The HOA and HOA Trustee owed a duty to Plaintiff and subordinate lienholders to allow Plaintiff or its predecessors-in-interest and their respective agents, servicers or trustees, if any, an opportunity to protect their interest and cure the super-priority lien threatening their security interests.

**149.**    The HOA and HOA Trustee breached their duty by rejecting the tendered super-priority lien amount and proceeding with the HOA Sale on the super-priority lien.

**150.**    The HOA and HOA Trustee breached their duty by failing to disclose the attempted payment of the super-priority portion of the lien, by failing to disclose the amount of the super-priority lien in any foreclosure notices, by failing to inform MBBW what they believed the super-priority amount to be when they rejected the MBBW super-priority tender, by failing to specify that it was foreclosing on the super-priority portion of its lien as opposed to the non-super-priority portion, and by failing to provide notice that Plaintiff and subordinate lienholders had an opportunity to cure.

**151.**    As an actual and proximate result of the HOA and HOA Trustee's breaches of their duties, the Deed of Trust has been threatened.

///

**152.**     As an actual and proximate result of the breaches of duties owed by the HOA and HOA Trustee, Plaintiff has incurred general and special damages.

**153.**     If Plaintiff is found to have lost its first security interest in the Property, it was the direct and proximate result of the HOA and HOA Trustee's breaches of their duties, and Plaintiff has thereby suffered general and special damages.

**154.**     Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## <u>EIGHTH CAUSE OF ACTION</u>

### (Negligence Per Se versus the HOA and HOA Trustee)

**155.**     Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

**156.**     NRS Chapter 116 imposes a duty on homeowners associations to conduct HOA foreclosure sales in a manner that is consistent with its provisions and, by reference, the provisions of NRS 107.090.

**157.**     The HOA and HOA Trustee breached the statutory duties imposed by NRS Chapter 116 by proceeding with the HOA foreclosure sale; and by accepting the tendered super-priority lien amount and proceeding with the HOA Sale without notice that the successful bidder would take title subject to the Deed of Trust.

**158.**     The HOA and HOA Trustee violated NRS 116.31162(1)(b)(1) by failing to disclose the correct amount in deficiency.

**159.**     Plaintiff is a member of the class of person whom NRS Chapter 116 is intended to protect.

**160.**     The injury that Plaintiff faces – extinguishment of the Deed of Trust – is the type against which NRS Chapter 116 is intended to protect.

**161.**     As an actual and proximate result of the HOA and HOA Trustee's breaches of their statutory duties, the Deed of Trust is threatened.

///

///

162.     As an actual and proximate result of the HOA and HOA Trustee's breaches of their duties, Plaintiff has incurred general and special damages to bring this action, in an amount not yet liquidated.

163.     If it is determined that the Deed of Trust was extinguished, Plaintiff's loss was actually and proximately caused by the actions and inactions of the HOA and the HOA Trustee, and the breaches of their statutory duties, and Plaintiff has thereby suffered general and special damages, not yet liquidated

164.     Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## NINTH CAUSE OF ACTION

### (Misrepresentation versus the HOA and HOA Trustee)

165.     Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

166.     Plaintiff is within the class or persons or entities that the HOA intended or had reason to expect to act or to refrain from action in reliance upon the acts of its agent, the HOA Trustee.

167.     Plaintiff justifiably relied upon the HOA Trustee's acceptance of the payment of the super-priority portion of the lien prior to the HOA Sale and the HOA and the HOA Trustee intended or had reason to expect their conduct would be influenced.

168.     The HOA and HOA Trustee's misrepresentations in accepting the payment of the super-priority portion of the lien and subsequently purporting to foreclose on the super-priority portion of the lien were false or they had an insufficient basis for making the representations.

169.     The HOA had a pecuniary interest in having Plaintiff and its predecessors in interest rely on the acts of its agent, the HOA Trustee.

170.     The HOA failed to exercise reasonable care or competence in purporting to foreclose on the super-priority lien despite the acceptance by the HOA Trustee of the payment of the super-priority portion of the lien prior to the HOA Sale and its representations regarding the foreclosure were false or it had an insufficient basis for making them.

**171.** Plaintiff suffered general and specific damages, not yet liquidated, as a proximate cause of its reliance.

**172.** Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees.

## **PRAYER**

Wherefore, Plaintiff prays for judgment against the Defendant as follows:

1.    For a declaration and determination that Plaintiff's interest is secured against the Property, and that Plaintiff's first Deed of Trust was not extinguished by the HOA Sale;

2.    For a declaration and determination that Buyer's interest, and any and all successors' interest, in the Property, if any, is subject to the Deed of Trust;

3.    For a declaration and determination that the HOA Sale was invalid to the extent it purports to convey the Property free and clear to Buyer;

4.    In the alternative, for a declaration and determination that the HOA Sale was void, invalid and/or should be set aside and conveyed no legitimate interest to Buyer;

5.    In the alternative, for a declaration and determination that the HOA Foreclosure Sale did not extinguish the Deed of Trust because it was conducted under a statute that facially violated Plaintiff's rights to due process;

6.    For a preliminary injunction that Buyer, its successors, assigns, and agents are prohibited from conducting a sale or transfer of the Property and representing the sale is free and clear of the Deed of Trust, unless Buyer tenders payment of the debt secured by the Deed of Trust, or from encumbering the Property during the pendency of this action;

7.    For a preliminary injunction that Buyer, its successors, assigns, and agents pay all taxes, insurance and homeowner's association dues during the pendency of this action;

///

| | | |
|---|---|---|
| 1 | 8. | For a preliminary injunction that Buyer, its successors, assigns, and agents be |
| 2 | | required to segregate and deposit all rents with the Court or a Court-approved |
| 3 | | trust account over which Buyer have no control during the pendency of this |
| 4 | | action; |
| 5 | 9. | If it is determined that Plaintiff's Deed of Trust has been extinguished by the |
| 6 | | HOA Sale, for special damages in the amount of the fair market value of the |
| 7 | | Property or the unpaid balance of the Moyer Loan and Deed of Trust, at the time |
| 8 | | of the HOA Sale, whichever is greater; |
| 9 | 10. | For general and special damages; |
| 10 | 11. | In the alternative, for restitution; |
| 11 | 12. | For attorney's fees; |
| 12 | 13. | For costs incurred herein, including post-judgment costs; and |
| 13 | 14. | For any and all further relief deemed appropriate by this Court. |

14   DATED this   day of November, 2017.

15                                     WRIGHT, FINLAY & ZAK, LLP

16

17                                     */s/ Rock K. Jung, Esq.*
                                       Edgar C. Smith, Esq.
18                                     Nevada Bar No. 05506
                                       Rock K. Jung, Esq.
19                                     Nevada Bar No. 10906
                                       7785 W. Sahara Ave., Suite 200
20                                     Las Vegas, NV 89117
                                       Tel: (702) 475-7964
21                                     Fax: (702) 946-1345
                                       *Attorney for Plaintiff,*
22                                     *PROF-2013-S3 Legal Title Trust, by*
                                       *U.S. Bank National Association, as*
23                                     *Legal Title Trustee*

24

25

26

27

28

| INDEX OF EXHIBITS | |
|---|---|
| **EXHIBIT NUMBER** | **DESCRIPTION** |
| #1 | Grant, Bargain and Sale Deed |
| #2 | Deed of Trust |
| #3 | Corporation Assignment of Deed of Trust Nevada |
| #4 | Assignment of Deed of Trust |
| #5 | Assignment of Deed of Trust |
| #6 | Assignment of Deed of Trust |
| #7 | Assignment of Deed of Trust |
| #8 | Lien for Delinquent Assessments |
| #9 | Notice of Default and Election To Sell Pursuant to the Lien for Delinquent Assessments |
| #10 | Miles, Bauer, Bergstrom & Winters LLP letter, dated 08/17/2011, to Red Rock Financial Services requesting payoff. |
| #11 | Red Rock Financial Services letter, dated 08/30/2011, to Miles, Bauer, Bergstrom & Winters LLP and transmittal of accounting ledger for Property |
| #12 | Miles, Bauer, Bergstrom & Winters LLP letter, dated 09/16/2011, to Red Rock Financial Services transmittal of tender check. |
| #13 | Notice of Foreclosure Sale |
| #14 | Foreclosure Deed |
| #15 | Declaration of Covenants, Conditions and Restrictions for Venezia |

# Exhibit 1: Grant, Bargain, Sale Deed

# Exhibit 1: Grant, Bargain, Sale Deed

20080731-0001575
Fee: $17.00 RPTT: $841.50
N/C Fee: $25.00
07/31/2008 11:36:43
T20080161953
Requestor:
TICOR TITLE LAS VEGAS
Debbie Conway OSA
Clark County Recorder Pgs: 5

536555 322061920

A.P.N. 176-05-813-041

When recorded mail to: Michael Moyer,
Mail tax statements 8970 Flying Frog Avenue, Las Vegas, NV 89148

Affix R. P. T. T., $ 841.50

# GRANT, BARGAIN, SALE DEED

THIS INDENTURE WITNESSETH: That Deutsche Bank National Trust Company as Trustee under the Pooling and Servicing Agreement Dated as of August 1, 2004 Finance America Mortgage Loan Trust 2004-2 Asset-Backed Certificates, Series 2004-2 (who erroneously acquired title as Deutsche Bank National Trust Company as Trustee by Barclays Capital Real Estate Inc.) in Consideration of $______________ and other valuable consideration, the receipt of which is hereby acknowledged, does hereby Grant, Bargain, Sell and Convey to

Michael Moyer, a single man

all that real property situated in the ________________________ County of Clark State of Nevada, bounded and described as follows:

See EXHIBIT "A"

Grantor covenants that it is seized and possessed of the said land and has a right to convey it, and warrants the title against the lawful claims of all persons claiming by, through, and under it, but not further otherwise.

The following reservations from and exceptions to this conveyance and the warranty of title herein shall apply.

(1) All Easements, rights of way and prescriptive rights whether of record or not, pertaining to any portions(s) of the herein described property (hereinafter, the "Property");

(2) All valid oil, gas and mineral rights, interests or leases, royalty reservations, mineral interest and transfers of interest of any character, in the oil, gas or minerals of record in any county in which any portion of the Property is located;

(3) All restrictive covenants, terms, conditions, contracts, provisions, zoning ordinances and other items of record in any county in which any portion of the Property is located, pertaining to any portion(s) of the Property, but only to the extent that same are still in effect:

(4) All presently recorded instruments (other than liens and conveyances by, through or under the Grantor) that affect the Property and any portion(s) thereof;

(5) Ad Valorem taxes, fees and assessments, if any, for the current year and all prior and

subsequent years, the payment of which Grantee assumes (at the time of transfer of title), and all subsequent assessments for this and all prior years due to change(s) in land usage (including, but not limited to, the presence or absence of improvements, if any, on the Property), ownership, or both, the payment of which Grantee assumes; and

(6)     Any conditions that would be revealed by a physical inspection and survey of the Property.

Together with all and singular tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining.

Witness _____ hand _____ this 18 day of July _____, 2008.

Deutsche Bank National Trust Company as Trustee under the Pooling and Servicing Agreement Dated as of August 1, 2004 Finance America Mortgage Loan Trust 2004-2 Asset-Backed Certificates, Series 2004-2 (who erroneously acquired title as Deutsche Bank National Trust Company as Trustee by Barclays Capital Real Estate Inc.)
By Barclays Capital Real Estate Inc., a Delaware Corporation, d/b/a HomEq Servicing, attorney in fact

By: _____

Printed Name    **Noriko Colston**

Its _____ **Assistant Secretary** _____

CORPORATE ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

On this _____ day of _____, _____, before me, _____, the undersigned Notary Public, personally appeared _____ known to me to be the person who executed the within instrument as _____ on behalf of the national banking association therein named, and acknowledged to me that the corporation executed the same.
WITNESS my hand and official seal.

_____
(Notary Public)

State of California        }
County of Sacramento  }  ss.

On _____7-18-08_____, before me, M. Schuessler, Notary Public, personally appeared Noriko Colston, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

_____
Notary signature          **M. Schuessler**

M. SCHUESSLER
COMM. #1788328
NOTARY PUBLIC-CALIFORNIA
SACRAMENTO CO.
EXP. DEC 30, 2011

**EXHIBIT A**
**LEGAL DESCRIPTION**

**PARCEL I:**

**Lot Seventy-Four (74) of VENEZIA PHASE I, as shown by map thereof on file in Book 105 of Plats, Page 97, in the Office of the County Recorder of Clark County, Nevada.**

**PARCEL II:**

**A easement for ingress and egress over the Private Streets and Common Areas as shown and delineated on said map.**

**STATE OF NEVADA**
**DECLARATION OF VALUE FORM**
1.  Assessor Parcel Number(s)
    a)  176-05-813-041
    b)  _____
    c)  _____
    d)  _____
2.  Type of Property:
    a) ☐ Vacant Land     b) ☑ Single Fam. Res
    c) ☐ Condo/Twnhse    d) ☐ 2-4 Plex
    e) ☐ Apt. Bldg       f) ☐ Comm'l/Ind'l
    g) ☐ Agricultural    h) ☐ Mobile Home
       ☐ Other_____

| FOR RECORDER'S OPTIONAL USE ONLY |
| --- |
| Book:_____Page:_____ |
| Date of Recording:_____ |
| Notes:_____ |

3.  Total Value/Sales Price of Property          $165,000.00
    Deed in Lieu of Foreclosure Only (value of property)   (_____)
                                                  Transfer Tax Value:
                                                  $ 165,000.00
    Real Property Tax Due:                        $ 841.50

4.  **If Exemption Claimed:**
    a.  Transfer Tax Exemption per NRS 375.090, Section _____
    b.  Explain Reason for Exemption: _____
        _____

5.  Partial Interest: Percentage being transferred:  100  %
        The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month.  Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.
    Signature  Kye Holder          Capacity  Seller
    Signature  Michael Moyer       Capacity  Buyer

| **SELLER (GRANTOR) INFORMATION** **(REQUIRED)** | **BUYER (GRANTEE) INFORMATION** **(REQUIRED)** |
| --- | --- |
| Print Name: Deutsche Bank National Trust Company | Print Name: Michael D. Moyer |
| Address: 701 Corporate Center Drive | Address: 8970 Flying Frog |
| City: Raleigh NC 27607 | City: Las Vegas |
| State: _____ Zip: _____ | State: NV   Zip: 89148 |

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buy)**
Print Name Ticor Title of Nevada, Inc.        Escrow #  07023572SK
Address  8379 W. Sunset Road, Suite 120
City: Las Vegas        State: NV        Zip: 89113

# Exhibit 2: Deed of Trust

# Exhibit 2: Deed of Trust

Parcel Number: **176-05-813-041**

RECORDING REQUESTED BY
Name: **Taylor, Bean & Whitaker Mortgage Corp.**

RETURN TO
Name:      **Taylor, Bean & Whitaker Mortgage Corp.**
Address:   **1417 North Magnolia Ave.**
               **Ocala, FL 34475**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
**20090401-0000659**
Fee: $23.00      RPTT: $0.00
N/C Fee: $0.00
04/01/2009        09:08:31
T20090111194
Requestor:
  NOBLE TITLE
Debbie Conway          AEA
Clark County Recorder    Pgs: 10

I hereby affirm that this document submitted for recording does not contain personal information.

Name/Title

──────── [Space Above This Line For Recording Data] ────────

## DEED OF TRUST

FHA CASE NO.

**MIN:**

THIS DEED OF TRUST ("Security Instrument") is made on  **March 23, 2009**  . The grantor is
**Michael Moyer, As a Single Man**

("Borrower"). The trustee is

**NOBLE TITLE**

("Trustee"). **The beneficiary is**
**Mortgage Electronic Registration Systems, Inc. ("MERS").** MERS is a separate corporation that is acting
solely as nominee for Lender and Lender's successors and assigns). MERS is organized and existing under the
laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel.
(888) 679-MERS. **Taylor, Bean & Whitaker Mortgage Corp.**

("Lender") is organized and existing
under the laws of **FL**                                                                , and
has an address of **1417 North Magnolia Ave, Ocala, FL  34475**

. Borrower owes Lender the principal sum of
**One Hundred Sixty Four Thousand Six Hundred Seven and no/100**
Dollars (U.S. $**164,607.00**       ). This debt is evidenced by Borrower's note dated the same date as this
Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due
and payable on        **April 01, 2039**        . The beneficiary of this Security Instrument is MERS (solely as
nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This
Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest,
advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of
Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower

**NEVADA FHA DEED OF TRUST**                                                    **6/96**
**MERS**
ITEM 2695L1                                                              **Great**Docs™
(0709)                                                                    *(Page 1 of 9)*



irrevocably grants and conveys to Trustee, in Trust, with power of sale, the following described property located in **Clark**                                    County, Nevada:

**See Attached Exhibit A.**

(If the legal description is a metes and bounds description, the name and mailing address of the person who prepared the legal description or if a document including the same legal description has been previously recorded, the information necessary to identify and locate the previous recording is:

**Taylor, Bean & Whitaker Mortgage Corp.**
**1417 North Magnolia Ave**
**Ocala, FL 34475**                                                                                                      )

which currently has the address of                        **8970 Flying Frog Ave.**
                                                                              [Street]

            **Las Vegas**                    , Nevada        **89148**          ("Property Address"):
              [City]                                          [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1.  Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

    **2.  Monthly Payment of Taxes, Insurance, and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L2                                                                      **Great**Docs™
(0709)                                                                            *(Page 2 of 9)*

for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

FIRST, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

SECOND, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

THIRD, to interest due under the Note;

FOURTH, to amortization of the principal of the Note; and

FIFTH, to late charges due under the Note.

**4. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L3                                                              **Great**Docs™
(0709)                                                                    *(Page 3 of 9)*

Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L4                                             **Great**Docs™
(0709)                                              *(Page 4 of 9)*

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

   **8.  Fees.** Lender may collect fees and charges authorized by the Secretary.

   **9.  Grounds for Acceleration of Debt.**

   **(a)  Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

      (i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

      (ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

   **(b)  Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

      (i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

      (ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property, but his or her credit has not been approved in accordance with the requirements of the Secretary.

   **(c)  No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

   **(d)  Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

   **(e)  Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within **eight months**
from the date hereof, Lender may, at its option require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to **eight months**          from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

   **10.  Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L5                                                           **Great**Docs™
(0709)                                                                 *(Page 5 of 9)*

Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L6                                                                                    **Great**Docs™
(0709)                                                                                          *(Page 6 of 9)*

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**18. Foreclosure Procedure.** If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by applicable law to Borrower and to the persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L7                                                    **Great**Docs™
(0709)                                                         *(Page 7 of 9)*

foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this paragraph 18 or applicable law.

**19. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under applicable law.

**20. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

**21. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $

**22. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

| ☐ Condominium Rider | ☐ Graduated Payment Rider |
|---|---|
| ☐ Growing Equity Rider | ☐ Planned Unit Development Rider |
| ☐ Adjustable Rate Rider | ☐ Rehabilitation Loan Rider |
| ☐ Non-Owner Occupancy Rider | ☐ Other [Specify] |

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L8
(0709)

**Great**Docs™
*(Page 8 of 9)*

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in pages 1 through 9 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ 3/24/09 (Seal)        _____ (Seal)
**Michael Moyer**      -Borrower                      -Borrower

_____ (Seal)        _____ (Seal)
             -Borrower                      -Borrower

_____ (Seal)        _____ (Seal)
             -Borrower                      -Borrower

State of _____NEVADA_____
County of _____CLARK_____

This instrument was acknowledged before me on ___3-24-2009___ (date) by _____

_____Michael Moyer_____

_____ (name[s] of person[s]).

_____ Notary Public
PATRICIA J. Goble
EXPIRES 4-29-2009

MAIL TAX STATEMENTS TO

Name:     **Taylor, Bean & Whitaker Mortgage Corp.**
            **1417 N Magnolia Ave**
Address:  **Ocala, FL 34475**

PATRICIA J. GOBLE
Notary Public State of Nevada
No. 05-96453-1
My appt. exp. Apr. 29, 2009

**NEVADA FHA DEED OF TRUST**
**MERS**
ITEM 2695L9
(0709)

GreatDocs™
*(Page 9 of 9)*

## Exhibit A

Parcel I:

Lot Seventy-Four (74) of Venezia Phase I, as shown by map thereof on file in Book 105 of Plats, Page 97, in the Office of the County Recorder of Clark County, Nevada.

Parcel II:

A easement for ingress and egress over the Private Streets and Common Areas as shown and delineated on said map.

# Exhibit 3: Corporation Assignment of Deed of Trust Nevada

# Exhibit 3: Corporation Assignment of Deed of Trust Nevada

Inst #: 201009080004810
Fees: $14.00
N/C Fee: $0.00
09/08/2010 03:09:50 PM
Receipt #: 494748
Requestor:
CLARK RECORDING SERVICE
Recorded By: ADF  Pgs: 1

**DEBBIE CONWAY**

**CLARK COUNTY RECORDER**

RECORDING REQUESTED BY:
RECONTRUST COMPANY, N.A.
AND WHEN RECORDED MAIL DOCUMENT TO:
BAC Home Loans Servicing, LP
400 COUNTRYWIDE WAY  SV-35
SIMI VALLEY, CA  93065

TS No. 10-0110579

*242*

TITLE ORDER#:  4532034
176-05-813-041

## CORPORATION ASSIGNMENT OF DEED OF TRUST NEVADA

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:
**BAC HOME LOANS SERVICING, LP, FKA COUNTRYWIDE HOME LOANS SERVICING, LP**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 03/23/2009,
EXECUTED BY:  MICHAEL MOYER, AS A SINGLE MAN,TRUSTOR: TO NOBLE TITLE,
TRUSTEE AND RECORDED AS INSTRUMENT NO. 0000659 ON 04/01/2009, IN BOOK 20090401,
OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF CLARK  COUNTY, IN THE
STATE OF NEVADA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST.

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE
MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS
ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED:   September 02, 2010               MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
                                          INC.

State of:  **Texas**                    )
County  of: **Tarrant**                 )
                                        )BY: *Khadija Gulley*
                                        Khadija Gulley
                                                        , Assistant Secretary

                                                        *Khadija Gulley*

**SEP 0 3 2010**
On _____ before me    **Elsie E. Kroussakis**      , personally appeared _____
**Asst. Sec.** know to me (or proved to me on the oath of _____ or through
_____ ) to be the person whose name is subscribed to the foregoing instrument and
acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
Witness my hand and official seal.

*Elsie K Kroussakis*

Notary Public's Signature

[Notary Seal:]
**ELSIE E KROUSSAKIS**
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-14-11

# Exhibit 4:   Assignment of Deed of  Trust

# Exhibit 4:   Assignment of Deed of  Trust

Inst #: **20140529-0000122**
Fees: **$18.00**
N/C Fee: **$0.00**
05/29/2014 08:01:50 AM
Receipt #: **2038715**
Requestor:
**DEFAULT SERVICES · AVENUE 3**
Recorded By: MAT   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

Recording Requested By:
**Bank of America, N.A.**
Prepared By: **Ralph Flores**
**800-444-4302**

When recorded mail to:
**Avenue 365 Lender Services, LLC**
**Ref: NB Assignments**
**401 Plymouth Road, Suite 500**
**Plymouth Meeting, PA 19462**

DocID#
Tax ID:        **176-05-813-041**
Property Address:
**8970 Flying Frog Ave**
**Las Vegas, NV 89148-3851**

This space for Recorder's use

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is **1800 TAPO CANYON ROAD, SIMI VALLEY, CA 93063** does hereby grant, sell, assign, transfer and convey unto **SECRETARY OF HOUSING AND URBAN DEVELOPMENT** whose address is **451 7TH STREET, S.W., WASHINGTON, D.C. 20410** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Beneficiary:          **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR TAYLOR, BEAN & WHITAKER MORTGAGE CORP., ITS SUCCESSORS AND ASSIGNS**

Made By:          **MICHAEL MOYER, AS A SINGLE MAN**

Trustee:          **NOBLE TITLE**

Date of Deed of Trust: **3/23/2009**        Original Loan Amount: **$164,607.00**

Recorded in **Clark County, NV** on: **4/1/2009**, book **N/A**, page **N/A** and instrument number **20090401-0000659**

I the undersigned hereby affirm that this document submitted for recording does not contain the social security number of any person or persons.

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
~~APR 0 3 2014~~

**BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP, FKA COUNTRYWIDE HOME LOANS SERVICING LP**

By: _____

**Shannon Mayfield**        ,
**Assistant Vice President**

State of **California**
County of **Los Angeles**

On  **APR 0 3 2014**  before me,    **Shannon Steeg**   , Notary Public, personally appeared
        **Shannon Mayfield**    , who proved to me on the basis of satisfactory evidence to be the person
(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

SHANNON STEEG
Commission # 2021493
Notary Public - California
Los Angeles County
My Comm. Expires May 17, 2017

Notary Public:    **Shannon Steeg**        **(Seal)**
My Commission Expires: **May 17, 2017**

DocID#

# Exhibit 5:   Assignment of Deed of  Trust

# Exhibit 5:   Assignment of Deed of  Trust

Inst #: 20140701-0002454
Fees: $17.00
N/C Fee: $25.00
07/01/2014 03:05:55 PM
Receipt #: 2075542
Requestor:
DEFAULT SERVICES - AVENUE 3
Recorded By: SUO   Pgs: 1
**DEBBIE CONWAY**
CLARK COUNTY RECORDER

PREPARED BY:                              WHEN RECORDED RETURN TO:
Secretary of Housing and Urban           Avenue 365 Lender Services
Development                              401 Plymouth RD, Ste. 550
451 7th Street, S.W.                      Plymouth Meeting, PA 19462
Washington,D.C. 20410
    Tax ID: 176-05-813-041

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned, **Secretary of Housing and Urban Development**, located at 451 7th **Street, S.W., Washington, D.C.  20410** ("ASSIGNOR/GRANTOR"), hereby grants, conveys, assigns to: **U.S. Bank National Association, as trustee for SROF-2013-S3 REMIC Trust I**, located at 60 Livingston Avenue, **EP-MN-WS3D, St. Paul, MN 55107** ("ASSIGNEE/GRANTEE") all beneficial interest under that certain **DEED OF TRUST** dated **3/23/2009**, and executed by **MICHAEL MOYER, AS A SINGLE MAN**, borrower(s) to: **Mortgage Electronic Registration Systems, Inc., solely as nominee for TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**, as original lender, and certain instrument recorded **4/1/2009**, in **DOC# 20090401-0000659**, in the Official Records of **CLARK** County, the State of **Nevada**, given to secure a certain Promissory Note in the amount of **$164,607.00** covering property located at: **8970 FLYING FROG AVE., LAS VEGAS, Nevada  89148.** TOGETHER with the note or notes therein described and secured thereby, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Mortgage including the right to have reconveyed, in whole or in part, the real property described therein.

Dated:   *6-20-14*                        ASSIGNOR: Secretary of Housing and Urban Development
                                          by PRMF Acquisition LLC, its attorney-in-fact, by Avenue
                                          365 Lender Services, LLC, its designee*

                                          By: _____

                                          Name:  Alan B. Kirsch

                                          Title:   Authorized Signatory

                                          *Power of Attorney recorded in Maricopa County, Arizona as
                                          Inst. #20140276293

State of Pennsylvania
County of Montgomery

Before me, **Carol A. Dierolf**, duly commissioned Notary Public, on this day personally appeared **Alan B. Kirsch**, **Authorized Signatory** of **Avenue 365 Lender Services, LLC**, designee for **PRMF Acquisition LLC**, attorney-in-fact for Secretary of Housing and Urban Development, known to me (or proved to me on the oath of _____ or through _____ ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this *20th* day of *June* , 20*14*

                                          _____
                                          Notary Public's Signature

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Carol A. Dierolf, Notary Public
New Hanover Twp., Montgomery County
My Commission Expires July 25, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

                                          Printed Name: Carol A. Dierolf

                                          My Commission Expires: 7/25/2017

# Exhibit 6:   Assignment of Deed of  Trust

# Exhibit 6:   Assignment of Deed of  Trust

**Inst #: 20150720-0000603**
**Fees: $18.00**
**N/C Fee: $0.00**
**07/20/2015 08:01:48 AM**
**Receipt #: 2499922**
**Requestor:**
**ORION FINANCIAL GROUP**
**Recorded By: ANI   Pgs: 2**
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

·I the undersigned hereby affirm that this document submitted
for recording does not contain the social security number
of any person or persons.  (Per NRS 239B.030)

PREPARED BY & RETURN TO:
M. E. Wileman
2860 Exchange Blvd. # 100
Southlake, TX 76092
Parcel # 176-05-813-041

**Assignment of Deed of Trust**     Send Any Notices to Assignee.

For Valuable Consideration, the undersigned, **U.S. BANK NATIONAL ASSOCIATION, AS
TRUSTEE FOR SROF-2013-S3 REMIC TRUST I  60 Livingston Avenue, EP-MN-WS3D, St. Paul,
MN 55107 (Assignor)** by these presents does assign and set over, without recourse, to **USROF III
LEGAL TITLE TRUST 2015-1, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE
TRUSTEE  60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107 (Assignee)** the described deed
of trust with all interest, all liens, any rights due or to become due thereon, executed by **MICHAEL
MOYER, AS A SINGLE MAN** to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
("MERS") AS NOMINEE FOR TAYLOR, BEAN & WHITAKER MORTGAGE CORP. IT'S
SUCCESSORS AND ASSIGNS.  Trustee: NOBLE TITLE    Said deed of trust **Dated: 3/23/2009** is
recorded in the **State of NV, County of Clark on 4/1/2009, Instrument# 20090401-0000659 AMOUNT:
$ 164,607.00**     Property Address: 8970 FLYING FROG AVE., LAS VEGAS, NV 89148

IN WITNESS WHEREOF, the undersigned corporation/trust has caused this instrument to be executed by
its proper officer.  Executed on:  07/20/2015

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR SROF-2013-S3 REMIC TRUST I

By: _____

Michael E. Wileman, Authorized Signator

NB114899
NV   Clark                         NBLLC/ USROF II, II/

State of Texas, County of Tarrant
On 07/20/2015, before me, the undersigned, Michael E. Wileman, who acknowledged that he/she is
Authorized Signator of/  for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR SROF-2013-
S3 REMIC TRUST I  and that he/she executed the foregoing instrument and that such execution was done
as the free act and deed of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR SROF-2013-S3
REMIC TRUST I



C. LAFFERTY
MY COMMISSION EXPIRES
November 30, 2018

Notary public, C. Lafferty
My commission expires: November 30, 2018

MAIL TAX BILL TO:
MICHAEL MOYER, AS A SINGLE MAN Property Address: 8970 FLYING FROG AVE., LAS VEGAS,
NV 89148

NV   Clark

NB114899
NBLLC/ USROF II, II/

# Exhibit 7:  Assignment of Deed of  Trust

# Exhibit 7:  Assignment of Deed of  Trust

**Inst #: 20161215-0001912**
Fees: $18.00
N/C Fee: $0.00
12/15/2016 12:15:27 PM
Receipt #: 2956330
Requestor:
**ORION FINANCIAL GROUP**
Recorded By: BGN   Pge: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

I the undersigned hereby affirm that this document submitted
for recording does not contain the social security number
of any person or persons.  (Per NRS 239B.030)

PREPARED BY & RETURN TO:
M. E. Wileman
2860 Exchange Blvd. # 100
Southlake, TX 76092
Parcel # 176-05-813-041

### Assignment of Deed of Trust     Send Any Notices to Assignee.

For Valuable Consideration, the undersigned, **U.S. ROF III LEGAL TITLE TRUST 2015-1, BY U.S.
BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE  60 Livingston Avenue, EP-
MN-WS3D, St. Paul, MN 55107 (Assignor)** by these presents does assign and set over, without recourse,
to **PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS
LEGAL TITLE TRUSTEE  60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107 (Assignee)**
the described deed of trust with all interest, all liens, any rights due or to become due thereon, executed by
**MICHAEL MOYER, AS A SINGLE MAN** to MORTGAGE ELECTRONIC  REGISTRATION
SYSTEMS, INC. (MERS) AS NOMINEE FOR TAYLOR, BEAN AND WHITAKER MORTGAGE
CORP. ITS SUCCESSORS AND ASSIGNS.  Trustee: NOBLE TITLE     Said deed of trust **Dated:
3/23/2009** is recorded in the **State of NV, County of Clark on 4/1/2009, Instrument# 20090401-
0000659 AMOUNT: $ 164,607.00**     Property Address: 8970 FLYING FROG AVE, LAS VEGAS NV
89148

IN WITNESS WHEREOF, the undersigned corporation/trust has caused this instrument to be executed by
its proper officer.  Executed on:  12/15/2016

U.S. ROF III LEGAL TITLE TRUST 2015-1, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL
TITLE TRUSTEE

By: _____

Michael E. Wileman, Authorized Signator

NB114899
NV  Clark                         NBLLC/USROF/2016-1&2

State of Texas, County of Tarrant

On 12/15/2016, before me, the undersigned, Michael E. Wileman, who acknowledged that he/she is Authorized Signator of/ for U.S. ROF III LEGAL TITLE TRUST 2015-1, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE and that he/she executed the foregoing instrument and that such execution was done as the free act and deed of U.S. ROF III LEGAL TITLE TRUST 2015-1, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE



C. LAFFERTY
MY COMMISSION EXPIRES
November 30, 2018

Notary public, C. Lafferty
My commission expires: November 30, 2018

MAIL TAX BILL TO:

MICHAEL MOYER, AS A SINGLE MAN Property Address: 8970 FLYING FROG AVE, LAS VEGAS NV 89148

NV   Clark

NB114899
NBLLC/USROF/2016-1&2

# Exhibit 8: Lien for Delinquent Assessments

# Exhibit 8: Lien for Delinquent Assessments

Assessor Parcel Number: 176-05-813-041
File Number: R68466
**Accommodation**

Inst #: **201106060002360**
Fees: $14.00
N/C Fee: $0.00
06/06/2011 09:59:48 AM
Receipt #: 800659
Requestor:
**NORTH AMERICAN TITLE COMPAN**
Recorded By: CDE   Pgs: 1
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

## LIEN FOR DELINQUENT ASSESSMENTS

*Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.*

**NOTICE IS HEREBY GIVEN:** Red Rock Financial Services, a division of RMI Management LLC, officially assigned as agent by the Venezia Community Association, herein also called the Association, in accordance with Nevada Revised Statues 116 and outlined in the Association Covenants, Conditions, and Restrictions, herein also called CC&R's, recorded on 08/06/2002, in Book Number 20020806, as Instrument Number 01138 and including any and all Amendments and Annexations et. seq., of Official Records of Clark County, Nevada, which have been supplied to and agreed upon by said owner.

Said Association imposes a Lien for Delinquent Assessments on the commonly known property:

    8970 Flying Frog Ave, Las Vegas, NV 89148
    VENEZIA UNIT-1 AT RHODES RANCH PLAT BOOK 105 PAGE 97 LOT 74, in the County of Clark

Current Owner(s) of Record:
    MICHAEL MOYER
**The amount owing as of the date of preparation of this lien is **$4,070.09.**
This amount includes assessments, late fees, interest, fines/violations and collection fees and costs.
** The said amount may increase or decrease as assessments, late fees, interest, fines/violations, collection fees, costs or partial payments are applied to the account.

Dated: May 31, 2011

_____
Prepared By Rebecca J. Tom, Red Rock Financial Services, on behalf of Venezia Community Association

STATE OF NEVADA        )
COUNTY OF CLARK       )
On May 31, 2011, before me, personally appeared Rebecca J. Tom, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
When Recorded Mail To: Red Rock Financial Services
                          7251 Amigo Street, Suite 100
                          Las Vegas, Nevada 89119
                          702-932-6887

**MERYL SIBLEY**
Notary Public State of Nevada
No. 08-7934-1
My appt. exp. Sept. 4, 2012

**Exhibit 9:**   **Notice of Default and Election to Sell Pursuant to the Lien for Delinquent Assessments**

**Exhibit 9:**   **Notice of Default and Election to Sell Pursuant to the Lien for Delinquent Assessments**

**Inst #: 201107260000731**
**Fees: $14.00**
**N/C Fee: $0.00**
**07/26/2011 09:12:58 AM**
**Receipt #: 856280**
**Requestor:**
**NORTH AMERICAN TITLE COMPAN**
**Recorded By: RNS  Pgs: 1**

**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

Assessor Parcel Number: 176-05-813-041
File Number:      R68466
Property Address:  8970 Flying Frog Ave
                      Las Vegas, NV 89148
Title Order Number:
        33317

<u>NOTICE OF DEFAULT AND ELECTION TO SELL PURSUANT TO THE</u>
<u>LIEN FOR DELINQUENT ASSESSMENTS</u>
◆ IMPORTANT NOTICE ◆

*Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained*
*will be used for that purpose.*

## WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

**NOTICE IS HEREBY GIVEN:** Red Rock Financial Services officially assigned as agent by the Venezia Community Association, under the Lien for Delinquent Assessments, recorded on 06/06/2011, in Book Number 20110606, as Instrument Number 0002360, reflecting MICHAEL MOYER as the owner(s) of record on said lien, land legally described as VENEZIA UNIT-1 AT RHODES RANCH PLAT BOOK 105 PAGE 97 LOT 74, of the Official Records in the Office of the Recorder of Clark County, Nevada, makes known the obligation under the Covenants, Conditions and Restrictions recorded 08/06/2002, in Book Number 20020806, as Instrument Number 01138, has been breached. As of 01/26/2010 forward, all assessments, whether monthly or otherwise, late fees, interest, Association charges, legal fees and collection fees and costs, less any credits, have gone unpaid.

Above stated, the Association has equipped Red Rock Financial Services with verification of the obligation according to the Covenants, Conditions and Restriction in addition to documents proving the debt, therefore declaring any and all amounts secured as well as due and payable, electing the property to be sold to satisfy the obligation. In accordance with Nevada Revised Statutes 116, no sale date may be set until the ninety-first (91) day after the recorded date or the mailing date of the Notice of Default and Election to Sell. As of July 21, 2011, the amount owed is $ 2,531.40. This amount will continue to increase until paid in full.

_____      Dated: July 21, 2011
Prepared By Joshua Wood, Red Rock Financial Services, on behalf of Venezia Community Association

STATE OF NEVADA             )
COUNTY OF CLARK          )
On July 21, 2011, before me, personally appeared Joshua Wood, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
When Recorded   Red Rock Financial Services
Mail To:          7251 Amigo Street, Suite 100
               Las Vegas, Nevada 89119
               702-932-6887

**ELIZABETH CERNAK**
Notary Public State of Nevada
No. 04-91116-1
My appt. exp. Aug. 5, 2012

**Exhibit 10: Miles, Bauer, Bergstrom & Winters LLP letter, dated 08/17/2011, to Red Rock Financial Services requesting payoff**

**Exhibit 10: Miles, Bauer, Bergstrom & Winters LLP letter, dated 08/17/2011, to Red Rock Financial Services requesting payoff**



DOUGLAS E. MILES *
  Also Admitted in California and
Illinois
RICHARD J. BAUER, JR.*
JEREMY T. BERGSTROM
  Also Admitted in Arizona
FRED TIMOTHY WINTERS*
KEENAN E. McCLENAHAN*
MARK T. DOMEYER*
  Also Admitted in District of
Columbia & Virginia
TAMI S. CROSBY*
L. BRYANT JAQUEZ *
DANIEL L. CARTER *
GINA M. CORENA
WAYNE A. RASH *
ROCK K. JUNG
VY T. PHAM *
KRISTA J. NIELSON
HADI R. SEYED-ALI *
JORY C. GARABEDIAN
THOMAS M. MORLAN
  Admitted in California
BRIAN H. TRAN *
ANNA A. GHAJAR *
CORI B. JONES *
STEVEN E. STERN
  Admitted in Arizona & Illinois
ANDREW H. PASTWICK
  Also Admitted in Arizona and
California
CATHERINE K. MASON *
CHRISTINE A. CHUNG *
HANH T. NGUYEN *
THOMAS B. SONG *

* CALIFORNIA OFFICE
1231 E. DYER ROAD
SUITE 100
SANTA ANA, CA 92705
PHONE (714) 481-9100
FACSIMILE (714) 481-9141

## MILES, BAUER, BERGSTROM & WINTERS, LLP
### ATTORNEYS AT LAW    SINCE 1985

2200 Paseo Verde Parkway, Suite 250
Henderson, NV 89052
Phone: (702) 369-5960
Fax: (702) 369-4955

August 17, 2011

Venezia Community Association
Red Rock Financial Services
7251 Amigo Street, Suite 100
Las Vegas, NV 89119

*SENT VIA FIRST CLASS MAIL*

Re:   *Property Address: 8970 Flying Frog Avenue, Las Vegas, NV 89148*
     *MBBW File No. 11-H1275*

Dear Sirs:

This letter is in response to your Notice of Default with regard to the HOA assessments purportedly owed on the above described real property. This firm represents the interests of MERS as nominee for Bank of America, N.A., as successor by merger to BAC Home Loans Servicing, LP (hereinafter "BANA") with regard to these issues. BANA is the beneficiary/servicer of the first deed of trust loan secured by the property.

As you know, NRS 116.3116 governs liens against units for assessments. Pursuant to NRS 116.3116:

> The association has a lien on a unit for:
> …
> *any penalties, fees, charges, late charges, fines and interest charged pursuant to paragraphs (j) to (n), inclusive, of subsection 1 of NRS 116.3102 are enforceable as assessments under this section*

While the HOA may claim a lien under NRS 116.3102 Subsection (1), Paragraphs (j) through (n) of this Statute clearly provide that such a lien is JUNIOR to first deeds of trust to the extent the lien is for fees and charges imposed for collection and/or attorney fees, collection costs, late fees, service charges and interest. See Subsection 2(b) of NRS 116.3116, which states in pertinent part:

> 2. A lien under this section is prior to all other liens and encumbrances on a unit except:

WFZ0512

*8970 Flying Frog Avenue, Las Vegas, NV 89148*                                                 *Page two of two*

(b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent…

**The lien is also prior to all security interests described in paragraph (b) <u>to the extent of the assessments for common expenses…which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien</u>.**

Subsection 2b of NRS 116.3116 clearly provides that an HOA lien "is prior to all other liens and encumbrances on a unit except: a first security interest on the unit…" But such a lien is prior to a first security interest to the extent of the assessments for common expenses which would have become due during the 9 months before institution of an action to enforce the lien.

Based on Section 2(b), a portion of your HOA lien is arguably senior to BANA's first deed of trust, specifically the nine months of assessments for common expenses incurred before the date of your notice of delinquent assessment dated July 21, 2011. For purposes of calculating the nine-month period, the trigger date is the date the HOA sought to enforce its lien. It is unclear, based upon the information known to date, what amount the nine months' of common assessments pre-dating the NOD actually are. That amount, whatever it is, is the amount BANA should be required to rightfully pay to fully discharge its obligations to the HOA per NRS 116.3102 and my client hereby offers to pay that sum upon presentation of adequate proof of the same by the HOA.

Please let me know what the status of any HOA lien foreclosure sale is, if any. My client does not want these issues to become further exacerbated by a wrongful HOA sale and it is my client's goal and intent to have these issues resolved as soon as possible. Please refrain from taking further action to enforce this HOA lien until my client and the HOA have had an opportunity to speak to attempt to fully resolve all issues.

Thank you for your time and assistance with this matter. I may be reached by phone directly at (702) 942-0471. Please fax the breakdown of the HOA arrears to my attention at (702) 942-0411. I will be in touch as soon as I've reviewed the same with BANA.

Sincerely,

*MILES, BAUER, BERGSTROM & WINTERS, LLP*

Krista J. Nielson, Esq.

WFZ0513

**Exhibit 11: Red Rock Financial Services letter, dated 08/30/2011, to Miles, Bauer, Bergstrom & Winters, LLP, transmittal of Accounting Ledger and Payoff**

**Exhibit 11: Red Rock Financial Services letter, dated 08/30/2011, to Miles, Bauer, Bergstrom & Winters, LLP, transmittal of Accounting Ledger and Payoff**

**RR**  Red Rock Financial Services

Numbers of Pages _____8_____

August 30, 2011

Miles, Bauer, Bergstrom & Winters, LLP
Attn: Alexander Bhame
Via Email: abhame@mileslegal.com

Re:     8970 Flying Frog Ave, Las Vegas, NV 89148
        Venezia Community Association / R68466

*Red Rock Financial Services is a debt collector and is attempting to collect a debt.  Any information obtained will be used for that purpose.*

In response to your request for payoff figures for the above reference account, the following accounting ledger is a breakdown for the payoff request.

The current balance is $6,191.76.  This demand and its balance due will expire on 9/2/11.  You MUST request an update as this balance will only be valid through the date above.  Payment received after the expiration date will not be accepted if the balance has changed.  Failure to remit the balance by the expiration date may result in the continuation of the collection process at an additional cost.  Check(s) should be made payable to Red Rock Financial Services and mailed to the address below.

If you have any questions, please contact our office at 702-932-6887.

Regards,

Red Rock Financial Services

## **PLEASE NOTE THIS PROPERTY HAS ONGOING FINES THEREFORE THIS DEMAND IS ONLY VALID FOR THREE DAYS.**

Red Rock Financial Services     ■ 7251 Amigo Street, Suite 100  Las Vegas, NV 89119

www.rrfs.com     ■ Phone: 702-932-6887 Toll Free: 888-319-9460 Fax: 702.341.7733

By sending your check, please be aware that you are authorizing Red Rock Financial Services to use the information on your check to make a one-time electronic debit from your account at the financial institution indicated on your check.  This electronic debit will be for the amount of your check; no additional amount will be added to the amount.  (If we cannot collect your electronic payment, we will issue a draft against your account.)  Please contact the Accounts Receivable department at (702) 932-6887 to learn about other payment options should you prefer to not have your payment processed in this manner.

WFZ0514

# Red Rock Financial Services
Page 1

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:  R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP,  / DISTRICT ATTORNEY,  / MERS,  / Moyer, Michael /
REPUBLIC SERVICES,  / TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,  / VENEZIA
COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 01/26/2010 | Fine | $50.00 | $50.00 | |
| 02/11/2010 | Fine | $50.00 | $100.00 | |
| 02/11/2010 | Fine | $50.00 | $150.00 | |
| 02/18/2010 | Fine | $50.00 | $200.00 | |
| 02/23/2010 | Fine | $50.00 | $250.00 | |
| 03/04/2010 | Fine | $50.00 | $300.00 | |
| 03/10/2010 | Fine | $50.00 | $350.00 | |
| 03/16/2010 | Fine | $50.00 | $400.00 | |
| 03/24/2010 | Fine | $50.00 | $450.00 | |
| 03/31/2010 | Fine | $50.00 | $500.00 | |
| 04/08/2010 | Fine | $50.00 | $550.00 | |
| 04/15/2010 | Fine | $50.00 | $600.00 | |
| 06/29/2010 | Intent Violation Mailing Costs | $9.00 | $609.00 | |
| 06/29/2010 | Intent to Lien for Violations | $125.00 | $734.00 | |
| 07/01/2010 | Assessment | $18.81 | $752.81 | |
| 07/21/2010 | Lien Violations Mailing Costs | $9.00 | $761.81 | |
| 07/21/2010 | Lien for Violations | $275.00 | $1,036.81 | |
| 07/21/2010 | Lien Violations Recording Cost | $28.00 | $1,064.81 | |
| 07/21/2010 | Lien Violations Release | $35.00 | $1,099.81 | |
| 07/22/2010 | Fine | $50.00 | $1,149.81 | |
| 08/01/2010 | Assessment | $37.50 | $1,187.31 | |
| 08/04/2010 | Fine/Violation | $50.00 | $1,237.31 | |
| 08/10/2010 | Fine | $50.00 | $1,287.31 | |

7251 Amigo Street, Suite 100, Las Vegas, NV 89119  Phone: (702) 932-6887  Fax: (702) 341-7733

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0515

# Red Rock Financial Services

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:  R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP,  / DISTRICT ATTORNEY,  / MERS,  / Moyer, Michael / REPUBLIC SERVICES,  / TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,  / VENEZIA COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 08/12/2010 | Non-Sufficient Funds | $30.00 | $1,317.31 | |
| 08/17/2010 | Fine | $50.00 | $1,367.31 | |
| 08/24/2010 | Fine | $50.00 | $1,417.31 | |
| 08/31/2010 | Fine | $50.00 | $1,467.31 | |
| 09/01/2010 | Assessment | $37.50 | $1,504.81 | |
| 09/07/2010 | Fine | $50.00 | $1,554.81 | |
| 09/10/2010 | Late Fee | $10.00 | $1,564.81 | |
| 09/14/2010 | Fine | $50.00 | $1,614.81 | |
| 09/21/2010 | Fine | $50.00 | $1,664.81 | |
| 09/28/2010 | Fine | $50.00 | $1,714.81 | |
| 10/01/2010 | Assessment | $37.50 | $1,752.31 | |
| 10/06/2010 | Fine | $50.00 | $1,802.31 | |
| 10/10/2010 | Late Fee | $10.00 | $1,812.31 | |
| 10/19/2010 | Fine | $50.00 | $1,862.31 | |
| 10/26/2010 | Fine | $50.00 | $1,912.31 | |
| 11/01/2010 | Assessment | $37.50 | $1,949.81 | |
| 11/10/2010 | Late Fee | $10.00 | $1,959.81 | |
| 11/17/2010 | Fine | $50.00 | $2,009.81 | |
| 11/23/2010 | Fine | $50.00 | $2,059.81 | |
| 12/01/2010 | Assessment | $37.50 | $2,097.31 | |
| 12/07/2010 | Fine | $50.00 | $2,147.31 | |
| 12/10/2010 | Late Fee | $10.00 | $2,157.31 | |
| 12/15/2010 | Fine | $50.00 | $2,207.31 | |

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0516

# Red Rock Financial Services

Page 3

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:   R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP,  / DISTRICT ATTORNEY,  / MERS,  / Moyer, Michael /
REPUBLIC SERVICES,  / TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,  / VENEZIA
COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 12/22/2010 | Fine | $50.00 | $2,257.31 | |
| 12/28/2010 | Fine | $50.00 | $2,307.31 | |
| 01/01/2011 | Assessment | $37.50 | $2,344.81 | |
| 01/04/2011 | Fine | $50.00 | $2,394.81 | |
| 01/10/2011 | Late Fee | $10.00 | $2,404.81 | |
| 01/11/2011 | Fine | $50.00 | $2,454.81 | |
| 01/18/2011 | Fine | $50.00 | $2,504.81 | |
| 01/25/2011 | Fine | $50.00 | $2,554.81 | |
| 02/01/2011 | Assessment | $37.50 | $2,592.31 | |
| 02/01/2011 | Fine | $50.00 | $2,642.31 | |
| 02/08/2011 | Fine | $50.00 | $2,692.31 | |
| 02/10/2011 | Late Fee | $10.00 | $2,702.31 | |
| 02/15/2011 | Fine | $50.00 | $2,752.31 | |
| 02/22/2011 | Fine | $50.00 | $2,802.31 | |
| 03/01/2011 | Assessment | $37.50 | $2,839.81 | |
| 03/02/2011 | Fine | $50.00 | $2,889.81 | |
| 03/08/2011 | Fine | $50.00 | $2,939.81 | |
| 03/10/2011 | Late Fee | $10.00 | $2,949.81 | |
| 03/16/2011 | Fine | $50.00 | $2,999.81 | |
| 03/22/2011 | Fine | $50.00 | $3,049.81 | |
| 03/29/2011 | Fine | $50.00 | $3,099.81 | |
| 04/01/2011 | Assessment | $37.50 | $3,137.31 | |
| 04/05/2011 | Fine | $50.00 | $3,187.31 | |

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0517

# Red Rock Financial Services

Page 4

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:   R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP,  / DISTRICT ATTORNEY,  / MERS,  / Moyer, Michael /
REPUBLIC SERVICES,  / TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,  / VENEZIA
COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 04/10/2011 | Late Fee | $10.00 | $3,197.31 | |
| 04/12/2011 | Fine | $50.00 | $3,247.31 | |
| 04/19/2011 | Fine | $50.00 | $3,297.31 | |
| 04/26/2011 | Fine | $50.00 | $3,347.31 | |
| 05/01/2011 | Assessment | $37.50 | $3,384.81 | |
| 05/03/2011 | Fine | $50.00 | $3,434.81 | |
| 05/10/2011 | Fine | $50.00 | $3,484.81 | |
| 05/10/2011 | Late Fee | $10.00 | $3,494.81 | |
| 05/11/2011 | Intent Mailing Costs | $7.98 | $3,502.79 | |
| 05/11/2011 | Intent to Lien Letter | $125.00 | $3,627.79 | |
| 05/17/2011 | Fine | $50.00 | $3,677.79 | |
| 05/24/2011 | Fine | $50.00 | $3,727.79 | |
| 05/30/2011 | Association Interest | $1.57 | $3,729.36 | |
| 05/31/2011 | Fine | $50.00 | $3,779.36 | |
| 05/31/2011 | Lien Mailing Costs | $7.98 | $3,787.34 | |
| 05/31/2011 | Lien for Delinquent Assessment | $275.00 | $4,062.34 | |
| 05/31/2011 | Lien Release | $30.00 | $4,092.34 | |
| 05/31/2011 | Lien Recording Costs | $28.00 | $4,120.34 | |
| 06/01/2011 | Assessment | $37.50 | $4,157.84 | |
| 06/07/2011 | Fine | $50.00 | $4,207.84 | |
| 06/10/2011 | Late Fee | $10.00 | $4,217.84 | |
| 06/14/2011 | Fine | $50.00 | $4,267.84 | |
| 06/21/2011 | Fine | $50.00 | $4,317.84 | |

7251 Amigo Street, Suite 100, Las Vegas, NV 89119   Phone: (702) 932-6887   Fax: (702) 341-7733

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0518

# Red Rock Financial Services

Page 5

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:   R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP, / DISTRICT ATTORNEY, / MERS, / Moyer, Michael / REPUBLIC SERVICES, / TAYLOR, BEAN & WHITAKER MORTGAGE CORP., / VENEZIA COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 06/28/2011 | Fine | $50.00 | $4,367.84 | |
| 06/29/2011 | Association Interest | $1.73 | $4,369.57 | |
| 07/01/2011 | Assessment | $37.50 | $4,407.07 | |
| 07/01/2011 | Intent to NOD | $90.00 | $4,497.07 | |
| 07/05/2011 | Fine | $50.00 | $4,547.07 | |
| 07/10/2011 | Late Fee | $10.00 | $4,557.07 | |
| 07/12/2011 | Fine | $50.00 | $4,607.07 | |
| 07/19/2011 | Fine | $50.00 | $4,657.07 | |
| 07/21/2011 | NOD Mailing Charges Adjustment | -$26.88 | $4,630.19 | |
| 07/21/2011 | Notice of Default | $375.00 | $5,005.19 | |
| 07/21/2011 | NOD Mailing Costs | $89.60 | $5,094.79 | |
| 07/21/2011 | NOD Recording Costs | $14.00 | $5,108.79 | |
| 07/21/2011 | NOD Release | $30.00 | $5,138.79 | |
| 07/21/2011 | NOD Release Recording Costs | $14.00 | $5,152.79 | |
| 07/21/2011 | Trustee Sale Guarantee | $350.00 | $5,502.79 | |
| 07/26/2011 | Fine | $50.00 | $5,552.79 | |
| 07/28/2011 | Fine | $50.00 | $5,602.79 | |
| 07/30/2011 | Association Interest | $1.90 | $5,604.69 | |
| 08/01/2011 | Assessment | $37.50 | $5,642.19 | |
| 08/02/2011 | Fine | $50.00 | $5,692.19 | |
| 08/09/2011 | Fine | $50.00 | $5,742.19 | |
| 08/10/2011 | Late Fee | $10.00 | $5,752.19 | |
| 08/11/2011 | Fine | $50.00 | $5,802.19 | |

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0519

# Red Rock Financial Services

Page 6

## Account Detail

## Venezia Community Association

Information as of:  August 30, 2011

Red Rock Financial Services Account Number:   R68466

Property Address: 8970 Flying Frog Ave, Las Vegas, NV 89148

BAC HOME LOANS SERVICING, LP, / DISTRICT ATTORNEY, / MERS, / Moyer, Michael / REPUBLIC SERVICES, / TAYLOR, BEAN & WHITAKER MORTGAGE CORP., / VENEZIA COMMUNITY ASSOCIATION,

Detailed Summary

| Date | Description | Amount | Balance | Check# |
|------|-------------|--------|---------|--------|
| 08/16/2011 | Fine | $50.00 | $5,852.19 | |
| 08/18/2011 | Fine | $50.00 | $5,902.19 | |
| 08/23/2011 | Fine | $50.00 | $5,952.19 | |
| 08/25/2011 | Fine | $50.00 | $6,002.19 | |
| 08/29/2011 | Association Interest | $2.07 | $6,004.26 | |
| 08/30/2011 | Payoff Demand | $150.00 | $6,154.26 | |
| 9/1/11 | *assessment* | $37.50 | $6,191.76 | |

Red Rock Financial Services is a debt collector and is attempting to collect a debt. Any information obtained will be used for that purpose.

Printed:  8/30/11

WFZ0520

| Form **W-9** | | |
|---|---|---|
| (Rev. January 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give Form to the**<br>**requester. Do not**<br>**send to the IRS.** |

Name (as shown on your income tax return)

**RMI MANAGEMENT, LLC**

Business name/disregarded entity name, if different from above

**RED ROCK FINANCIAL SERVICES**

Check appropriate box for federal tax classification (required):

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☑ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

**7251 AMIGO STREET, SUITE 100**

City, state, and ZIP code

**LAS VEGAS, NV  89119**

Requester's name and address (optional)

List account number(s) here (optional)

**Part I   Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

8 8 – 0 3 5 8 1 3 2

**Part II   Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here   Signature of U.S. person ▶          Date ▶ 8/30/11

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X          Form **W-9** (Rev. 1-2011)

WFZ0521

**Exhibit 12: Miles, Bauer, Bergstrom & Winters LLP letter, dated 09/16/2011, to Red Rock Financial Services transmittal of tender check**

**Exhibit 12: Miles, Bauer, Bergstrom & Winters LLP letter, dated 09/16/2011, to Red Rock Financial Services transmittal of tender check**

**DOUGLAS E. MILES** \*
  Also Admitted in California and
Illinois
**RICHARD J. BAUER, JR.**\*
**JEREMY T. BERGSTROM**
  Also Admitted in Arizona
**FRED TIMOTHY WINTERS**\*
**KEENAN E. McCLENAHAN**\*
**MARK T. DOMEYER**\*
  Also Admitted in District of
Columbia & Virginia
**TAMI S. CROSBY**\*
**L. BRYANT JAQUEZ** \*
**DANIEL L. CARTER** \*
**GINA M. CORENA**
**WAYNE A. RASH** \*
**ROCK K. JUNG**
**VY T. PHAM** \*
**KRISTA J. NIELSON**
**HADI R. SEYED-ALI** \*
**JORY C. GARABEDIAN**
**THOMAS M. MORLAN**
  Admitted in California
**BRIAN H. TRAN** \*
**ANNA A. GHAJAR** \*
**CORI B. JONES** \*
**STEVEN E. STERN**
  Admitted in Arizona & Illinois
**ANDREW H. PASTWICK**
  Also Admitted in Arizona and
California
**CATHERINE K. MASON** \*
**CHRISTINE A. CHUNG** \*
**HANH T. NGUYEN** \*
**THOMAS B. SONG** \*



\* **CALIFORNIA OFFICE**
1231 E. DYER ROAD
SUITE 100
SANTA ANA, CA 92705
PHONE (714) 481-9100
FACSIMILE (714) 481-9141

## MILES, BAUER, BERGSTROM & WINTERS, LLP
### ATTORNEYS  AT  LAW          SINCE  1985

2200 Paseo Verde Parkway, Suite 250
Henderson, NV 89052
Phone: (702) 369-5960
Fax: (702) 369-4955

September 16, 2011

RED ROCK FINANCIAL SERVICES
7251 Amigo Street, Suite 100
Las Vegas, NV 89119

Re:     *Property Address:* 8970 Flying Frog Avenue
        ACCT NO.: R68466
        LOAN #
        *MBBW File No.* 11-H1275

Dear Sir/Madame:

As you may recall, this firm represents the interests of Bank of America, N.A., as successor by merger to
BAC Home Loans Servicing, LP (hereinafter "BANA") with regard to the issues set forth herein. We
have received correspondence from your firm regarding our inquiry into the "Super Priority Demand
Payoff" for the above referenced property. The Statement of Account provided by you in regards to the
above-referenced address shows a full payoff amount of $6,191.76. BANA is the beneficiary/servicer of
the first deed of trust loan secured by the property and wishes to satisfy its obligations to the HOA.
Please bear in mind that:

NRS 116.3116 governs liens against units for assessments.  Pursuant to NRS 116.3116:

        The association has a lien on a unit for:

        ...
        *any penalties, fees, charges, late charges, fines and interest charged pursuant to paragraphs (j) to*
        *(n), inclusive, of subsection 1 of NRS 116.3102 are enforceable as assessments under this section*

WFZ0522

While the HOA may claim a lien under NRS 116.3102 Subsection (1), Paragraphs (j) through (n) of this Statute clearly provide that such a lien is JUNIOR to first deeds of trust to the extent the lien is for fees and charges imposed for collection and/or attorney fees, collection costs, late fees, service charges and interest. See Subsection 2(b) of NRS 116.3116, which states in pertinent part:

> 2. A lien under this section is prior to all other liens and encumbrances on a unit except:
> (b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent…
>
> **The lien is also prior to all security interests described in paragraph (b) <u>to the extent of the assessments for common expenses…which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien</u>.**

Based on Section 2(b), a portion of your HOA lien is arguably prior to BANA's first deed of trust, specifically the nine months of assessments for common expenses incurred before the date of your notice of delinquent assessment. As stated above, the payoff amount stated by you includes many fees that are junior to our client's first deed of trust pursuant to the aforementioned NRS 116.3102 Subsection (1), Paragraphs (j) through (n).

Our client has authorized us to make payment to you in the amount of $450.00 to satisfy its obligations to the HOA as a holder of the first deed of trust against the property. Thus, enclosed you will find a cashier's check made out to Red Rock Financial Services in the sum of $450.00, which represents the maximum 9 months worth of delinquent assessments recoverable by an HOA. This is a non-negotiable amount and any endorsement of said cashier's check on your part, whether express or implied, will be strictly construed as an unconditional acceptance on your part of the facts stated herein and express agreement that BANA's financial obligations towards the HOA in regards to the real property located at 8970 Flying Frog Avenue have now been "paid in full".

Thank you for your prompt attention to this matter. If you have any questions or concerns,  I may be reached by phone directly at (702) 942-0471.

Sincerely,

*MILES, BAUER, BERGSTROM & WINTERS, LLP*

Krista J. Nielson, Esq.

WFZ0523

Miles, Bauer, Bergstrom & Winters, LLP  Trust Acct

Payee: RED ROCK FINANCIAL SERVICES

11-H1275

Initials: SRN

Check #:  11129

Date:  9/14/2011    Amount:    450.00

| Inv. Date | Reference # | Description | Inv. Amount | Case # | Matter Description | Cost Amount |
|---|---|---|---|---|---|---|
| 9/13/2011 | R68466 | To Cure HOA Deficiency | 450.00 | | | |



Miles, Bauer, Bergstrom & Winters, LLP
Trust Account
1231 E. Dyer Road, #100
Santa Ana, CA 92705
Phone: (714) 481-9100

Bank of America
1100 N. Green Valley Parkway
Henderson, NV 89074
16-66/1220
1020
11-H1275
Loan #

11129

Date:        9/14/2011

Amount  $**** 450.00

Check Void After 90 Days

Pay   $*****Four Hundred Fifty & No/100 Dollars

to the order of

RED ROCK FINANCIAL SERVICES

⑂" ⅃ ⅃ ⅃ ⅄ ⅃ ⑂ "⑂

Security features. Details on back.

# Exhibit 13: Notice of Foreclosure Sale

# Exhibit 13: Notice of Foreclosure Sale

Inst #: 201209100001419
Fees: $18.00
N/C Fee: $0.00
09/10/2012 09:36:12 AM
Receipt #: 1301170
Requestor:
NORTH AMERICAN TITLE COMPAN
Recorded By: DXI   Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

Assessor Parcel Number:  176-05-813-041
File Number:      R68466
Property Address:   8970 Flying Frog Ave
                    Las Vegas, NV 89148

**Accommodation**

## NOTICE OF FORECLOSURE SALE
UNDER THE LIEN FOR DELINQUENT ASSESSMENTS

*Red Rock Financial Services is a debt collector and is attempting to collect a debt.  Any information obtained will be used for that purpose.*

## WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE DATE.  IF YOU HAVE ANY QUESTIONS, PLEASE CALL RED ROCK FINANCIAL SERVICES AT (702) 932-6887 or (702) 215-8130.  IF YOU NEED ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION AT (877) 829-9907 IMMEDIATELY.

Red Rock Financial Services officially assigned as agent by the Venezia Community Association under the Lien for Delinquent Assessments.  **YOU ARE IN DEFAULT UNDER THE LIEN FOR DELINQUENT ASSESSMENTS,** recorded on 06/06/2011, in Book Number 20110606, as Instrument Number 0002360 reflecting MICHAEL MOYER as the owner(s) of record on said lien.  **UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT PUBLIC SALE.**  If you need an explanation of the nature of the proceedings against you, you should contact an attorney.

The Notice of Default and Election to Sell Pursuant to the Lien for Delinquent Assessments was recorded on 07/26/2011, in Book Number 20110726, as Instrument Number 0000731 of the Official Records in the Office of the Recorder.

**NOTICE IS HEREBY GIVEN**:  That on **_10/04/2012_**, at **_10:00 a.m._** at the front entrance of the Nevada Legal News located at 930 South Fourth Street, Las Vegas, Nevada 89101, that the property commonly known as 8970 Flying Frog Ave, Las Vegas, NV 89148 and land legally described as VENEZIA UNIT-1 AT RHODES RANCH PLAT BOOK 105 PAGE 97 LOT 74 of the Official Records in the Office of the County Recorder of Clark County, Nevada, will sell at public auction to the highest bidder, for cash payable at the time of sale in lawful money of the United Sales, by

Assessor Parcel Number:  176-05-813-041
File Number:            R68466
Property Address:       8970 Flying Frog Ave
                        Las Vegas, NV 89148

cash, a cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, state or federal savings and loan association or savings association authorized to do business in the State of Nevada, in the amount of **$4,359.13** as of 09/07/2012, which includes the total amount of the unpaid balance and reasonably estimated costs, expenses and advances at the time of the initial publication of this notice.  Any subsequent Association assessments, late fees interest, expenses or advancements, if any, of the Association or its Agent, under the terms of the Lien for Delinquent Assessments shall continue to accrue until the date of the sale. The property heretofore described is being sold "as is".

The sale will be made without covenant or warranty, expressed or implied regarding, but not limited to, title or possession, encumbrances, obligations to satisfy any secured or unsecured liens or against all right, title and interest of the owner, without equity or right of redemption to satisfy the indebtedness secured by said Lien, with interest thereon, as provided in the Declaration of Covenants, Conditions and Restrictions, recorded on 08/06/2002, in Book Number 20020806, as Instrument Number 01138 of the Official Records in the Office of the Recorder and any subsequent amendments or updates that may have been recorded.

Dated: September 7, 2012

_Kimberlee Sibley_

Prepared By Kimberlee Sibley, Red Rock Financial Services, on behalf of Venezia Community Association

STATE OF NEVADA           )
COUNTY OF CLARK           )

On September 7, 2012, before me, personally appeared Kimberlee Sibley, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_Anna Romero_

**Reinstatement Information:**  (702) 215-8130 or **Sale Information:**  (714) 573-1965

When Recorded Mail To:
Red Rock Financial Services
7251 Amigo Street, Suite 100
Las Vegas, Nevada 89119
(702) 215-8130 or (702) 932-6887

ANNA ROMERO
Notary Public State of Nevada
No. 12-7487-1
My appt. exp. Apr. 20 2016

# Exhibit 14: Foreclosure Deed

# Exhibit 14: Foreclosure Deed

Mail Tax statement to:
Flying Frog Avenue Trust
900 S. Las Vegas Blvd, Suite 810
Las Vegas, NV 89101

APN # 176-05-813-041

Inst #: 201302140001444
Fees: $18.00 N/C Fee: $25.00
RPTT: $33.15 Ex: #
02/14/2013 09:54:26 AM
Receipt #: 1497488
Requestor:
**RESOURCES GROUP**
Recorded By: GILKS  Pgs: 3
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

## FORECLOSURE DEED

The undersigned declares: $33.15

Red Rock Financial Services, herein called agent for (Venezia Community Association), was the duly appointed agent under that certain Lien for Delinquent Assessments, recorded 06/06/2011 as instrument number 0002360 Book 20110606, in Clark County.  The previous owner as reflected on said lien is **MICHAEL MOYER**.  Red Rock Financial Services as agent for Venezia Community Association does hereby grant and convey, but without warranty expressed or implied to: **Flying Frog Avenue Trust** (herein called grantee), pursuant to NRS 116.31162, 116.31163 and 116.31164, all its right, title and interest in and to that certain property legally described as: VENEZIA UNIT-1 AT RHODES RANCH PLAT BOOK 105 PAGE 97 LOT 74 which is commonly known as **8970 Flying Frog Ave, Las Vegas, NV 89148.**

AGENT STATES THAT:
This conveyance is made pursuant to the powers conferred upon agent by Nevada Revised Statutes, the Venezia Community Association governing documents (CC&R's) and that certain Lien for Delinquent Assessments, described herein.  Default occurred as set forth in a Notice of Default and Election to Sell, recorded on 07/26/2011 as instrument number 0000731 which was recorded in the office of the recorder of said county. Red Rock Financial Services has complied with all requirements of law including, but not limited to, the elapsing of 90 days, mailing of copies of Lien for Delinquent Assessments and Notice of Default and the posting and publication of the Notice of Sale.  Said property was sold by said agent, on behalf of Venezia Community Association at public auction on **02/04/2013**, at the place indicated on the Notice of Sale.  Grantee being the highest bidder at such sale became the purchaser of said property and paid therefore to said agent the amount bid **$6,002.00** in lawful money of the United States, or by satisfaction, pro tanto, of the obligations then secured by the Lien for Delinquent Assessment.

Dated: February 7, 2013

*Kimberlee Sibley*

By: Kimberlee Sibley, employee of Red Rock Financial Services, agent for Venezia Community Association

STATE OF NEVADA                    )
COUNTY OF CLARK                    )

On February 7, 2013, before me, personally appeared Kimberlee Sibley, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.



When Recorded Mail To:    Flying Frog Avenue Trust
                          900 S. Las Vegas Blvd, Suite 810
                          Las Vegas, NV 89101

ELIZABETH CERNAK
Notary Public State of Nevada
No.04-91116-1
My appt. exp. July 25, 2016

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1. Assessor Parcel Number(s)
   a. 176-05-813-041
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☐ Vacant Land      b. ☑ Single Fam. Res.
   c. ☐ Condo/Twnhse    d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg        f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural     h. ☐ Mobile Home
      ☐ Other

   | FOR RECORDERS OPTIONAL USE ONLY |
   | Book_____ Page:_____ |
   | Date of Recording:_____ |
   | Notes: |

3. a. Total Value/Sales Price of Property          $ 6,002.00
   b. Deed in Lieu of Foreclosure Only (value of property(_____)
   c. Transfer Tax Value:                          $ 6,002.00
   d. Real Property Transfer Tax Due               $ 33.15

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section_____
   b. Explain Reason for Exemption: _____

5. Partial Interest: Percentage being transferred: _100_ %

The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _Kimberlee W Bley_          Capacity: EMPLOYEE OF AGENT OF
                                                 FORECLOSING BENEFICIARY

Signature _____    Capacity: _____

**SELLER (GRANTOR) INFORMATION**            **BUYER (GRANTEE) INFORMATION**
RED ROCK FINANCIAL SERVICES
Print Name: c/o Venezia Community Assn.    Print Name: Flying Frog Avenue Trust
Address: 7251 Amigo Street, Suite 100       Address: 900 S. Las Vegas Blvd, Suite 810
City: Las Vegas                             City: Las Vegas
State: NV          Zip: 89101               State: NV          Zip: 89101

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**
Print Name: Resources Group LLC             Escrow #
Address: P.O. Box 36208
City: LV                                    State: NV   Zip: 89133

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

# Exhibit 15: Declaration of Covenants, Conditions and Restrictions for Venezia

# Exhibit 15: Declaration of Covenants, Conditions and Restrictions for Venezia

20020806
.01138

When Recorded Mail To:

APN: 176-05-801-015 (a portion)

KB Home Nevada Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119



# DECLARATION OF

# COVENANTS, CONDITIONS AND RESTRICTIONS FOR

# VENEZIA



# TABLE OF CONTENTS

**ARTICLE I**

<u>DEFINITIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.1    <u>Act</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.2    <u>Allocated Interests</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.3    <u>Annexable Property</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.4    <u>Annexation Amendment</u> . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.5    <u>ARC</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.6    <u>ARC Rules</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.7    <u>Articles</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1.8    <u>Assessment, Capital Improvement</u> . . . . . . . . . . . . . . . . 3
Section 1.9    <u>Assessment, Common or Common Expense</u> . . . . . . . . . . 3
Section 1.10   <u>Assessment, Reconstruction</u> . . . . . . . . . . . . . . . . . . . . 3
Section 1.11   <u>Assessment, Special</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1.12   <u>Association</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1.13   <u>Board of Directors or Board</u> . . . . . . . . . . . . . . . . . . . . 3
Section 1.14   <u>Bylaws</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1.15   <u>Commercial Vehicle</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1.16   <u>Common Elements</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1.17   <u>Common Expenses</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1.18   <u>Declarant</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1.19   Declarant Control Period . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.20   <u>Declaration</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.21   <u>Development Rights</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.22   <u>Director</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.23   <u>Documents</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.24   <u>Eligible Insurer</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.25   <u>Eligible Mortgage</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.26   <u>HUD</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.27   <u>Improvements</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1.28   <u>Liability for Common Expenses</u> . . . . . . . . . . . . . . . . . . 5
Section 1.29   <u>Limited Common Elements</u> . . . . . . . . . . . . . . . . . . . . . 6
Section 1.30   <u>Majority of Members or Majority of Owners</u> . . . . . . . . . 6
Section 1.31   <u>Manager</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.32   <u>Member:</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.33   <u>Notice and Comment</u> . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.34   <u>Notice and Hearing</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.35   <u>NRS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.36   <u>Owner</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.37   <u>Person</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.38   <u>Phase 1</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.39   <u>Plat</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1.40   <u>Private Drainage Easement</u> . . . . . . . . . . . . . . . . . . . . . 7
Section 1.41   <u>Project</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7



Section 1.42   Public Offering Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.43   Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.44   Recreational Vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.45   Residential Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.46   Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.47   Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.48   Security Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 1.49   Sight Visibility Zones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 1.50   Special Declarant Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 1.51   Subsidy Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 1.52   Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 1.53   Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 1.54   VA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE II
       PROJECT AND ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 2.1    Project and Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 2.2    Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE III
       DESCRIPTION OF REAL PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IV
       UNIT AND BOUNDARY DESCRIPTIONS . . . . . . . . . . . . . . . . . . . . . . 9
Section 4.1    Maximum Number of Units . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Section 4.2    Boundaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE V
       COMMON ELEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Section 5.1    Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Section 5.2    Limitation on Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Section 5.3    Declarant's Plans and Specifications . . . . . . . . . . . . . . . . . . . . . 10
Section 5.4    Owner's Easement of Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . 10
Section 5.5    Delegation of Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Section 5.6    Nuisances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Section 5.7    Declarant's Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Section 5.8    Owner's Liability for Damages to Common Elements . . . . . . . . . . 11
Section 5.9    Duties of Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Section 5.10   Mineral Exploration; Toxic Substances . . . . . . . . . . . . . . . . . . . 11
Section 5.11   Automatic Irrigation Systems . . . . . . . . . . . . . . . . . . . . . . . . . 11
Section 5.12   Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Section 5.13   Declarant's Maintenance of Certain Common Elements . . . . . . . . 12
Section 5.14   Limited Common Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**ARTICLE VI**
    MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 6.1    Common Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 6.2    Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 6.3    Right of Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 6.4    Repairs Resulting From Negligence . . . . . . . . . . . . . . . . . . . . 13
    Section 6.5    Association Easement for Removal of Graffiti . . . . . . . . . . . . . . 13

**ARTICLE VII**
    DEVELOPMENT RIGHTS AND OTHER SPECIAL DECLARANT RIGHTS . . . 13
    Section 7.1    Reservation of Development Rights . . . . . . . . . . . . . . . . . . . . 13
    Section 7.2    Limitations on Development Rights . . . . . . . . . . . . . . . . . . . . 15
    Section 7.3    Phasing of Development Rights . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 7.4    Special Declarant Rights . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 7.5    Models, Sales Offices and Management Offices . . . . . . . . . . . . . 16
    Section 7.6    Construction; Declarant's Easement . . . . . . . . . . . . . . . . . . . . 16
    Section 7.7    Signs and Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 7.8    Declarant's Personal Property . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 7.9    Declarant Control of the Association . . . . . . . . . . . . . . . . . . . 17
    Section 7.10    Limitations on Special Declarant Rights . . . . . . . . . . . . . . . . . 17
    Section 7.11    Interference with Special Declarant Rights . . . . . . . . . . . . . . . . 18
    Section 7.12    VA/HUD Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 7.13    Declarant's Rights to Complete Development . . . . . . . . . . . . . . . 18
    Section 7.14    Priority of Declarant's Rights and Reservations . . . . . . . . . . . . . 18
    Section 7.15    Assignment of Declarant's Rights and Duties . . . . . . . . . . . . . . 19

**ARTICLE VIII**
    ALLOCATED INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 8.1    Allocation of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 8.2    Formulas for the Allocation of Interests . . . . . . . . . . . . . . . . . 19
    Section 8.3    Assignment of Allocated Interests Pursuant to Exercise of Development
             Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**ARTICLE IX**
    RESTRICTION ON USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 9.1    Residential Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 9.2    Improvements; Limitations . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 9.3    Oil, Water and Mineral Operations; Hazardous and Toxic Materials . 20
    Section 9.4    Laws and Insurance Requirements . . . . . . . . . . . . . . . . . . . . . 20
    Section 9.5    Antennae; Satellite Dishes . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 9.6    Landscaping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 9.7    Maintenance of Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 9.8    Perimeter Block Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 9.9    Nuisances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Section 9.10    Repair of Improvement . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

20020806
.01138



Section 9.11    Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 9.12    Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 9.13    Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Section 9.14    Unsightly Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 9.15    Solar Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 9.16    Garage Doors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 9.17    Restricted Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 9.18    Clotheslines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Section 9.19    Post-Construction Entry Rights . . . . . . . . . . . . . . . . . . . . . . . . 25
Section 9.20    Construction of Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Section 9.21    Restrictions on Alienation; Leasing . . . . . . . . . . . . . . . . . . . . . . 25
Section 9.22    Parking Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Section 9.23    Declarant's Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Section 9.24    Declarant's Approval of Conveyances or Changes in Use of Project . 26
Section 9.25    Board of Directors and ARC Discretion . . . . . . . . . . . . . . . . . . . 26
Section 9.26    Sight Visibility Zones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Section 9.27    Slopes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Section 9.28    Drainage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Section 9.29    Private Drainage Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Section 9.30    Declarant's Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28


ARTICLE X
       EASEMENTS AND LICENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 10.1    Easements of Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 10.2    Encroachment Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 10.3    Utility Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 10.4    Easement for Expansion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 10.5    Reservation of Easements, Exceptions, and Exclusions . . . . . . . . . . 30
Section 10.6    Drainage Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Section 10.7    Maintenance Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Section 10.8    Easements Deemed Created . . . . . . . . . . . . . . . . . . . . . . . . . . . 30


ARTICLE XI
       ALLOCATION OF LIMITED COMMON ELEMENTS . . . . . . . . . . . . . . . . . 31


ARTICLE XII
       ARCHITECTURAL REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Section 12.1    Creation of ARC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Section 12.2    Provision for Architectural Approvals . . . . . . . . . . . . . . . . . . . . . 31
Section 12.3    ARC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 12.4    Procedure for Approval of Committee . . . . . . . . . . . . . . . . . . . . . 32
Section 12.5    Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 12.6    Liability of Committee Members . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 12.7    Painting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Section 12.8    Failure to Appoint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Section 12.9   Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**ARTICLE XIII**
   **BOUNDARIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   Section 13.1   Application and Amendment . . . . . . . . . . . . . . . . . . . . . . . . 33
   Section 13.2   Recording Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**ARTICLE XIV**
   **AMENDMENTS TO DECLARATION** . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.1   In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.2   Limitation of Challenges . . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.3   Recordation of Amendments . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.4   Unanimous Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.5   Execution of Amendments . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.6   Special Declarant Rights . . . . . . . . . . . . . . . . . . . . . . . . . 34
   Section 14.7   Consent of Holders of Security Interests . . . . . . . . . . . . . . . . . 34
   Section 14.8   Amendments To Create Units . . . . . . . . . . . . . . . . . . . . . . 34

**ARTICLE XV**
   **AMENDMENTS TO BYLAWS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**ARTICLE XVI**
   **TERMINATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**ARTICLE XVII**
   **MORTGAGEE PROTECTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   Section 17.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   Section 17.2   Percentage of Eligible Mortgagees . . . . . . . . . . . . . . . . . . . . 35
   Section 17.3   Notice of Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   Section 17.4   Consent and Notice Required . . . . . . . . . . . . . . . . . . . . . . 36
   Section 17.5   Development Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   Section 17.6   Inspection of Books . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   Section 17.7   Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   Section 17.8   Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   Section 17.9   Attendance at Meetings . . . . . . . . . . . . . . . . . . . . . . . . . 39
   Section 17.10  Appointment of Trustee . . . . . . . . . . . . . . . . . . . . . . . . 39

**ARTICLE XVIII**
   **ASSESSMENT AND COLLECTION OF COMMON EXPENSES** . . . . . . . . . . 39
   Section 18.1   Apportionment of Common Expenses . . . . . . . . . . . . . . . . . . 39
   Section 18.2   Common Expenses Attributable to Fewer than all Units; Exempt
                  Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   Section 18.3   Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   Section 18.4   Budget Adoption and Ratification . . . . . . . . . . . . . . . . . . . . 41
   Section 18.5   Capital Improvement Assessments . . . . . . . . . . . . . . . . . . . 42

Section 18.6    Certificate of Payment of Common Expense Assessments . . . . . . . . 42
Section 18.7    Monthly Payment of Common Expenses . . . . . . . . . . . . . . . . . . 42
Section 18.8    Limitations on Maximum Annual Assessment . . . . . . . . . . . . . . . 42
Section 18.9    Acceleration of Common Expense Assessments . . . . . . . . . . . . . . 42
Section 18.10   Commencement of Common Expense Assessments . . . . . . . . . . . . 42
Section 18.11   No Waiver of Liability for Common Expenses . . . . . . . . . . . . . . 42
Section 18.12   Personal Liability of Owners . . . . . . . . . . . . . . . . . . . . . . . . 43
Section 18.13   Working Capital Assessment . . . . . . . . . . . . . . . . . . . . . . . . 43
Section 18.14   Subsidy Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE XIX
        RIGHT TO ASSIGN FUTURE INCOME . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE XX
        PERSONS AND UNITS SUBJECT TO DOCUMENTS . . . . . . . . . . . . . . . 44
Section 20.1    Membership in the Association . . . . . . . . . . . . . . . . . . . . . . . 44
Section 20.2    Compliance with Documents . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 20.3    Adoption of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE XXI
        INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 21.1    Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 21.2    Property Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 21.3    Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Section 21.4    Fidelity Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Section 21.5    Owner Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Section 21.6    Workers' Compensation Insurance . . . . . . . . . . . . . . . . . . . . . 47
Section 21.7    Directors' and Officers' Liability Insurance . . . . . . . . . . . . . . . 47
Section 21.8    Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Section 21.9    Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ARTICLE XXII
        DAMAGE TO OR DESTRUCTION OF PROPERTY . . . . . . . . . . . . . . . 47
Section 22.1    Duty to Restore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Section 22.2    Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Section 22.3    Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Section 22.4    Replacement of Less Than Entire Property . . . . . . . . . . . . . . . . 47
Section 22.5    Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Section 22.6    Certificates By Board of Directors . . . . . . . . . . . . . . . . . . . . . 48
Section 22.7    Certificates by Title Insurance Companies . . . . . . . . . . . . . . . . . 48

ARTICLE XXIII
        NOTICE AND HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Section 23.1    Right to Notice and Comment . . . . . . . . . . . . . . . . . . . . . . . . 48
Section 23.2    Right to Notice and Hearing . . . . . . . . . . . . . . . . . . . . . . . . . 49

vi

Section 23.3   Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**ARTICLE XXIV**
    BOARD OF DIRECTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    Section 24.1   Association Records and Minutes of Board of Directors Meetings . . 49
    Section 24.2   Powers and Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    Section 24.3.   Rule Making Authority of the Board of Directors . . . . . . . . . . . . 49
    Section 24.4   Board of Directors Limitations . . . . . . . . . . . . . . . . . . . . . . . 50

**ARTICLE XXV**
    CLAIMS AGAINST DECLARANT: RIGHT TO CURE AND ARBITRATION . . 50
    Section 25.1   Declarant's Right to Cure Alleged Defects . . . . . . . . . . . . . . . . 50
    Section 25.2   Arbitration of Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**ARTICLE XXVI**
    CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**ARTICLE XXVII**
    MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    Section 27.1   Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    Section 27.2   Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.3   Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.4   Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.5   Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.6   Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.7   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Section 27.8   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

EXHIBIT "A" - ANNEXABLE PROPERTY - LEGAL DESCRIPTION



## DECLARATION OF
## COVENANTS, CONDITIONS AND RESTRICTIONS FOR
## VENEZIA

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR VENEZIA(the "Declaration") is made as of this  5 ᵗͪ   day of July, 2002, by KB Home Nevada Inc. ("Declarant") for the purpose of submitting that certain real property located in the County of Clark, State of Nevada described below as the Real Property, to the provisions of the Uniform Common Interest Ownership Act, Chapter 116 of the Nevada Revised Statutes, for the purpose of creating a Project and making the improvements shown in the Plat referred to herein.

## R E C I T A L S:

A.     Declarant is the owner of all of the Real Property (defined below) together with that certain real property located in the County of Clark, State of Nevada more particularly described in Exhibit "A" attached hereto and incorporated herein by reference (the "Annexable Property").

B.     Declarant proposes to develop the Real Property and any Annexable Property hereafter made subject to this Declaration, to be known as Venezia (the "Project").

C.     Declarant intends to develop the Project in three (3) or more phases under the provisions of the Nevada Common Interest Ownership Act pursuant to a general plan for the maintenance, care, use and management of the Project, and to convey the real property within the Project subject to certain protective covenants, conditions, restrictions, reservations, easements, equitable servitudes, liens and charges, all running with the real property as hereinafter set forth.

D.     At the present time, Declarant proposes that the Project may include approximately one hundred forty (140) residential dwellings, together with certain Common Elements (defined below).

E.     The initial phase of the Project which shall be subject to this Declaration of Covenant, Conditions and Restrictions is Phase 1, more particularly described as:

Lots Thirty-Four (34) through One Hundred (100) inclusive, of Venezia at Rhodes Ranch Unit 1, as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105 , of Plats, page  97 , in the Office of the County Recorder, Clark County, Nevada;

(the "Real Property"). Phase 1 shall contain a total of seventy-nine (79) Units, together with Common Elements.

F.     There is no guarantee that all phases will be completed, or that the contemplated number of Units will be developed as described above. The project will be consistent with any

1

development plans submitted to the U.S. Department of Veterans Affairs and Federal Housing Administration.

G.    Each Unit shall have appurtenant to it a membership in the Venezia Community Association, a Nevada nonprofit corporation ("Association"), which will be the management body for the overall Project.

H.    Before selling or conveying any interest in the Real Property, Declarant desires to subject the Real Property in accordance with a common plan to certain covenants, conditions, and restrictions for the benefit of Declarant and any and all present and future owners of the Real Property.

NOW THEREFORE, Declarant hereby declares that the Real Property shall be held, sold, and conveyed subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with the real property and be binding on all parties having any right, title, or interest in the described properties or any part thereof, their heirs, successors, and assigns, and shall inure to the benefit of each owner thereof.

## ARTICLE I
## DEFINITIONS

Section 1.1    Act: "Act" shall mean the Uniform Common Interest Ownership Act, NRS Chapter 116, as it may be amended from time to time.

Section 1.2    Allocated Interests: "Allocated Interests" shall mean the Liability for Common Expenses and votes in the Association, which are allocated to Units in the Project. The Allocated Interests are described in Article VIII of this Declaration.

Section 1.3    Annexable Property: "Annexable Property" shall mean the real property described in Exhibit "A" which may hereafter be brought within the terms of this Declaration as part of the Project pursuant to Article VII.

Section 1.4    Annexation Amendment: "Annexation Amendment" shall mean deeds, notices, declarations, or supplements hereto whereby Declarant exercises its right to expand the Project to include all or part of the Annexable Property pursuant to Section 7.1(a).

Section 1.5    ARC: "ARC" shall mean the architectural, design and landscaping committee created pursuant to Article XII hereto.

Section 1.6    ARC Rules: "ARC Rules" shall mean the rules adopted by the ARC pursuant to Article XII hereof.

Section 1.7    Articles: "Articles" shall mean the Articles of Incorporation of the Association as may be amended from time to time.

Section 1.8     Assessment, Capital Improvement:  "Assessment, Capital Improvement" shall mean a charge against each Owner and his Unit representing a portion of the costs to the Association for installation or construction of any Improvements on any portion of the Common Elements which the Association may from time to time authorize, pursuant to the provisions of this Declaration.

Section 1.9     Assessment, Common or Common Expense:  "Assessment, Common or Common Expense" shall mean the annual charge against each Owner and his Unit representing a portion of the total, ordinary costs of maintaining, improving, repairing, replacing, managing and operating the Common Elements or other Common Expenses, which are to be paid by each Owner to the Association, as provided herein.

Section 1.10   Assessment, Reconstruction:  "Assessment, Reconstruction" shall mean a charge against each Owner and his Unit, representing a portion of the cost to the Association for reconstruction of any portion of the Improvements on the Common Elements, pursuant to the provisions of this Declaration.

Section 1.11   Assessment, Special:  "Assessment, Special" shall mean a charge against a particular Owner and his Unit, directly attributable to or reimbursable by the Unit Owner, equal to the cost incurred by the Association for corrective action performed pursuant to the provisions of this Declaration (including, if applicable, the amount of any deductible payable in connection with an insured loss), or levied by the Board as a reasonable fine or penalty for non-compliance with the Restrictions, plus interest and other charges on such Special Assessment as provided for in this Declaration.

Section 1.12   Association:  "Association" shall mean the Venezia Community Association, a nonprofit corporation organized under NRS Chapter 82 organized as the Association of Owners pursuant to the Act (NRS 116.3101).

Section 1.13   Board of Directors or Board:  "Board of Directors" or "Board" shall mean the board of directors of the Association.

Section 1.14   Bylaws:  "Bylaws" shall mean the Bylaws of the Association, as may be amended from time to time.

Section 1.15   Commercial Vehicle:  "Commercial Vehicle" shall mean (i) a truck of greater than one (1) ton capacity; or (ii) a bus.  A Commercial Vehicle may be defined as such even if the vehicle does not have a commercial license plate.

Section 1.16   Common Elements:  "Common Elements" shall mean all (i) real property, other than Units, owned or leased by the Association, (ii) real property over which the Association holds an easement for the use and enjoyment of the Owners, (iii) any personal property owned by the Association for the use and enjoyment of the Owners, and (iv) any other property owned or held by the Association for the use and enjoyment of the Owners.  The Common Elements shall

3

20020806
.01138

additionally initially consist of the real property (together with the improvements constructed thereon) described as follows:

Common Element Lots "B" and "C" of Venezia at Rhodes Ranch Unit 1, as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded AuGUST 2, 2002, on file in Book 105, of Plats, page 97 , in the Office of the County Recorder, Clark County, Nevada; and

A non-exclusive easement across:

those portions of Common Element Lot "A" (Garden Pond Street, Argus Reed Avenue, Flying Frog Avenue, Ornate Glade Avenue and Tree Frog Street which constitute the Private Streets of Venezia at Rhodes Ranch Unit 1), as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97 , in the Office of the County Recorder, Clark County, Nevada;

for access to Lots Thirty-Four (34) through One Hundred (100) inclusive of Venezia at Rhodes Ranch Unit 1, as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97 , in the Office of the County Recorder, Clark County, Nevada.

Section 1.17  Common Expenses: "Common Expenses" shall mean the expenses or financial liabilities for the operation of the Project together with any allocations to reserves and shall include:

(i)       Expenses of administration, maintenance, repair or replacement of the Common Elements;

(ii)      Expenses declared to be Common Expenses under the Documents or the Act (including without limitation, expenses for the maintenance of the coach lights on each Unit pursuant to Section 6.1 of this Declaration);

(iii)     Expenses agreed upon as Common Expenses by the Association; and

(iv)      Reserves established by the Association, for repairs, replacements or additions to the Common Elements; and

(v)       Expenses, fees, and other charges imposed upon the Association by any governmental entity because the Project is a common interest community pursuant to the Act.

Section 1.18  Declarant: "Declarant" shall mean KB HOME Nevada Inc., or its successor as defined in the Act (NRS 116.110335).

4



Section 1.19   Declarant Control Period: "Declarant Control Period" shall mean the period of time during which the Declarant is entitled to appoint a majority of the members of the Board of Directors pursuant to Section 7.9.

Section 1.20   Declaration: "Declaration" shall mean this document, including any amendments.

Section 1.21   Development Rights: "Development Rights" shall mean the rights reserved by the Declarant under Article VII of this Declaration to create Units, Common Elements and Limited Common Elements within the Project as well as other rights provided for herein.

Section 1.22   Director: "Director" shall mean a member of the Board of Directors.

Section 1.23   Documents: "Documents" shall mean this Declaration, the Plat, the Articles, the Bylaws and the Rules as they be amended from time to time. Any exhibit, schedule or certification accompanying a Document shall be deemed to be a part of that Document.

Section 1.24   Eligible Insurer: "Eligible Insurer" shall mean an insurer or guarantor of a first Security Interest in a Unit. An Eligible Insurer shall notify the Association in writing of its name and address and inform the Association that it has insured or guaranteed a first Security Interest in a Unit and must provide the Association with the Unit number and address of the Unit on which it is the insurer or guarantor of a Security Interest. Such notice shall be deemed to include a request that the Eligible Insurer be given the notices and other rights described in Article XVII.

Section 1.25   Eligible Mortgagee: "Eligible Mortgagee" shall mean the holder of a first Security Interest in a Unit, when the holder has notified the Association, in writing, of its name and address and that it holds a first Security Interest in a Unit. The notice must include the Unit number and address of the Unit on which it has a security interest. This notice shall be deemed to include a request that the Eligible Mortgagee be given the notices and other rights described in Article XVII.

Section 1.26   HUD: "HUD" shall mean the U.S. Department of Housing and Urban Development.

Section 1.27   Improvements: "Improvements" shall mean any construction, structure, fixture or facilities existing or to be constructed on the real property which is included in the Project, including, but not limited to: buildings, trees and shrubbery planted by the Declarant or the Association, paving, utility wires, pipes, light poles, fire hydrants and walls.

Section 1.28   Liability for Common Expenses: "Liability for Common Expenses" shall mean the liability for common expenses allocated to each Unit pursuant to Article VIII.

Section 1.29   Limited Common Elements: "Limited Common Elements" shall mean the portion of the Common Elements allocated for the exclusive use of fewer than all Unit Owners under the Declaration or the Act.

Section 1.30   Majority of Members or Majority of Owners: "Majority of Members" or "Majority of Owners" shall mean the Owners of Units to which at least a majority of the votes in the Association are allocated.

Section 1.31   Manager: "Manager" shall mean a person, firm or corporation possessing all licenses and certifications required by the Act, employed or engaged to perform management services for the Project and the Association.

Section 1.32   Member: "Member" shall mean a person entitled to membership in the Association as provided in the Documents. A "Member in Good Standing" shall mean a Member whose voting rights have not been suspended in accordance with Section 13.2 of the Bylaws.

Section 1.33   Notice and Comment: "Notice and Comment" shall mean the right of an Owner to receive notice of an action proposed to be taken by or on behalf of the Association, and the right to comment thereon, the procedure for which is set forth in Section 23.1 of this Declaration.

Section 1.34   Notice and Hearing: "Notice and Hearing" shall mean the right of an Owner to receive notice of an action proposed to be taken by or on behalf of the Association, and the right to be heard thereon, the procedure for which is set forth in Section 23.2 of this Declaration.

Section 1.35   NRS: "NRS" shall mean the Nevada Revised Statutes.

Section 1.36   Owner: "Owner" shall mean the Declarant or other Person who owns a Unit, however, Owner does not include a Person having an interest in a Unit solely as security for an obligation. The Declarant is the initial owner of any Unit created by this Declaration.

Section 1.37   Person: "Person" shall mean an individual, corporation, business trust, estate, trust, partnership, association, joint venture, government, government subdivision or agency or other legal or commercial entity.

Section 1.38   Phase 1: "Phase 1" shall mean the Real Property initially subject to this Declaration and together with the Common Elements and including all Improvements constructed thereon.

Section 1.39   Plat: "Plat" means the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97, in the Office of the County Recorder, Clark County, Nevada, together with such other final maps, diagrammatic plans and information regarding the Real Property or the Annexable Property as may be required by the Act or other applicable law, or as may be added to this Declaration, as each may be amended and supplemented from time to time.

6


20020806
.01138

Section 1.40    Private Drainage Easement: "Private Drainage Easement" means those certain private drainage easements now or hereafter reserved in the Plat which burden certain Units, as more particularly described in Section 9.29 of this Declaration.

Section 1.41    Project: "Project" shall mean the Real Property, the Common Elements and any additional real property that may be annexed under Article VII, including all Improvements erected or to be erected thereon.

Section 1.42    Public Offering Statement: "Public Offering Statement" shall mean the current document pertaining to the Project prepared pursuant to the Act as it may be amended from time to time, and provided to purchasers prior to the time of execution of a binding purchase agreement.

Section 1.43    Real Property: "Real Property" shall mean the real property described as follows:

> Lots Thirty-Four (34) through One Hundred (100) inclusive, of Venezia at Rhodes Ranch Unit 1, as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97 , in the Office of the County Recorder, Clark County, Nevada,

and all Improvements, easements, rights, appurtenances and additions which have been or hereafter are submitted to the provisions of the Act by this Declaration.

Section 1.44    Recreational Vehicle: "Recreation Vehicle" shall mean any motorhome, bus, trailer coach, trailer, off-road vehicle, boat or other watercraft, aircraft, camper or any other vehicle classified by the Board as a Recreational Vehicle in the Rules.

Section 1.45    Residential Use: "Residential Use" shall mean use as a dwelling for personal family or household purposes by ordinary customers.

Section 1.46    Restrictions: "Restrictions" shall mean this Declaration, the Articles of Incorporation of the Association, the Bylaws and the Rules from time to time in effect.

Section 1.47    Rules: "Rules" shall mean the regulations for the use of Common Elements and the conduct of persons in connection therewith within the Project as adopted by the Board of Directors pursuant to this Declaration.

Section 1.48    Security Interest: "Security Interest" shall mean the interest in real estate or personal property, created by contract or conveyance, which secures payment or performance of an obligation. The term includes a lien created by a mortgage, deed of trust, trust deed, security deed, contract for deed, land sales contract, lease intended as security, assignment of lease or rents intended as security, pledge of an ownership interest in an Association, and any other consensual lien or title retention contract intended as security for an obligation.


20320906
C1138

Section 1.49    Sight Visibility Zones: "Sight Visibility Zones" means those certain sight visibility zones reserved in the Plat which burdens certain Units, as more particularly described in Section 9.26 of this Declaration.

Section 1.50    Special Declarant Rights: "Special Declarant Rights" shall mean those rights reserved for the benefit of Declarant to (1) complete improvements indicated on the Plats; (2) exercise any Development Right; (3) maintain sales offices, management offices, advertisement signs and models within the Project for the benefit of the Real Property and any other real property owned by Declarant; (4) use easements through the Common Elements for the purpose of making improvements within the Project, within real estate that may be added to the Project and any other real property owned by Declarant; or (5) appoint or remove an officer of the Association or any Board of Directors member during the Declarant Control Period.

Section 1.51    Subsidy Agreement: "Subsidy Agreement" means an agreement of the type described in Section 18.14 of this Declaration.

Section 1.52    Trustee: "Trustee" shall mean the entity which may be designated by the Board of Directors as the Trustee for the receipt, administration and disbursement of funds derived from insured losses, condemnation awards, special assessments for uninsured losses and other sources as defined in the Bylaws. If no Trustee has been designated, the Trustee shall be the Board of Directors acting by majority vote, as executed by the president and attested by the secretary.

Section 1.53    Unit: "Unit" shall mean the physical portion of the Project designated for separate ownership and occupancy which shall include a single family house on a separately platted lot, the boundaries of which are described in Section 4.2 of this Declaration.

Section 1.54    VA: "VA" shall mean and refer to the U.S. Department of Veterans Affairs.

## ARTICLE II
## PROJECT AND ASSOCIATION

Section 2.1    Project and Association: The name of the Project is Venezia. Venezia is a planned community under the Act.

Section 2.2    Association: The name of the Association is Venezia Community Association. The Association is charged with the duties and vested with the powers prescribed by law and set forth in the Articles, Bylaws, and this Declaration. Neither the Articles nor Bylaws shall, for any reason, be amended or otherwise changed so as to be inconsistent with this Declaration. If there should exist any ambiguity in any provision of the Articles or Bylaws, then such provision shall be consistent with the provisions of this Declaration.



## ARTICLE III
## DESCRIPTION OF REAL PROPERTY

The Project is situated in the County of Clark, State of Nevada, and initially consists of the Real Property described in Section 1.43 hereof.

## ARTICLE IV
## UNIT AND BOUNDARY DESCRIPTIONS

Section 4.1    Maximum Number of Units: When created, the Project shall contain seventy-nine (79) Units. Declarant reserves the right to create up to a total of one hundred forty (140) Units pursuant to Article VII.

Section 4.2    Boundaries: The Boundaries of each Unit created by the Declaration are the lot lines shown on the Plat as numbered lots, along with their identifying number.

## ARTICLE V
## COMMON ELEMENTS

Section 5.1    Use: Except as otherwise provided herein and subject to such specific limitations as may otherwise be imposed upon any portion of the Common Elements, the Common Elements shall be improved and used only for the purposes of (i) affording pedestrian and vehicular movement and parking within the Project subject to Rules established by the Board and easements provided for in the Documents; and (ii) beautification of the Common Elements and providing privacy to the residents of the Project through landscaping and such other means as the Board shall deem appropriate. In addition:

(a)    Entrances. Any lighted entry monument structure and sign(s) and/or open space landscaping which may be installed or constructed by Declarant within the Project for the common enjoyment of the Owners.

(b)    Restriction on Change. The right and easement to the Common Elements shall be held, maintained and used by the Association to enhance the Owners' enjoyment of the natural environment of the Project and for no other purposes. No Improvement, excavation or work which in any way alters any Common Elements from its natural or existing state on the date such area was transferred to or otherwise came under the jurisdiction of the Association shall be made or done except upon strict compliance with, and within the restrictions and limitations of, this Declaration.

Section 5.2    Limitation on Construction: Subject to Articles VII and XI, no person other than the Declarant or the Association or its duly authorized agents shall construct, reconstruct, refinish, alter or maintain any Improvement upon, or shall make or create any excavation or fill upon, or shall change the natural or existing drainage of, or shall destroy or remove any tree, shrub, or other vegetation from any Common Elements. The Association may, at any time, as to any Common Elements:

9

(a)     Reconstruct, replace or refinish any Improvement or portion thereof upon any such Common Elements (to the extent that such work is not done by a governmental entity, if any, responsible for the maintenance and upkeep of such area), in accordance with the plans filed by Declarant with the Board pursuant to Section 5.3.

(b)     Construct, reconstruct, replace or refinish any road improvement or surface upon any portion of the Common Elements used as a road or driveway in accordance with the plans filed by Declarant with the Board pursuant to Section 5.3.

(c)     Replace injured or diseased trees, shrubs or other vegetation in any Common Elements, and plant trees, shrubs and other vegetation to the extent that the Association deems necessary for the conservation of water and soil or for aesthetic purposes; and

(d)     Place and maintain upon any Common Elements such signs as the Association may deem appropriate for the proper identification, use and regulation thereof.

Notwithstanding the foregoing, no change, alteration or modification to the Common Elements, including the removal of trees, shrubs or other vegetation thereon or any pruning or trimming thereof which would alter height or width by more than five percent (5%), shall be made by the Association after the termination of the Declarant Control Period, which is not in accordance with the plans filed by Declarant with the Board pursuant to Section 5.3, without the affirmative vote of a Majority of Owners at a special meeting thereof, duly called and held, notice of which shall specifically state the proposed change, alteration or modification to be made to the Common Elements.

Section 5.3     Declarant's Plans and Specifications: Declarant shall from time to time file with the Board such plans and specifications as it may have in its possession for the purpose of maintaining a permanent record of Improvements constructed on any Common Elements. If Declarant, for any reason, has not delivered such plans and specifications to the Board, the references to such "plans and specifications" shall mean to the Improvements as originally constructed by Declarant.

Section 5.4     Owner's Easement of Enjoyment: Every Owner is hereby granted a right and easement of enjoyment of the Common Elements and such easement shall be appurtenant to and shall pass with title to every Unit subject to the following provisions:

(a)     The right of the Association to establish and enforce Rules.

(b)     The right of the Association to suspend the voting rights of an Owner for any period during which any assessment against his or her Unit remains unpaid and delinquent, and for a period not to exceed thirty (30) days for any single infraction of the Declaration, Bylaws or Rules provided that any suspension of such voting rights except for failure to pay assessments, shall be made only by the Association after notice and hearing given and held in accordance with Section 8.4 of the Bylaws.

10

20020806
.01138

(c)     The Special Declarant Rights described in Article VII.

(d)     No Owner shall allow his or her furniture, furnishings, or other personal property to remain within any portion of the Common Elements except as may otherwise be permitted by the Association.

Section 5.5     Delegation of Enjoyment:  Any Owner may delegate, in accordance with the Documents his or her rights of enjoyment to the Common Elements to the members of his or her family, social invitees, tenants or contract purchasers subject to reasonable regulations and procedures established by the Board. The Board may extend permission to recognized community leagues to use appropriate portions of the Common Elements subject to such terms and conditions as the Board may impose.

Section 5.6     Nuisances:  No rubbish or debris of any kind shall be placed or permitted to accumulate upon or adjacent to the Common Elements, and no odors shall be permitted to arise therefrom, so as to render any such property or any portion thereof unsanitary, unsightly, offensive or detrimental to any other property in the vicinity thereof or to the occupants of such other property.  No nuisance shall be permitted to exist or operate upon the Common Elements so as to be offensive or detrimental to any other property in the vicinity thereof or the occupants of such other property.

Section 5.7     Declarant's Exemption:  Nothing contained in this Declaration shall be construed to prevent the exercise by Declarant or its duly authorized agents within the Common Elements of any Special Declarant Rights.

Section 5.8     Owner's Liability for Damages to Common Elements:  Each Owner shall be legally liable to the Association for all damages to the Common Elements or to any Improvements thereof or thereto, including, but not limited to, curbs, sidewalks, paved surfaces, any buildings and landscaping, caused by such Owner, his or her licensees, guests or any occupant of such Owner's Unit, as such liability may be determined under Nevada law.

Section 5.9     Duties of Association:  The Association shall be obligated to adhere to the standards of maintenance for the Common Elements established as provided in Section 5.3. Subject to the foregoing limitations, the Board shall have the right to establish standards of maintenance for the Common Elements more stringent than those initially established by Declarant but not less stringent than those established by Declarant.

Section 5.10    Mineral Exploration; Toxic Substances:  No property within the Common Elements shall be used in any manner to explore for or to remove any water, oil or other hydrocarbons, minerals of any kind, gravel, or any earth substance of any kind, or for the storage or disposal of "hazardous waste" or other hazardous or toxic materials, as such terms are defined by federal, state or local laws now or hereafter in effect.

Section 5.11    Automatic Irrigation Systems:  Any and all irrigation systems installed within the Common Elements shall be automatic.

Section 5.12  Security:  The Association may, but shall not be obligated to, maintain or support certain activities within the Project designed to make the Project safer than they otherwise might be.  Neither the Association (including the Board and any committees) nor Declarant shall in any way be considered insurers or guarantors of security within the Project, nor shall any of the above-mentioned parties be held liable for any loss or damage by reason of failure to provide adequate security or ineffectiveness of security measures undertaken.  No representation or warranty is made that any systems or measures, including any mechanism or system for limiting access to the Project cannot be compromised or circumvented, nor that any such systems or security measures undertaken will in all cases prevent loss or provide the detection or protection for which the system is designed or intended.

Each Owner acknowledges, understands and covenants to inform all residents of its unit, and their respective families and invitees, that neither the Association (including the Board and any committees) nor all other person involved with the governance, maintenance, and management of the Project, including Declarant, are insurers of safety or security within the Project.  All Owners and residents, and their respective families and invitees, assume all risks of personal injury and loss or damage to persons, units, and the contents of units, and further acknowledge that neither the Association (including the Board and any committees), the Board nor Declarant have made representations or warranties regarding any entry gate, patrolling of the properties, any fire protection system, burglar alarm system, or other security systems recommended or installed or any security measures undertaken within the Project.  All Owners and residents, and their respective families and invitees, further acknowledge that they have not relied upon any such representations or warranties, expressed or implied.

Section 5.13  Declarant's Maintenance of Certain Common Elements:  Any or all of the Common Elements may be conveyed to the Association subject to easements in favor of Declarant for purposes of maintenance.

Section 5.14  Limited Common Elements:  There are currently no Limited Common Elements within the Project.

## ARTICLE VI
## MAINTENANCE

Section 6.1  Common Elements:  The Association shall maintain, repair and replace all of the Common Elements within the Project, including without limitation planting, replacing, repairing and maintaining all landscaped areas (including the park, if constructed), irrigation systems, drainage areas, monument signs and private streets, and shall keep all Improvements of whatever kind and for whatever purpose from time to time located thereon in good order and repair; provided, however, that the Association shall have the right but not the obligation to paint and maintain the exterior of the perimeter walls and the exterior of any other walls within the Project that can be seen from any Unit, private street or Common Element within the Project or from any street adjacent to the Project.  The Association shall also have the responsibility and obligation to maintain, repair and replace the coach lights attached to the front of the home on each Unit (excluding the cost of the electricity), including the repair and/or replacement of photocells

H.USERS.RRR KBHOME venezia cc&r 2 wpd  8 1 02

12

and light bulbs. In the maintenance of the Common Elements, the Association shall at all times strictly comply with the conditions of all applicable federal, state and local laws, including any applicable city or county laws and ordinances. In addition, the Association may maintain and keep in good repair rights-of-way owned by any political subdivision of the State (subject to the approval or consent of the political subdivision), so long as the rights-of-way are within the Common Elements or within the Project. This maintenance may include, but not be limited to, maintenance, repair, and replacement, subject to any insurance then in effect, of all landscaping and other flora, structures and improvements situated upon such areas.

Section 6.2     Units: Each Owner shall maintain, repair and replace, at his or her own expense, all portions of his or her Unit, except that the Association shall be responsible to maintain, repair and replace the coach lights attached to the front of the home on each Unit, including the repair and/or replacement of the photocells and light bulbs; provided however, that each Owner shall be responsible to pay all the electricity costs and shall not interfere in any manner whatsoever with the coach lights, light bulbs, or photocells.

Section 6.3     Right of Access: Any person authorized by the Board of Directors shall have the right of access to all portions of the Real Property for the purpose of performing emergency repairs or to do other work reasonably necessary for the proper maintenance of the Project, for the purpose of performing installations, alterations or repairs, and for the purpose of reading, repairing and replacing utility meters and related pipes, valves, wires and equipment, provided that requests for entry are made in advance and that any entry is at a time reasonably convenient to the affected Owner. In case of an emergency, no request or notice is required and the right of entry shall be immediate, and with as much force as is reasonably necessary to gain entrance, whether or not the Owner is present at the time.

Section 6.4     Repairs Resulting From Negligence: Each Owner will reimburse the Association for any damages to any other Unit or to the Common Elements caused intentionally, negligently or by his or her failure to properly maintain, repair or make replacements to his or her Unit. The Association will be responsible for damage to Units which is caused intentionally, negligently or by its failure to maintain, repair or make replacements to the Common Elements. If such damage is caused by misconduct, it will be assessed following Notice and Hearing.

Section 6.5     Association Easement for Removal of Graffiti: The Association shall have the right but not the obligation to remove all graffiti and similar unsightly appearance from all walls in the Project (notwithstanding that such walls may constitute part of a Unit) which are visible from the Common Elements or from dedicated streets or rights of way and Declarant hereby reserves an easement in favor of the Association for such purpose.

## ARTICLE VII
## DEVELOPMENT RIGHTS AND OTHER SPECIAL DECLARANT RIGHTS

Section 7.1     Reservation of Development Rights: Declarant reserves the following Development Rights:

(a)  The right, but not the obligation, by amendment to expand the Project to include all or part of the Annexable Property. Declarant shall have the unilateral right to transfer to any other person the right to expand which is herein reserved. Declarant shall pay all taxes and other governmental assessments relating to the Annexable Property owned by Declarant until expansion.

Such expansion may be accomplished by recording one or more deeds, notices, declarations, or supplements hereto (which forms of recorded instruments are each referred to herein as an "Annexation Amendment") in the records of the County Recorder of Clark County, Nevada, describing the real property to be annexed, submitting it to the covenants, conditions, and restrictions contained herein, and providing for the readjustment of voting rights and assessment allocations provided for herein on the basis of formulas provided herein. Each Annexation Amendment shall not require the consent of the Owners. Any such expansion shall be effective upon the filing for record of the Annexation Amendment except as provided therein. The expansion may be accomplished in stages by successive Annexation Amendments or in one expansion through an Annexation Amendment. Upon the recordation of any Annexation Amendment, the definitions used in this Declaration shall be expanded automatically to encompass and refer to the Real Property as expanded. Such Annexation Amendment may add, delete, or modify provisions of this Declaration as it applies to all or any portion of the Annexable Property then being subjected to the Declaration, provided, however, that this Declaration may not be modified with respect to the Real Property previously subject to the Declaration except as provided herein for amendment

(b)  The right, but not the obligation, by amendment to create Units and Common Elements upon all or parts of the Annexable Property as well as any real property adjacent thereto that shall be annexed into the Project.

(c)  The right, but not the obligation, by amendment to subdivide Units located on the Real Property or convert such Units into Common Elements.

(d)  The right, but not the obligation, to construct underground utility lines, pipes, wires, ducts, conduits and other facilities upon the real property in the Project, for the purpose of furnishing utility and other services to buildings and Improvements to be constructed in the Project. Declarant also reserves the right to withdraw and grant easements to public utility companies and to convey Improvements within those easements anywhere in the Project not occupied by buildings, for the purposes mentioned above. If Declarant grants any such easements, the Plats will be amended to include reference to the recorded easement.

(e)  The right, but not the obligation, to withdraw any Unit from this Declaration at any time prior to the sale or conveyance of that Unit by Declarant. Such withdrawal shall be accomplished by recording a declaration of withdrawal in the records of the Recorder of Clark County, Nevada, describing the real property to be withdrawn, and providing for the readjustment of voting rights and assessment allocations provided for herein. Such declaration of withdrawal shall not require the consent of the Owners. Any such withdrawal shall be effective upon the filing for record of such declaration of withdrawal except as provided therein. The withdrawal may be accomplished in stages by successive declarations or in one declaration of withdrawal.

14

20020806
.01138

(f)     The right, but not the obligation, to unilaterally amend this Declaration at any time prior to the close of the first sale of a Unit.

Section 7.2     Limitations on Development Rights: The Development Rights reserved in Section 7.1 are limited as follows:

(a)     The Development Rights may be exercised at any time within five (5) years after the recording of the initial Declaration;

(b)     Not more than sixty-one (61) additional Units may be created under the Development Rights;

(c)     The quality of the construction of any buildings and improvements to be created on the Real Property shall be consistent with the buildings and improvements of those constructed in Phase 1 (this limitation shall not prevent Declarant from having the right to modify the shape, size, elevation, or floor plan of Units);

(d)     All Units and Common Elements created pursuant to the Development Rights will be restricted to Residential Use in the same manner and to the same extent as the Units created under this Declaration as initially recorded;

(e)     All taxes, assessments, mechanic's liens and other charges affecting the Real Property arising in connection with Declarant's ownership of, and construction of improvements upon, the Annexable Property which may adversely affect the rights of existing Unit Owners, or the priority of any Eligible Mortgagee on Units in the Real Property, are to be paid or otherwise satisfactorily provided for by Declarant; and

(f)     During the exercise of the Developmental Rights, Declarant (at Declarant's own expense) shall maintain a general liability insurance policy in an amount not less than one million dollars ($1,000,000.00) for each occurrence, to cover any damages or injuries incurred by Owners of previously sold Units as a result of further development.

Section 7.3     Phasing of Development Rights: No assurances are made by Declarant as to the Annexable Property as to whether Declarant will exercise its Development Rights or the order in which such portions, or all of the areas, will be developed. The exercise of Development Rights as to some portions will not obligate Declarant to exercise its Development Rights as to other portions.

Section 7.4     Special Declarant Rights: Declarant reserves the following Special Declarant Rights, to the maximum extent permitted by law, which may be exercised, where applicable, anywhere within the Project:

(a)     To complete any Improvements indicated on Plats;

(b)     To exercise any Development Right reserved in this Declaration;

20020806
C1138

(c)     To maintain sales offices, management offices, signs advertising the Project and models which are reasonably necessary to market the Units or any other real property owned by Declarant regardless of whether such real property is part of the Project;

(d)     To use easements through the Common Elements for the purpose of making Improvements within the Project or within real estate which may be added to the Project or any other real property owned by Declarant regardless of whether such real property is part of the Project;

(e)     To merge or consolidate the Project with another Project of the same form of ownership; and

(f)     To appoint or remove any officer of the Association or a Board of Directors member during the Declarant Control Period.

Section 7.5     Models, Sales Offices and Management Offices: For so long as Declarant is an Owner, Declarant, its duly authorized agents, representatives and employees may maintain any Unit owned by Declarant or any portion of the Common Elements as a model Unit, sales office or management office.

Section 7.6     Construction; Declarant's Easement: Declarant reserves the right to perform warranty work, repairs and construction work in Units and Common Elements, to store materials in secure areas, and to control and have the right of access to work and repairs until completion. All work may be performed by Declarant without the consent or approval of the Board of Directors. Declarant has an easement through the Common Elements as may be reasonably necessary for the purpose of discharging Declarant's obligations or exercising Special Declarant Rights, whether arising under the Act or reserved in this Declaration. This easement includes the right to convey utility and drainage easements to public utilities, municipalities, the State, riparian owners or upland owners to fulfill the plan of development.

Section 7.7     Signs and Marketing: Declarant reserves the right to post signs and displays in the Common Elements in order to promote sales of Units. Declarant also reserves the right to conduct general sales activities in a manner which will not unreasonably disturb the rights of Owners.

Section 7.8     Declarant's Personal Property: Declarant reserves the right to retain all personal property and equipment used in the sales, management, construction and maintenance of the Project that has not been represented as property of the Association. Declarant reserves the right to remove from the Project (promptly after the sale and close of escrow of the last Unit) any and all goods and improvements used in development, marketing and construction, whether or not they have become fixtures.

Section 7.9    Declarant Control of the Association:

(a)    Subject to Subsection 7.9(b), there shall be a Declarant Control Period during which Declarant, or persons designated by Declarant, may appoint and remove the officers and members of the Board of Directors. The Declarant Control Period terminates no later than the earlier of:

(i)    Sixty (60) days after conveyance of seventy-five percent (75%) of the Units that may be created to Owners other than Declarant; or

(ii)    Five (5) years after Declarant has ceased to offer Units for sale in the ordinary course of business; or

(iii)    Five (5) years after any right to add new Units was last exercised.

Declarant may voluntarily surrender the right to appoint and remove officers and members of the Board of Directors before termination of that period. In that event, Declarant may require, for the duration of the Declarant Control Period, that specified actions of the Association or Board of Directors, as described in a recorded instrument executed by Declarant, be approved by Declarant before they become effective.

(b)    Not later than sixty (60) days after conveyance of twenty-five percent (25%) of the Units that may be created to Owners other than Declarant, at least one (1) member and not less than twenty-five percent (25%) of the members of the Board of Directors shall be elected by Owners other than Declarant. Not later than sixty (60) days after conveyance of fifty percent (50%) of the Units that may be created to Owners other than Declarant, not less than thirty-three and one-third percent (33-1/3%) of the members of the Board of Directors must be elected by Owners other than Declarant.

(c)    Not later than the termination of the Declarant Control Period, each member of the Board of Directors must have been elected by the Owners as provided in the Bylaws.

(d)    Notwithstanding any provision of this Declaration to the contrary, the termination of the Declarant Control Period under this Section 7.9 shall not affect Declarant's rights as an Owner to exercise the vote allocated to Units which Declarant owns.

Section 7.10    Limitations on Special Declarant Rights: Unless terminated earlier by an amendment to this Declaration executed by Declarant, any Special Declarant Right may be exercised by Declarant until the later of the following: as long as Declarant (a) is obligated under any warranty or obligation, (b) holds a Development Right to create additional Units or Common Elements, (c) owns any Unit; (d) owns any Security Interest in any Units; or (e) fifteen (15) years have elapsed after recording of this Declaration. Earlier termination of certain rights may occur by statute.

Section 7.11   Interference with Special Declarant Rights: Neither the Association nor any Unit Owner may take any action or adopt any rule that will interfere with or diminish any Special Declarant Right without the prior written consent of Declarant.

Section 7.12   VA/HUD Approval: During the Declarant Control Period, the following actions will require the prior approval of the VA and/or HUD to the extent necessary to meet any VA and/or HUD requirements applicable to the Project: annexation or de-annexation of any additional properties, any merger or consolidation of the Association, any special assessment, mortgaging of the Common Elements, dedication of the Common Elements, any amendment of the Declaration, any amendment to the Bylaws, and the removal of any portion of the Common Elements. Additional limitations on the right of Declarant to exercise Development Rights may be found in Article XVII of this Declaration.

Section 7.13   Declarant's Rights to Complete Development: No provision of this Declaration shall be construed to prevent or limit Declarant's rights to complete the development, construction, promotion, marketing, sale and leasing of properties within the boundaries of the area comprised of the Real Property and the Annexable Property; to construct or alter Improvements on any property owned by Declarant within such boundaries; to maintain model homes, offices for construction, sales or leasing purposes or similar facilities on any property owned by Declarant or owned by the Association within such boundaries; or to post signs incidental to the development, construction, promotion, marketing, sale and leasing of property within such boundaries. Nothing contained in this Declaration shall limit the right of Declarant or require Declarant to obtain approval to: (a) excavate, cut, fill or grade any property owned by Declarant or to construct, alter, remodel, demolish or replace any Improvements on any of the Real Property or any property owned by Declarant; (b) use any structure on any of the Real Property or any property owned by Declarant as a construction, model home or real estate sales or leasing office in connection with the sale of any property within such boundaries; or (c) require Declarant to seek or obtain the approval of the ARC or of the Association for any such activity or Improvement to property by Declarant on any of the Real Property or any property owned by Declarant. Nothing in this Section shall limit or impair the reserved rights of Declarant as elsewhere provided in this Declaration.

Section 7.14   Priority of Declarant's Rights and Reservations: Declarant shall have, and hereby retains and reserves, certain rights as set forth in this Declaration with respect to the Association and the Project. The rights and reservations of Declarant set forth in this Declaration shall be deemed excepted and reserved in each recorded Annexation Amendment, in each conveyance of property by Declarant to the Association and in each deed or other instrument by which any property encumbered hereby is conveyed by Declarant, whether or not specifically stated therein. The rights, reservations and easements of Declarant set forth in this Declaration shall be prior and superior to any other provisions of this Declaration and may not, without Declarant's prior written consent, be modified, amended, rescinded or affected by any amendment of this Declaration, including any amendment of this Section. Declarant's consent to any one such amendment shall not be construed as consent to any other or subsequent amendment.

20020806
.01138

Section 7.15 Assignment of Declarant's Rights and Duties: Any and all of the rights, powers and reservations of Declarant herein contained may be assigned by Declarant to any person, corporation or association which will assume any or all of the duties of Declarant hereunder, and upon any such person, corporation or association's evidencing its consent in writing to accept such assignment, said assignee shall, to the extent of such assignment, assume Declarant's duties hereunder, have the same rights and powers and be subject to the same obligations and duties as are given to and assumed by Declarant herein. Upon such assignment, and to the extent thereof, Declarant shall be relieved from all liabilities, obligations and duties hereunder.

## ARTICLE VIII
## ALLOCATED INTERESTS

Section 8.1 Allocation of Interests: The Allocated Interests shall be allocated and calculated in accordance with the formulas set forth in this Article. The same formulas are to be used in reallocating interests if Units are added to the Project pursuant to Section 7.1 of this Declaration.

Section 8.2 Formulas for the Allocation of Interests: The interests allocated to each Unit have been calculated by the following formulas:

(a) Liability for Common Expenses. The percentage of Liability for Common Expenses allocated to each Unit shall be one (1) equal share for each Unit. Nothing contained in this Subsection shall prohibit certain Common Expenses from being apportioned to particular Units under Article XVIII of this Declaration.

(b) Votes. Each Unit in the Project shall have one (1) equal vote in Association matters pursuant to the Documents. Any specified percentage, portion or fraction of Owners, unless otherwise stated in the Documents, shall be deemed to require the specified percentage, portion or fraction of all of the votes allocated to Units in the Project.

Section 8.3 Assignment of Allocated Interests Pursuant to Exercise of Development Rights: The effective date for assigning Allocated Interests to Units created pursuant to Section 7.1 of this Declaration shall be the date on which the amendment creating the Units is recorded in the Recorder's Office for Clark County, Nevada.

## ARTICLE IX
## RESTRICTION ON USE

Section 9.1 Residential Area: Except as provided in Article VII with respect to Declarant, each Unit shall be used for private, one-family residence purposes exclusively. No part of the Project shall be used or caused, allowed or authorized to be used in any way whatsoever, directly or indirectly, for any business, commercial, manufacturing, mercantile, storing, vending or other non-residential purpose, without the prior written consent of the Board. In deciding whether or not to permit an otherwise nonconforming use hereunder, the Board shall consider the

19



potential effect upon traffic in the Project and interference with or annoyance of neighbors; notwithstanding the foregoing, a nonconforming use shall never be permitted unless such use is incidental to the Residential Use of the Unit and is permitted by applicable law.

Section 9.2    Improvements; Limitations. No structure whatsoever, other than one-family private residence may be erected or maintained on a Unit at any one time. No building, structure or other Improvement of any kind shall be erected, constructed, altered or maintained on any lot in excess of one-story; other than those lots upon which Declarant (or any entity owned or controlled by Declarant) has previously erected a two-story residential dwelling, in which case alone, no such dwelling or other Improvement shall be erected, constructed, altered or maintained thereon more than two stories. Every single-family dwelling erected upon a Unit shall contain not less than six hundred (600) square feet floor space, exclusive of porches, patios, garages and carports. No garage or carport shall be used for a living area or used for other purposes other than those uses normally attendant to a garage or carport. All lavatories and toilets shall be built indoors and connected with the sewer system.

Section 9.3    Oil, Water and Mineral Operations; Hazardous and Toxic Materials: No tools or equipment and no derrick or other structure designed for use in boring for oil, gas, or other kindred substances, or designed for use in boring for water, or designed for use in any mining operation or exploration shall hereafter be erected or placed upon the Real Property or any portion thereof; and no Owner of any Unit shall ever consent to the use of the surface of the land, or any portion of the subsurface thereof, by any lessee under any lease to be negotiated or under any lease now of record affecting any Unit, which lease pertains to the exploration, mining, or operating for oil, gas or other hydrocarbon substances and the taking, storing, removing and disposition of same. No Unit or any portion thereof shall ever be used for the storage or disposal of **"hazardous waste"** or other hazardous or toxic materials, as such terms are defined by federal, state or local laws now or hereafter in effect.

Section 9.4    Laws and Insurance Requirements: Nothing shall be done to or kept on any Unit or Improvement thereon or in the Common Elements that might increase the rate of, or cause the cancellation of, insurance for the Project, or any portion of the Project, without the prior written consent of the Association. No Owner shall permit anything to be done or kept in his or her Unit or any Improvement thereon that violates any of the restrictions contained in this Declaration or any law, ordinance, statute, rule, or regulation of any local, county, state or federal body, including, without limitation, local ordinances relating to zoning and building codes.

Section 9.5    Antennae; Satellite Dishes: Except as otherwise expressly permitted by law, no antennae, satellite dish, or other device for the transmission or reception of television or radio signals or any other form of electromagnetic radiation, including, but not limited to, a dish or other device capable of transmitting or receiving signals for cable, satellite or pay-television systems, as well as any other pole or tower, shall be erected, used or maintained outdoors above ground within the Project whether attached to a building or otherwise, unless such antenna or device shall have been approved by the ARC.

**Section 9.6    Landscaping.** If Declarant has not provided a ground cover for a Unit, then the Owner of that Unit shall have installed thereon a ground cover acceptable to the ARC (i) covering the front yard of a Unit within six (6) months following the recordation of a deed conveying title to the Unit to the Owner from Declarant or the date of occupancy thereof, whichever occurs first, and (ii) covering the rear yard of a Unit within nine (9) months following the recordation of a deed conveying title to the Unit to the Owner from Declarant or the date of occupancy thereof, whichever occurs first. Nothing herein shall operate to permit the Association or ARC to prevent the use of water-efficient landscaping, as defined by the applicable water district, solely on the basis that such design makes use of water-efficient landscaping.

**Section 9.7    Maintenance of Units.** No rubbish, brush, weeds, undergrowth, debris of any kind or character shall ever be placed or permitted to accumulate upon any Unit, or any portion thereof, so as to render it a fire hazard, unsanitary, unsightly, offensive or detrimental to the Common Elements, any other Unit in the Project or to any occupants in the Project. The Owner of each Unit shall care for, water, cultivate, prune and maintain in good condition any and all trees, shrubs and other landscaping (including without limitation acceptable desert or water-efficient landscaping) growing on his or her Unit in a manner consistent with the restrictions set forth in this Declaration and the standards originally established by Declarant or the ARC for the Real Property; except to the extent that the Association is responsible to maintain the coach lights as set forth in Section 6.1 of this Declaration. The Association may assume all or any portion of the landscaping duties set forth in this Section but the Association shall in no event be obligated to undertake such work, except with respect to Common Elements. Should an Owner fail to perform his or her obligations under this Section or Section 9.6, or fail to keep his or her Unit free from rubbish, brush, weeds, dead or dying shrubbery, overgrown landscaping, undergrowth or debris of any character, the Association may, at any time, (i) initiate legal proceedings to enforce compliance with either of such Sections or (ii) upon thirty (30) days' written notice to such Owner of its intention to do so, enter upon that Unit and (A) remove such rubbish, brush, weeds, dead or dying shrubbery, overgrown landscaping, undergrowth or debris or (B) cause any required ground cover acceptable to the Association, together with any necessary sprinklers and irrigation facilities to be completed and, in either event, assess that Owner for the cost thereof. The Association shall notify the Owner in writing of the cost thereof, and in the event that Owner fails to reimburse the Association for its costs and expenses, such charges shall constitute a lien on that Owner's Unit, which may be enforced by the Association in accordance with the provisions of Article XVIII of this Declaration.

**Section 9.8    Perimeter Block Walls.** There are perimeter block walls and/or fences around the Project which were constructed and are to be constructed by Declarant and are subject to this Declaration. It shall be the duty of every Owner to maintain and repair those walls and/or fences and, if necessary, replace the walls and/or fences as originally constructed, all at such Owner's sole cost and expense. No changes or alterations, including, without limitation, temporary alterations (e.g., removal for construction of pool) shall be made to the perimeter walls and/or fences. It shall be the duty of the Owner of each Unit on which a block wall and/or fence is located to maintain the interior portion of that wall and/or fence and to obtain and maintain in force property and casualty insurance on a current replacement cost basis on such block walls and/or fences. If an Owner fails to repair or replace such block wall and/or fence, in accordance

with this Section within ninety (90) days after the occurrence of any damage thereto, the Association shall be entitled to repair such damaged block wall and/or fence, in which event any insurance proceeds an Owner may receive for any damage or destruction to the block wall and/or fence located on his or her Unit shall be paid to the Association which shall as promptly as practicable and in a lawful and workmanlike manner restore and repair the block wall and/or fence to its former condition. If an Owner fails to reimburse the Association the cost of such repairs, then the Association shall have the right to place a lien upon the Unit of such Owner in an amount equal to the cost of such repairs, which shall be enforceable in accordance with the procedures described in Article XVIII for unpaid assessments. The Association is hereby granted a right and easement over, under, upon and across each Unit whereon a perimeter block wall and/or fence is located for the purposes of exercising its rights under this Section.

Section 9.9   Nuisances:   No odors shall be permitted to arise from any Unit so as to render any Unit unsanitary, unsightly, offensive or detrimental to the Common Elements or any other Unit; and no nuisance shall be permitted to exist or operate upon any Unit so as to be offensive or detrimental to any other Unit or to the Owner thereof. Without limiting the generality of the foregoing provision, no horns, whistles, bells or other sound devices, except devices used exclusively for security purposes, shall be located, used or placed upon any Unit; no Owner shall permit any thing or condition to exist upon any Unit which shall induce, breed or harbor infectious plant diseases or noxious insects, and no noxious or offensive trade or activity shall be carried on upon any Unit, nor shall anything be done thereon which is or may become an annoyance or nuisance to the Project.

Section 9.10   Repair of Improvement:   No Improvement to a Unit (including, but not limited to, dwelling units, garages, carports, driveways, walls and fences) shall be permitted to fall into disrepair and all Improvements shall be kept at all times in good condition and repair and, if appropriate, painted or otherwise finished. Any and all repairs, redecorations, modifications or additions, interior or exterior, shall fully comply with all applicable building code and other governmental requirements; the Documents and, for exterior repairs, redecorations, modifications or additions only, shall comply with the guidelines, rules and specifications established by the ARC.

Section 9.11   Signs:   Except with respect to the Special Declarant Rights reserved in Article VII, no billboards, signs or advertising of any kind, excepting one (1) standard "for sale" sign or "for rent" signs, shall be erected or maintained upon any Unit without the prior written consent of the ARC.

Section 9.12   Animals:   No animals or fowl, other than commonly recognized household pets, shall be kept or maintained on a Unit or any portion thereof; no animal shall be kept, bred or maintained for any commercial purpose; and no animals or fowl, including household pets, which, after Notice and Hearing are determined by the Board of Directors to be dangerous, may be kept or maintained anywhere within the Project. At any one time the total number of household pets shall not exceed four (4) unless otherwise approved by the Board of Directors. If an animal is not confined within the Unit, the animal must be leashed and under direct control of the Owner. It shall be the absolute duty and responsibility of each Owner or tenant to clean up any solid

20020806
.01136

animal waste after such animals which have used any portion of the Real Property or any public property in the vicinity of the Real Property. No pet shall be permitted to be kept within any portion of the Real Property if it makes excessive noise or is otherwise determined to be a nuisance. If a pet is determined to be a nuisance, the Board of Directors may, after Notice and Hearing, order the removal of the pet.

Section 9.13  Easements:

(a)  Easements for installation and maintenance of utilities and drainage facilities have been conveyed as shown on the Plats. Whether or not such easements constitute a part of the Common Elements, neither the Association nor any Owner shall take any action which would interfere with the reasonable and normal use and operation of such easements.

(b)  Without limiting any provision of this Declaration, neither an Owner nor any licensee, invitee, tenant or other occupant of a Unit or contractor (other than Declarant and its affiliates) shall excavate in a street, highway, public space or private easement of a utility, the Association, Declarant or any municipality, or near the location of an underground line installed on the premises of an Owner served by a utility, the Association, Declarant or any municipality, or demolish a building without having first:

(i)  Complied with the provisions of NRS 455.100 et seq. (the "call before you dig" laws) with respect to utility lines subject to that law;

(ii)  Notified the Association by telephoning its representative at least two (2) but not more than fourteen (14) working days before excavation or demolition is scheduled to commence;

(iii)  Cooperated with the utility, the Declarant, the Association and/or governing municipality in locating and identifying any of its underground lines by:

(1)  Meeting with its representative as requested; and

(2)  Observing and being guided by its physical marking of the area containing the underground line.

An Owner intending to excavate or demolish shall give the entity, the Declarant, the Association and/or the governing municipality a reasonable amount of time to replace, remove or relocate its underground line if Declarant, the Association, and/or the governing municipality so requests.

A person responsible for emergency excavation or demolition is not required to comply with the provisions of this Section if there is a substantial likelihood that loss of life, health or property will result before the provisions of this Section can be fully complied with. The person shall notify the Association of the action he or she has been required to take as soon as practicable.



As used herein, "line" means any system of traffic control signals or line, system or facility used for producing, storing, conveying, transmitting or distributing electricity, gas, petroleum, petroleum products, hazardous liquids, water, steam, sewage or communications, including television.

For purposes of this Section, the representative of the Association shall be its Manager or, if none, any duly appointed officer of the Association or duly elected Board Member.

(c)     If an Owner fails to comply with this Section, the cost of any damage or repair to an underground line shall be borne by such owner, and, in addition to any other right or remedy permitted by law or this Declaration, the Association shall have the right, but not the obligation, after reasonable notice, but not less than five (5) days, to enter upon a Unit to repair damage to an underground line (and an easement in favor of the Association is hereby reserved) and to assess the Owner for the cost of such damage or repair, together with any costs or expenses incurred by the Association in connection therewith. The Association shall notify the Owner in writing of the cost thereof, and in the event that Owner fails to reimburse the Association for its costs and expenses, such charges shall constitute a lien on that Owner's Unit, which may be enforced by the Association in accordance with the provisions of this Declaration.

Section 9.14   Unsightly Articles:   No unsightly articles shall be permitted to remain on any Unit so as to be visible from any street within the Project or from any other Unit. Without limiting the generality of the foregoing, refuse, garbage and trash shall be kept at all times in covered, sanitary containers, or enclosed areas designed for such purpose. Such containers shall be exposed to the view of neighboring Units only when set out for a reasonable period of time (not to exceed twelve (12) hours before scheduled trash collection and twelve (12) hours after scheduled trash collection hours by a trash disposal company). There shall be no exterior fires whatsoever, except barbecue fires contained within receptacles commercially designed therefor such that they do not create a fire hazard, and except as specifically authorized in writing by the Association (and subject to applicable ordinances and fire regulations).

Section 9.15   Solar Equipment.   No solar equipment, including, but not limited to, solar collectors and solar panels, shall be installed until approval of the ARC has been obtained as to (i) the type of solar equipment to be installed and (ii) the location thereof.

Section 9.16   Garage Doors:   Garage doors shall be kept closed, except for those periods reasonably necessary for entry and exit of vehicles, cleaning, removing trash or other similar residential household purposes.

Section 9.17   Restricted Access:   Certain Units have prohibitions or restrictions on access to adjoining public streets from the rear or side yards of each Unit as set forth in the Plats. No Owner shall at any time permit access, ingress or egress to or from his or her Unit in violation of any prohibitions or restrictions on access set forth on the Plats; nor in any other manner shall an Owner otherwise cause or permit his or her Unit to be in violation of the restrictions set forth in the Plats.



Section 9.18   Clotheslines: No clotheslines shall be placed, nor shall any clothes be hung in any manner whatsoever, on any Unit in a location, including, but not limited to, the garage door, visible from any street within the Project or the Common Elements.

Section 9.19   Post-Construction Entry Rights: In addition to, and not in limitation of any Special Declarant Rights provided for in Article VII, Declarant or its designee shall have the right to enter upon each Unit in the Project for the purpose of planting and maintaining any slope or drainage control areas. The right of entry under this Section shall exist for a period not to exceed ninety (90) days after the completion of the construction of all residential structures in the Project, at which time the right of entry and maintenance under this Section shall terminate as to the Project.

Section 9.20   Construction of Walls: Without limiting the provisions of this Declaration requiring prior ARC approval, no fence, wall, hedge, construction, or obstruction shall be installed upon any Unit in the Project except the residence, garage or other improvement permitted to be erected under the provisions of this Declaration, unless approved as required herein or unless such fence, hedge, wall, construction or obstruction was originally constructed by Declarant.

Section 9.21   Restrictions on Alienation; Leasing: An Owner may lease or sublease his or her Unit (but not less than an entire residential Unit) at any time and from time to time provided that:

(a)   No Unit may be leased or subleased for transient or hotel purposes or for an initial term of less than ninety (90) days;

(b)   No Unit may be leased or subleased without a written lease or sublease;

(c)   A copy of such lease or sublease shall be furnished to the Board within ten (10) days after written request therefor; and

(d)   The Owner must make available to the tenant copies of the Documents

(e)   The rights of any lessee or sublessee of the Unit shall be subject to, and each such lessee or sublessee shall be bound by, the Restrictions, and a breach of any Restriction shall constitute a default under the lease or sublease; provided, however, that the foregoing shall not impose any direct liability on any lessee or sublessee of a Unit to pay any regular assessment or special assessment on behalf of the Owner of that Unit.   Notwithstanding the foregoing, the provisions of this Section shall not apply to an Eligible Mortgagee who is in possession of a Unit following a default in such Security Interest, a foreclosure proceeding or any deed or other arrangement in lieu of foreclosure; and shall not restrict the exercise of any Special Declarant Rights.

(f)   A Unit may not be conveyed pursuant to a time-sharing plan.

269208O6
C1133

Section 9.22    Parking Restrictions: No vehicle, including, but not limited to, automobiles, vans, motorcycles, trucks, Commercial Vehicles, and Recreational Vehicles, may be parked in the Project except as expressly permitted by this Section.

(a)    No Commercial Vehicle or Recreational Vehicle may be parked on any Unit or Common Element within the Project (including the private streets within the Project) except that (i) a Commercial Vehicle not owned or operated by an Owner or an occupant of a Unit may be parked temporarily during such time as the operator of such Commercial Vehicle is delivering goods or providing services to the Owner or occupant of the Unit, (ii) Recreational Vehicles owned by an Owner or occupant of a Unit may be parked on the driveway of the Unit while the Recreational Vehicle is being loaded or unloaded, and (iii) Recreational Vehicles and Commercial Vehicles may be parked on a Unit if the entire vehicle is wholly within the garage or is otherwise adequately screened from view.

(b)    No vehicle, including, but not limited to, automobiles, vans, motorcycles, trucks, Commercial Vehicles, and Recreational Vehicles, or any other equipment may be dismantled, repaired or serviced on: (i) any Unit visible from adjoining property or any private or public street; or (ii) any part of the Project.

Section 9.23    Declarant's Rights: As long as Declarant is a Unit Owner, Declarant and its duly authorized agents, representatives and employees may maintain any Unit owned by Declarant or any portion of the Common Elements, as model units or sales offices. Declarant may also maintain management offices and signs and displays advertising the Project.

Section 9.24    Declarant's Approval of Conveyances or Changes in Use of Project: As long as the Declarant is a Unit Owner, the Association shall not, without first obtaining the prior written consent of Declarant, convey, change or alter the use of the Project, mortgage all or any portion of the Project or use all or any portion of the Project other than solely for the benefit of Owners.

Section 9.25    Board of Directors and ARC Discretion: Except as may be expressly provided in this Declaration, any consent or approval of the Board of Directors, ARC, or Association that is required under the provisions hereof may be granted or withheld in the sole and absolute discretion of the Board of Directors, ARC, or Association, as applicable. In that regard, the granting or withholding of such consent or approval shall not be subject to any objective standards of "reasonableness" or otherwise. Further, the approval of or consent to any matter shall not be deemed to be a waiver of the right to disapprove the same or similar matters in subsequent requests for consents or approvals from the same or other parties.

Section 9.26    Sight Visibility Zones: Certain sight visibility zones ("Sight Visibility Zones") have been created and establish as set forth in the Plat to prevent obstructions of sightlines of the roadways within the Project. No fence, wall, hedge, tree, shrub planting or other Improvement shall be placed or permitted to remain on any Unit within the Sight Visibility Zone which is higher that two (2) feet above the roadway on such Unit.

Section 9.27   Slopes:  Each Owner of a Unit agrees that he will permit free access by Owners of adjacent or adjoining Units to slopes or drainage ways located on his Unit, which affect said adjacent or adjoining Units, when such access is reasonably necessary for the maintenance or permanent stabilization of said slopes, or maintenance of the drainage facilities for the protection and use of property other than the Unit on which the slope or drainage way is located.

Section 9.28   Drainage:  Each Owner of a Unit agrees that he will accept the burden of, and not in any way interfere with, the established drainage pattern over his Unit or from adjoining or other Units over his Unit, or in the event it is necessary to change the established drainage, that he will make adequate provisions for proper drainage over his Unit.  No structure or other material, including a wall or fence, shall be placed or permitted to remain which may damage, interfere with, obstruct, or retard the flow of water through drainage channels, or which may change the direction of flow of such channels.  Without limiting the foregoing, each Owner shall use his reasonable efforts to prevent surface drainage on his Unit from accumulating behind a wall or fence in order to prevent or minimize the penetration of such water through or under the wall or fence and any staining of such wall or fence.  For the purposes of this Declaration, "established" drainage is defined as the drainage which occurred at the time the overall grading of the Real Property, including, if applicable, the landscaping of each Unit within the Real Property, was completed by Declarant.

(a)   If water drains toward the house or ponds against a residence, there is a possibility for damage to the structure.  Each Owner shall be responsible to maintain all grading, landscaping, and hardscaping in such a manner as to keep water away from the foundation of the Owner's residence.

(b)   Each Owner of a Unit agrees, as a part of the acceptance of the burden of the established drainage pattern over his Unit from adjoining or other Units, to maintain any yard drain inlet and all other drainage features and improvements located on his Unit in a clean and fully functioning state, unblocked and free of silt and debris.

(c)   Each Owner of a Unit agrees that in the event any slopes located on his Unit have been planted for stabilization of said slope or slopes and/or to comply with jurisdictional agencies' requirements, Owner shall adequately water and continuously maintain said slope or slopes.

(d)   Each Owner of a Unit agrees that in the event that any slopes or other area(s) located on said Owner's Unit or elsewhere in the Real Property have had rip-rap, ground cover, or any other stabilization technique installed for the purpose of stabilization of slopes and/or as part of the drainage system for the Real Property, the Owner shall take no action that will remove, dislocate, wash out, cover up, or in any other way disturb or interfere with the proper functioning or installation of such material.  This provision includes the installation, and/or maintenance of block walls and/or wood fences, including all retaining walls.  Further, Owner agrees to restore said material to its condition when originally installed if any material is damaged, dislocated, or has its functioning impaired in any other way.

27

(e) In the event that an Owner of a Unit alters the grading of his Unit within five feet (5') of its property line, and this alteration results in a slope steeper than one foot (1') vertically to three feet (3') horizontal, that slope must be stabilized mechanically in order to protect the adjoining Unit. However, nothing in this Section shall be construed to prevent any such alteration in any manner, with or without retaining walls, by the Declarant, in carrying out the development and improvement of the Real Property.

(f) Each Owner agrees to comply with and assume responsibility for anything done or required to be done in compliance with the plans filed by Declarant with respect to the National Pollutant Discharge Elimination System (NPDES) and Declarant's Storm Water Pollution Prevention Plan (SWPPP). Each Owner shall assume all responsibility and liability relating to the prevention of pollutant discharge, including soil materials, from such Owner's Unit.

Section 9.29 Private Drainage Easement: Certain private drainage easements ("Private Drainage Easements") may be established on additional Units added to the Project by Declarant under Section 7.1(a) as set forth in the Plat which creates the Unit, to allow for certain drainage facilities on those Units subject to a Private Drainage Easement. Each Private Drainage Easement shall run with the land and be binding upon the Owners and occupants of the Units upon which they are located and shall inure to the benefit of the Association and all Owners.

The Owners and occupants of each Unit which is subject to a Private Drainage Easement shall have the obligation to maintain the Private Drainage Easement area and all improvements located thereon in good condition and repair, and shall maintain all such improvements to ensure that the drainage remains unobstructed. Should an Owner fail to perform his or her maintenance obligations under this Section 9.29, then the Association may, at any time, (i) initiate legal proceedings to enforce compliance with this Section, or (ii) upon thirty (30) days' written notice to such Owner of its intention to do so, enter upon that Unit and take such action as may be required to maintain the Private Drainage Easement area and assess that Owner for the cost thereof. The Association shall notify the Owner in writing of the cost thereof, and if that Owner fails to reimburse the Association for its costs and expenses, such charges shall constitute a lien on that Owner's Unit, which may be enforced by the Association in accordance with the provisions of Article XVIII of this Declaration.

Section 9.30 Declarant's Access: Each Owner of a Unit agrees that he will permit free access upon such Unit by Declarant for the purpose of remedying any default under, or enforcing any provision of this Declaration and Declarant shall have the right, but not the obligation, to take affirmative action pursuant to this Section. Each Owner further agrees to permit Declarant, its successors or assigns, to enter onto such Owner's Unit and to add or remove earth therefrom in order to comply with grading plans approved by any authorized local agency, which plans apply to the Real Property or any of the Annexable Property owned by Declarant, its successors or assigns.



20020806
.01133

## ARTICLE X
## EASEMENTS AND LICENSES

Section 10.1   Easements of Record: All easements or licenses to which the Project is presently subject are shown on Plats or otherwise contained herein.  In addition, the Project may be subject to other easements or licenses granted by Declarant pursuant to its powers under Article VII of this Declaration, liens created under Article XVIII of this Declaration, and easements granted by the Association pursuant to its powers under Article XXIV of this Declaration.

Section 10.2   Encroachment Easement: The Project, and all portions thereof, shall be subject to an easement of up to one foot (1') from the Unit border lines or Common Elements boundaries for the actual extent of encroachments created by construction as designed or constructed by Declarant and for settling, shifting, and movement of any portion of the Real Property, except that no such easement is created for an encroachment which is the result of willful conduct on the part of Declarant, an Owner, a tenant, the Association, or any other person or entity. A valid easement for said encroachments and for the maintenance thereof shall exist. Such encroachments shall not be considered to be encumbrances upon any part of the Project. Encroachments referred to herein include, but are not limited to, encroachments caused by error in the original construction of improvements constructed on any Unit, by settling, rising, or shifting of the earth, or by changes in position caused by repair or reconstruction of any improvements on the Real Property.

Section 10.3   Utility Easement: There is hereby created a general easement upon, across, over, in, and under the Real Property for ingress and egress and for installation, replacement, repair, and maintenance of all utilities, including, but not limited to water, sewer, gas, telephone, electrical, television and a master communications system. By virtue of this easement, it will be expressly permissible and proper for the County of Clark, any other municipality, or companies providing electrical, television, telephone and other communication services to install and maintain necessary equipment on the Real Property and to affix and maintain electrical, television, communications, and telephone wires, circuits, and conduits under the Real Property. Any utility company using this general easement will use its best efforts to install and maintain the utilities provided for without disturbing the uses of the Owners, the Association and Declarant; will prosecute its installation and maintenance activities as promptly and expeditiously as reasonably possible; and will restore the surface to its original condition as soon as possible after completion of its work. Should any utility company furnishing a service covered by the general easement request a specific easement by separate recordable document, either Declarant or the Association will have, and are hereby given, the right and authority to grant such easement upon, across, over, or under any part or all of the Real Property without conflicting with the terms of this Declaration. This general easement will in no way affect, avoid, extinguish, or modify any other recorded easement on the Real Property.

Section 10.4   Easement for Expansion: Declarant hereby reserves to itself and for Owners of Units in all future phases of the Project a perpetual easement and right-of-way and access over, upon, and across the Real Property for construction, utilities, drainage, ingress and egress, and

for use of the Common Elements. The location of said easements and rights-of-way may be made certain by Declarant or the Association by recorded documents.

Section 10.5   Reservation of Easements, Exceptions, and Exclusions: Declarant reserves to itself and hereby grants to the Association the concurrent right to establish from time to time, by declaration or otherwise, utility and other easements, permits, or licenses over the Common Elements, for purposes including, but not limited to, streets, paths, walkways, drainage, recreation areas, parking areas, ducts, shafts, flues, and conduit installation areas, and to create other reservations, exceptions, and exclusions consistent with the ownership of the Project for the best interest of all the Owners and the Association, in order to serve all the Owners within the Project as initially built and expanded. Declarant further reserves the right to establish from time to time, by dedication or otherwise, utility and other easements, and to create other reservations, exceptions, rights of ingress and egress, and exclusions convenient or necessary for the use and operation of any other property of Declarant, as long as it does not materially hamper the enjoyment of the Project, as built or expanded, by the Owners. In addition, Declarant reserves to it and its successors and assigns the right of ingress and egress through streets, paths and walkways and for the purpose of construction, maintenance and operation of commercial areas located outside the Project including, but not limited to, offices, shopping centers, resort complexes and for the purpose of installation and maintenance of utilities to serve those projects which are located on parcels of land not governed by this Declaration.

Section 10.6   Drainage Easement: An easement is hereby reserved to Declarant and granted to the Association, and their respective officers, agents, employees, successors, and assigns to enter upon, across, over, in, and under any portion of the Real Property for the purpose of changing, correcting, or otherwise modifying the grade or drainage channels of the Real Property so as to improve the drainage of water on the Real Property. Best efforts shall be made to use this easement so as to disturb, as little as possible, the uses of the Owners, the Association and Declarant, as applicable, to prosecute such drainage work promptly and expeditiously, and to restore any areas affected by such work to a sightly and usable condition as soon as reasonably possible following such work. Declarant shall inform and obtain the approval of the Board of Directors prior to undertaking such drainage work, which approval shall not be unreasonably withheld.

Section 10.7   Maintenance Easement: An easement is hereby reserved to Declarant, and granted to the Association, and any Director or Manager, and their respective officers, agents, employees, and assigns upon, across, over, in, and under the Units and a right to make such use of the Units as may be necessary or appropriate to make emergency repairs or to perform the duties and functions which the Association is obligated or permitted to perform pursuant to the Documents, including the right to enter upon any Unit for the purpose of performing maintenance to the landscaping or the exterior of improvements to such Unit as required by the Documents. The Association shall not unreasonably interfere with the rights of the Owners in the use of this easement.

Section 10.8   Easements Deemed Created: All conveyances of Units hereafter made, whether by Declarant or otherwise, shall be construed to grant and reserve the easements

contained in this Article X, even though no specific reference to such easements or to this Section appears in the instrument for such conveyance.

## ARTICLE XI
## ALLOCATION OF LIMITED COMMON ELEMENTS

A Common Element not previously allocated as a Limited Common Element may be so allocated only pursuant to the provisions of this Article. All allocations will be made by amendments to the Declaration specifying to which Unit or Units the Limited Common Element is allocated.

All amendments shall specify to which Unit or Units the Limited Common Element is allocated. Such amendment shall require the approval of all holders of Security Interests in the affected Units. The person executing the amendment shall provide an executed copy of the amendment to the Association, which shall record it, provided that the amendment complies with the provisions of this Declaration and the Act. The amendment shall contain words of conveyance and must be recorded and indexed in the names of the parties and the Project.

The parties executing the amendment shall be responsible for the preparation of the amendment and shall reimburse the Association for its reasonable attorneys' fees in connection with the review of the amendment and for the recording costs.

## ARTICLE XII
## ARCHITECTURAL REVIEW

Section 12.1   Creation of ARC:  There is hereby established an ARC which shall have exclusive jurisdiction over all construction, modification, addition or alteration of Improvements located within the Project, other than Improvements constructed by Declarant. Whenever in this Declaration the prior consent or approval of the Association is required as a condition to any action by an Owner affecting any construction, alterations, changes, additions, or modifications, the ARC shall have the right and duty to grant or withhold such consent or approval.

The Board of Directors shall have the authority and standing, on behalf of the Association, to enforce in courts of competent jurisdiction decisions of the ARC. This Section may not be amended without the Declarant's written consent, so long as the Declarant owns any land subject to this Declaration or subject to annexation to this Declaration.

Section 12.2   Provision for Architectural Approvals:  Except as to construction of Improvements by Declarant in any phase of the Project, no building, fence, wall, or other structure (including the following by way of illustration and not limitation: solar or heating systems; air conditioning systems; pools, spas, ponds, fountains; landscaping, additional trees, shrubs or ground cover, stonework, or concrete work; related mechanical, plumbing, or electrical facilities, storage sheds; garbage areas) shall be constructed, erected, maintained, altered or changed on the Real Property until the plans and specifications showing the nature, kind, shape, materials, and location of the Improvements prior to the commencement of such work, shall have

31

been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the ARC. No permission or approval shall be required to repaint in accordance with an originally approved color scheme, or to rebuild in accordance with the originally approved plans and specifications. Nothing contained herein shall be construed to limit the right of an Owner to remodel the interior of his or her residence, or to paint the interior of his or her residence any color desired. The ARC is specifically authorized and empowered to establish different criteria for the homogeneous areas within the Project which are not generally applicable to all areas of the Project.

Section 12.3   ARC: The Declarant shall appoint all of the original members of the ARC consisting of not less than three (3) nor more than five (5) members, the initial members of which shall be Leah Bryant, Jim Widner, and Shelly Stewart, at Venezia Community Association, c/o KB Home Nevada Inc., 750 Pilot Road, Suite F, Las Vegas, Nevada 89119, Attn: Association ARC Review. A majority of the ARC may designate a representative to act for it. Any member shall have the right to resign at any time. Neither the members of the ARC nor its designated representative shall be entitled to any compensation for services performed under this provision. Following the appointment of the original members of the ARC, the Board shall thereafter have the right to appoint, remove and replace from time to time all of the members of the ARC. The terms of office of the members of the ARC shall expire at such time as the Board, in its sole discretion shall determine, whichever shall be entitled to appoint the members thereof.

Section 12.4   Procedure for Approval of Committee: The ARC's approval or disapproval as required in this Declaration shall be in writing. The method of submission shall be by personal delivery or by the mailing of a first class United States Mail Certified Receipt Requested letter together with all necessary plans and specifications, to any current member of the ARC. In the event the ARC or its designated representatives fails to approve or disapprove such design and location within sixty (60) days after the plans and specifications have been submitted to it in accordance with this Section, the plans and specifications shall be deemed to be disapproved. The sixty (60) day period shall begin to run on the date of receipt of a complete submission by the ARC member.

Section 12.5   Guidelines: The ARC shall, upon request of the Board and subject to the approval of the Board, prepare and promulgate ARC guidelines ("Guidelines") and application and review procedures ("Procedures") on behalf of the Association. The Guidelines and Procedures shall be those of the Association, and the ARC shall have sole and full authority to prepare and to amend the Guidelines and Procedures, provided the Guidelines and Procedures are otherwise in compliance with the Articles, the Bylaws and this Declaration. The ARC shall make both available to Owners.

Section 12.6   Liability of Committee Members: Neither Declarant, the Association nor any member or representative of the ARC shall be liable, whether for damages or other relief, to anyone submitting plans and specifications to it for approval or to any Owner, occupant or guest, affected by the action or inaction of the ARC, by reason of a mistake in judgment, negligence or nonfeasance arising in connection with the approval or disapproval of any plans and specifications.

32

Anyone who submits plans and specifications to the ARC shall be deemed to have agreed by submission of such plans and specifications, and every Owner and occupant of any Unit, or any part of the Real Property, agrees, by acquiring title and/or possessory rights thereto, that he or she will not bring any action or suit against Declarant, the Association, any member of the ARC or its designated representative for the recovery of damages by reason of any such approval or disapproval.

Section 12.7   Painting:   No building, including without limitation, garages, shall be painted or repainted other than in its original colors until the new color has been approved by the ARC.

Section 12.8   Failure to Appoint:   If at any time the Board fails to cause an ARC to be in existence, the members of the ARC shall be appointed or removed by the written consent of Owners of fifty-one percent (51%) of the Units. Appointment or removal of members of the ARC shall be evidenced by written instrument recorded setting forth the fact of appointment or removal, the name and address of the person appointed or removed, and in the case of an appointment, the term of office of the person appointed. The written instrument shall be filed by at least two (2) Directors or Owners, if the Directors or Owners are then appointing the members of the ARC.

Section 12.9   Limitation:   Nothing contained in this Article XII shall authorize the ARC to take any action or approve any plans and specifications in violation of this Declaration.

## ARTICLE XIII
## BOUNDARIES

Section 13.1   Application and Amendment:   The boundaries between adjoining Units may not be relocated without the approval of the ARC under Article XII. In addition to the plans and specifications required for ARC approval under Section 12.4, a request for a boundary adjustment must be accompanied by the written consent of all Owners of the Units affected by the relocation. If the Owners of the adjoining Units have specified a reallocation between their Units of their Allocated Interests, the application shall state the proposed reallocation. In the event that the ARC approves the request for boundary adjustment, the Association shall prepare an amendment that identifies the Units involved, states the reallocations and indicates the Association's consent. The amendment must be executed by those Unit Owners affected and contain words of conveyance between them. The approval of all holders of Security Interests in the affected Units shall be endorsed on the conveyance. On recordation, the amendment shall be indexed in the name of the grantor and the grantee, and in the grantee's index in the name of the Association. The applicants will pay for the costs of preparation of the amendment and its recording, as well as any reasonable consultant fees incurred by the Association

Section 13.2   Recording Amendments:   The Association shall prepare and record Plats necessary to show the altered boundaries between adjoining Units, along with the Units' dimensions and identifying numbers. The applicants will pay for the costs of preparation of the amendment and its recording, as well as any reasonable consultant fees incurred by the Association.



## ARTICLE XIV
## AMENDMENTS TO DECLARATION

Section 14.1    In General: Except in cases of amendments that may be executed (i) by Declarant in the exercise of its Development Rights, (ii) by the Association under Article X of this Declaration and NRS 116.1107, or (iii) by certain Unit Owners under Article XIII and Section 13.1 of this Declaration and NRS 116.2118, and except as limited by Section 14.4 and Article XVII of this Declaration, this Declaration, including the Plat, may be amended only by vote or agreement of a Majority of Owners. The procedure for amendment must follow the procedures set forth in NRS 116.2117.

Section 14.2    Limitation of Challenges: An action to challenge the validity of an amendment adopted by the Association pursuant to this Article may not be brought more than one year after the amendment is recorded.

Section 14.3    Recordation of Amendments: Each amendment to this Declaration must be recorded in the Clark County Recorder's Office, and the amendment is effective only upon recording.

Section 14.4    Unanimous Consent: Except to the extent expressly permitted or required by other provisions of this Declaration or the Act, an amendment may not create or increase Special Declarant Rights, increase the number of Units, change the boundaries of any Unit, change the Allocated Interests of a Unit or change the uses to which any Unit is restricted, except by unanimous consent of the Owners affected and the consent of a Majority of Owners.

Section 14.5    Execution of Amendments: An amendment to this Declaration required by the Act to be recorded by the Association, which has been adopted in accordance with this Declaration and the Act, must be prepared, executed, recorded and certified on behalf of the Association by an officer of the Association designated for that purpose or, in the absence of designation, by the president of the Association.

Section 14.6    Special Declarant Rights: Provisions in this Declaration creating Special Declarant Rights may not be amended without the consent of Declarant.

Section 14.7    Consent of Holders of Security Interests and VA: Amendments are subject to the consent requirements of Article XVII.

Section 14.8    Amendments To Create Units: To exercise any Development Right reserved under Section 7.1 of this Declaration, Declarant shall prepare, execute and record an amendment to this Declaration. Declarant shall also record new Plats as necessary to conform to the requirements of NRS 116.2109(1), (2) and (4) or new certifications of the Plat if the Plat otherwise conforms to the requirements of those Subsections.

The amendment to this Declaration shall assign an identifying number to each new Unit created and reallocate the Allocated Interests among all Units. The amendment shall describe any

Common Elements and any Limited Common Elements created and designate the Unit to which each Limited Common Element is allocated to the extent required by NRS 116.2108(a).

## ARTICLE XV
## AMENDMENTS TO BYLAWS

The Bylaws may be amended or repealed by the vote of the Majority of Owners, or by the written consent of such Members and in accordance with Article 12 of the Bylaws. Furthermore, during the Declarant Control Period, any amendment of the Bylaws shall require prior approval of the VA and/or HUD to the extent necessary to meet any VA and/or HUD requirements applicable to the Project.

## ARTICLE XVI
## TERMINATION

Termination of the Project may be accomplished only upon the approval of one hundred percent (100%) of the Members, and then in accordance with the provisions of NRS Chapter 116.

## ARTICLE XVII
## MORTGAGEE PROTECTION

Section 17.1   Introduction: This Article establishes certain standards and covenants which are for the benefit of the holders, insurers and guarantors of certain Security Interests. This Article is supplemental to, not a substitution for, any other provisions of the Documents, but in the case of conflict, this Article shall control.

Section 17.2   Percentage of Eligible Mortgagees: Wherever in this Declaration the approval or consent of a specified percentage of Eligible Mortgagees is required, it shall mean the approval or consent of Eligible Mortgagees holding Security Interests in Units which in the aggregate have allocated to them that specified percentage of votes as compared to the total votes allocated to all Units in the Association then subject to Security Interests held by all Eligible Mortgagees.

Section 17.3   Notice of Actions: The Association shall give prompt written notice to each Eligible Mortgagee and Eligible Insurer of:

(a)   Any condemnation loss or any casualty loss which affects a material portion of the Project or any Unit in which there is a first Security Interest held, insured or guaranteed by that Eligible Mortgagee or Eligible Insurer, as applicable;

(b)   Any delinquency in the payment of Common Expense Assessments owed by a Unit Owner which remains uncured for a period of sixty (60) days and whose Unit is subject to a first Security Interest held, insured or guaranteed by that Eligible Mortgagee or Eligible Insurer, as applicable;

35

20020806
.C1138

(c)     Any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

(d)     Any proposed action which would require the consent of a specified percentage of Eligible Mortgagees as specified in Section 17.4 of the Declaration; and

(e)     Any judgment rendered against the Association.

Section 17.4   Consent and Notice Required:

(a)     Document Changes.   Notwithstanding any requirement permitted by this Declaration or the Act, no amendment of any material provision of the Documents by the Association or Owners described in this Section may be effective without notice to all Eligible Mortgagees and Eligible Insurers, as required by Section 17.3 above, without the approval of Owners representing at least sixty-seven percent (67%) of the votes in the Association (or any greater percentage required in this Declaration or the Act) and without approval by at least fifty-one percent (51%) of the Eligible Mortgagees (or any greater Eligible Mortgagee approval required by this Declaration).   The foregoing approval requirements do not apply to amendments effected by the exercise of any Development Right.   A change to any of the following would be considered material:

(i)     Any provision of this Declaration pertaining to voting rights;

(ii)    Any provision of this Declaration pertaining to assessments, assessment liens or priority of assessment liens;

(iii)   Any provision of this Declaration pertaining to reserves for maintenance, repair and replacement of Common Elements;

(iv)    Any provision of this Declaration pertaining to responsibility for maintenance and repairs;

(v)     Any provision of this Declaration pertaining to expansion or contraction of the Project, or the addition, annexation or withdrawal of property to or from the Project;

(vi)    Any provision of this Declaration pertaining to insurance or fidelity bonds;

(vii)   Any provision of this Declaration pertaining to leasing of Units;

(viii)  Any provision of this Declaration pertaining to imposition of any restrictions on Unit Owners' right to sell or transfer their Units; or

(ix)    Any provision of this Declaration that expressly benefits holders, insurers or guarantors of Security Interests.

(b)    Actions.  Notwithstanding any lower requirement permitted by this Declaration or the Act, the Association may not take any of the following actions, other than rights reserved to Declarant as Special Declarant Rights, without notice to all Eligible Mortgagees and Eligible Insurers, as required by Section 17.3 above, and approval of at least fifty-one percent (51%) (or the indicated percentage, if higher) of the Eligible Mortgagees:

(i)    Reallocation of interests in the Common Elements or Limited Common Elements, except that when Limited Common Elements are reallocated by agreement between Owners, only those Owners and only the Eligible Mortgagees holding Security Interests in those Units need approve the action;

(ii)    Redefinitions of boundaries of Units, except that when boundaries of only adjoining Units are involved, or a Unit is being subdivided, then only those Unit Owners and the Eligible Mortgagees holding Security Interests in the Unit or Units need approve the action;

(iii)    Convertibility of Units into Common Elements or Common Elements into Units;

(iv)    A decision by the Association to establish self-management when professional management had been required previously by the Documents or any Eligible Mortgagee;

(v)    Termination of the Project after occurrence of substantial destruction or condemnation;

(vi)    Convey or encumber the Common Elements or any portion of the Common Elements, for which approval of at least sixty-seven percent (67%) of the Eligible Mortgagees is required. (The granting of easements for public utilities or for other public purposes consistent with the intended use of the Common Elements by the Project will not be deemed a transfer within the meaning of this clause);

(vii)    The termination of the Project for reasons other than substantial destruction or condemnation, for which approval of at least sixty-seven percent (67%) of Eligible Mortgagees is required;

(viii)    The alteration of any partition or creation of any aperture between adjoining Units (when Unit boundaries are not otherwise being affected), for which only the owners of Units affected and Eligible Mortgagees of those Units need approve the action;

(ix)    The granting of any easements, leases, licenses or concessions through or over the Common Elements (excluding, however, any utility easements serving or to serve the Project and also excluding any leases, licenses or concessions lasting for no more than one (1) year);

(x)     The restoration or repair of the Real Property after hazard damage or a partial condemnation in a manner other than specified in the Documents;

(xi)     The merger of the Project with any other Project, for which the prior written approval of the VA and/or HUD must also be obtained to the extent required under Section 7.12 hereof;

(xii)     The assignment of the future income of the Association, including its right to receive Common Expense Assessments; or

(xiii)     Any action taken not to repair or replace the Real Property in the event of substantial destruction of any part of a Unit or the Common Elements.

(c)     Limitations. The Association may not change the period for collection of regularly budgeted Common Expense Assessments to other than monthly collection without the consent of all Eligible Mortgagees.

(d)     VA/HUD Approval. During the Declarant Control Period, the prior approval of the VA and/or HUD shall be required for those Association actions set forth in Section 7.12 to the extent necessary to meet any VA and/or HUD requirements applicable to the Project.

(e)     Implied Approval. The failure of an Eligible Mortgagee or Insurer to respond within thirty (30) days to any written request for approval of an addition or amendment to the Document wherever Eligible Mortgagee or Insurer approval is required, when such request is delivered by certified or registered mail, return receipt requested, shall constitute an implied approval of the addition or amendment.

Section 17.5    Development Rights: No Development Rights may be exercised, voluntarily abandoned or terminated by Declarant unless all persons holding Security Interests in the Development Rights consent to the exercise, abandonment or termination.

Section 17.6    Inspection of Books: The Association must maintain current copies of the Declaration, Bylaws, Rules, the Articles of Incorporation, books, records and financial statements of the Association  The Association shall permit any Eligible Mortgagee or Eligible Insurer, or other first mortgagee of Units, to inspect the books and records of the Association during normal business hours.

Section 17.7    Financial Statements: The Association shall provide any Eligible Mortgagee or Eligible Insurer who submits a written request with a copy of an annual financial statement. It shall be provided within one hundred twenty (120) days following the end of each fiscal year of the Association.

Section 17.8    Enforcement: The provisions of this Article are for the benefit of Eligible Mortgagees and Eligible Insurers and their successors and may be enforced by any of them by any available means, at law or in equity.

Section 17.9   Attendance at Meetings: Any representative of an Eligible Mortgagee or Eligible Insurer may attend and address any meeting which an Owner may attend.

Section 17.10 Appointment of Trustee:  In the event of damage or destruction under Article XXI or XXII or condemnation of all or a portion of the Project, any Eligible Mortgagee may require that such proceeds be payable to a Trustee established pursuant to this Declaration This Trustee may be required to be a corporate trustee licensed by the State of Nevada. Proceeds will then be distributed pursuant to Article XXII or pursuant to a condemnation award. Unless otherwise required, the members of the Board of Directors, acting by majority vote through the president, may act as Trustee.

## ARTICLE XVIII
## ASSESSMENT AND COLLECTION OF COMMON EXPENSES

Section 18.1   Apportionment of Common Expenses: Except as provided in Section 18.2, all Common Expenses shall be assessed at a uniform rate for all Units in accordance with the percentage of Liability for Common Expenses as set forth in Article VIII of this Declaration.

Section 18.2   Common Expenses Attributable to Fewer than all Units; Exempt Property:

(a)      Any Common Expense or portion thereof benefitting fewer than all of the Units shall be assessed exclusively against the Units benefitted.

(b)      An assessment to pay a judgment against the Association may be made only against the Units in the Project at the time the judgment was entered, in proportion to their respective Liability for Common Expense.

(c)      If a Common Expense is caused by the misconduct of an Owner, the Association may assess that expense exclusively against that Owner's Unit.

(d)      If the Liability for Common Expenses are reallocated, Common Expense Assessments and any installment thereof not yet due shall be recalculated in accordance with the reallocated liabilities.

(e)      Fees, charges, late charges, fines, collection costs and interest charged against an Owner pursuant to the Documents and the Act are enforceable as Common Expense Assessments against that Owner's Unit.

(f)      The following portions of the Real Property shall be exempt from the assessments, charges, and liens created herein:

(1)      All properties dedicated and accepted by a governmental municipality and devoted to public uses, whether the governmental municipality's interest is represented by a fee ownership, by an easement, or in any other form of property ownership;

(2)     All utility lines and easements; and

(3)     The Common Elements.

Section 18.3   Lien:

(a)     The Association has a lien on a Unit for an assessment levied against the Unit or fines imposed against its Unit Owner from the time the assessment or fine becomes due. Fees, charges, late charges, fines and interest charged pursuant to the Act and the Documents are enforceable as assessments under this Section; provided, however, that unless otherwise permitted by law, the Association may not foreclose upon a lien for unpaid assessments which is comprised solely of fines levied against an Owner for violation of the Documents unless the violation is of a type that threatens the health and welfare of the residents of the Project. If an assessment is payable in installments, the full amount of the assessment is a lien from the time the first installment becomes due.

(b)     Except to the extent permitted under the Act (NRS 116.3116(2)), a lien under this Section is prior to all other liens and encumbrances on a Unit except: (1) liens and encumbrances recorded before the recordation of this Declaration; (2) a first Security Interest on the Unit recorded before the date on which the assessment sought to be enforced became delinquent; and (3) liens for real estate taxes and other governmental assessments or charges against the Unit. A lien under this Section is also prior to all Security Interests described in Subdivision (2) of this Subsection to the extent that the Common Expense assessments are based on the periodic budget adopted by the Association pursuant to Section 18.4 and 18.5 of this Article and would have become due in the absence of acceleration, during the six (6) months immediately preceding institution of an action to enforce the Association's lien. This Subsection does not affect the priority of mechanics' or materialmen's liens or the priority of a lien for other assessments made by the Association.

(c)     Recording of the Declaration constitutes record notice and perfection of the lien. Further recording of a claim of lien for assessment under this Section is not required.

(d)     A lien for an unpaid assessment is extinguished unless proceedings to enforce the lien are instituted within three (3) years after the full amount of the assessment becomes due, except that if an Owner of a Unit subject to a lien under this Section files a petition for relief under the United States Bankruptcy Code, the time period for instituting proceedings to enforce the Association's lien shall be tolled until thirty (30) days after the automatic stay of proceedings under Section 362 of the Bankruptcy Code is lifted.

(e)     This Section does not prohibit an action to recover sums for which Subsection (a) of this Section creates a lien or prohibit the Association from taking a deed in lieu of foreclosure.

(f)     A judgment or decree in any action brought under this Section shall include costs and reasonable attorney's fees for the prevailing party.

(g)     The Association's lien must be foreclosed by the same procedure set forth in NRS 116.31162 and NRS 116.31164.

(h)     In any action by the Association to collect assessments or to foreclose a lien for unpaid assessments, the court may appoint a receiver for the Owner to collect all sums alleged to be due to that Owner from third parties prior to or during the pendency of the action. The court may order the receiver to pay any sums held by the receiver to the Association during the pendency of the action to the extent of the Association's Common Expense Assessments, based on a periodic budget adopted by the Association pursuant to Section 18.4 of this Declaration.

(i)     If a holder of a first Security Interest in a Unit forecloses that Security Interest, the purchaser at the foreclosure sale is not liable for any unpaid assessments against that Unit which became due before the sale, other than the assessments which are prior to that Security Interest under Subsection (b) of this Section of this Declaration. Any unpaid assessments not satisfied from the proceeds of sale become Common Expenses collectible from all the Owners, including the purchaser.

(j)     A Request for Notice of Default and Sale recorded in accordance with NRS 107.090 shall apply to the foreclosure of an Association lien. The Request must identify the lien by stating the names of the Owner and the Project.

(k)     In the case of foreclosure under NRS 116.31162 and NRS 116.31164, the Association shall give reasonable notice of its intent to foreclose to each lien holder of the affected Unit known to the Association.

(l)     Any payments received by the Association in the discharge of an Owner's obligation may be applied to the oldest balance due; provided, however, that the Association may not apply any assessment, fee or other charge that is paid by an Owner toward a fine imposed against the Owner by the Association unless otherwise directed by the Owner or as permitted by law.

Section 18.4   Budget Adoption and Ratification: Each year the Board of Directors shall adopt a proposed budget of the Common Expenses of the Project, which shall include the budget for the daily operation of the Association and an adequate reserve for the repair, replacement and restoration of the major components of the Common Elements. Such budget must be adopted by the Board before the beginning of each Fiscal Year and distributed to the Members in accordance with the Bylaws and the Act. Within thirty (30) days after adoption of a proposed budget for the Project, the Board of Directors shall provide the budget or a summary thereof to each Owner and shall set a date for a meeting of the Owners to consider ratification of the budget. The meeting shall be not less than fourteen (14) or more than thirty (30) days after mailing of the summary. Unless at that meeting a Majority of Owners reject the budget, the budget is ratified, whether or not a quorum is present. If the proposed budget is rejected, the periodic budget last ratified by the Owners continues until the Owners ratify a subsequent budget proposed by the Board of Directors.

Section 18.5   Capital Improvement Assessments: If the Board of Directors votes to levy a Capital Improvement Assessment the Board of Directors shall submit the assessment to the Owners for ratification in the same manner as budget under Section 18.4. A Capital Improvement Assessment levied pursuant to this Section 18.5 shall include (i) an assessment not included in the current budget, other than one enumerated in Section 18.2 of this Declaration, in an amount greater than fifteen percent (15%) of the current annual operating budget, or (ii) an assessment for the cost of construction, reconstruction, repair or replacement of a capital improvement upon the Common Elements.

Section 18.6   Certificate of Payment of Common Expense Assessments: The Association, upon written request, shall furnish an Owner with a statement, in recordable form, setting out the amount of unpaid assessments against the Unit. The statement must be furnished within ten (10) business days after receipt of the request and is binding on the Association, the Board of Directors and each Owner.

Section 18.7   Monthly Payment of Common Expenses: All Common Expenses assessed under Sections 18.1 and 18.2 of this Declaration shall be due and payable monthly, at 1/12th of the annual total (in cases where an annual total is applicable).

Section 18.8   Limitations on Maximum Annual Assessment: From and after January 1st of the year immediately following the first conveyance of a Unit to an Owner other than Declarant, the maximum annual Common Expense Assessment may not be increased by more than fifteen percent (15%) of the annual budget for the previous year unless approved by the vote or written assent of a Majority of Owners.

Section 18.9   Acceleration of Common Expense Assessments: In the event of default in which any Owner does not make the payment of any Common Expense Assessment levied against his or her Unit within ten (10) days after the date due, the Board of Directors shall have the right, after Notice and Hearing, to declare all unpaid assessments for the pertinent fiscal year immediately due and payable.

Section 18.10   Commencement of Common Expense Assessments: The Common Expense Assessments provided for herein shall begin as to all Units in each phase of the Project (other than unsold Units owned by Declarant if a Subsidy Agreement is in effect) on the first day of the month following the first conveyance of a Unit to an Owner other than Declarant in that phase. The first assessment shall be adjusted according to the number of months remaining in the calendar year. If a Subsidy Agreement is in effect, regular assessments to all unsold Units owned by Declarant shall commence upon termination or expiration of the Subsidy Agreement.

Section 18.11   No Waiver of Liability for Common Expenses: No Owner may become exempt from liability for payment of the Common Expense Assessments by waiver of the use or enjoyment of the Common Elements or by abandonment of the Unit against which the assessments are made.

Section 18.12  Personal Liability of Owners:  The Owner of a Unit, at the time a Common Expense Assessment or portion of the assessment is due and payable, is personally liable for the assessment.  Additionally, the Owner of a Unit, by acceptance of a deed or other conveyance therefor, whether or not it shall be so expressed in such deed or such other instrument, is deemed to covenant and agree to pay to the Association (1) annual Common Expense Assessments, (2) Capital Improvement Assessments, (3) Special Assessments, and (4) Reconstruction Assessments; such assessments to be established and collected as herein provided.  All Assessments, together with interest, costs, and reasonable attorneys' fees for the collection thereof, shall be a charge on the land and shall be a continuing lien upon the Unit against which such assessment is made.

(a)       No owner may exempt himself from the personal liability for assessments levied by the Association, nor release the Unit owned by him from the liens and charges thereof by waiver of the use or enjoyment of any of the Common Elements or by abandonment of his/her Unit.

(b)       Personal liability for the assessment shall not pass to a successor in title to the Unit unless the successor agrees to assume the obligation.  The successor in title shall be personally liable for any Common Expense Assessments thereafter due.

Section 18.13  Working Capital Assessment:  Upon the acquisition of record title to a Unit by an Owner from Declarant, the Owner of such Unit shall pay to the Association, or pay to Declarant if previously paid for that Unit by Declarant to the Association, One Hundred Forty Dollars ($140.00) (the "Working Capital Assessment") to be deposited by the Association in the accounts of the Association and apportioned between the accounts for the daily operation of the Association and the reserve account (as described in Section 18.4) as the Board determines is reasonably necessary.  Any amounts paid into the working capital fund shall not be considered as advance payment of assessments.  Each Unit's share of the working capital fund may be collected and then contributed to the Association by Declarant at the time the sale of the Unit is closed or at the termination of the Declarant Control Period, if earlier.  Until paid to the Association, the contribution to the working capital shall be considered an unpaid Common Expense Assessment, with a lien on Declarant's unsold Units pursuant to the Act.  While Declarant is in control of the Board of Directors, Declarant cannot use any of the working capital funds to defray the Declarant's own expenses, reserve contributions or construction costs.

Section 18.14  Subsidy Agreements:  The Association is specifically authorized to enter into an agreement (a "Subsidy Agreement") with the Declarant or other entities under which such party provides maintenance of the Common Elements and/or certain other services which are Common Expenses of the Association in exchange for a temporary suspension of regular assessments.

## ARTICLE XIX
## RIGHT TO ASSIGN FUTURE INCOME

The Association may assign its future income, including its right to receive Common Expense Assessments, only upon the approval of a Majority of Owners, at a meeting called for that purpose, and with the Eligible Mortgagee consent described in Article XVII.



# ARTICLE XX
## PERSONS AND UNITS SUBJECT TO DOCUMENTS

Section 20.1 Membership in the Association: Every Owner of a Unit shall be a Member of the Association. Membership shall be appurtenant to and may not be separated from ownership of a Unit. Membership in the Association shall not be transferred, pledged, or alienated in any way, except upon the sale of a Unit to which it is appurtenant, and then only to the purchaser of such Unit. Any attempt to make a prohibited transfer is void. In the event the Owner of any Unit should fail or refuse to transfer the membership registered in his or her name to the purchaser of his or her Unit, the Association shall have the right to record the transfer upon its books and thereupon the old membership outstanding in the name of the seller shall be null and void.

Section 20.2 Compliance with Documents: All Owners, tenants, mortgagees and occupants of Units shall comply with the Documents. The acceptance of a deed or the exercise of any incident of ownership or the entering into of a lease or the occupancy of a Unit constitutes agreement that the provisions of the Documents are accepted and ratified by that Owner, tenant, mortgagee or occupant. All provisions of the Documents recorded in the Clark County Recorder's Office are covenants running with the land and shall bind any Persons having at any time any interest or estate in any Unit.

Section 20.3 Adoption of Rules: The Board of Directors may adopt Rules regarding the use and occupancy of Units as it affects the Common Elements, the Limited Common Elements and the activities of occupants, subject to Notice and Comment.

# ARTICLE XXI
## INSURANCE

Section 21.1 Coverage: To the extent reasonably available, the Board of Directors shall obtain and maintain insurance coverage as set forth in this Article. If such insurance is not reasonably available, and the Board of Directors determines that any insurance described in this Article will not be maintained, the Board of Directors shall promptly cause notice of that fact to be hand-delivered or sent prepaid by United States mail to all Owners and Eligible Mortgagees at their respective last known addresses.

Section 21.2 Property Insurance Coverage:

(a)     Coverage. Property insurance will cover:

    (i)     All fixtures, equipment and any improvements and betterments which are affixed to or a part of the Common Elements; and

    (ii)     All personal property owned by the Association.

(b)     Amounts. The insurance will be for an amount (after application of any deductions) equal to one hundred percent (100%) of the actual cash value of the covered items at the time the insurance is purchased and at each renewal date.

The Board of Directors is authorized to obtain appraisals periodically for the purpose of establishing replacement cost of the insured items, and the cost of such appraisals shall be a Common Expense.

(c)     Risks Insured Against. The insurance shall afford protection against "all risks" of direct physical loss commonly insured.

(d)     Other Provisions. Insurance policies required by this Section shall provide that:

(i)     Each Owner is an insured person under the policy with respect to liability arising out of the Owner's interest in the Common Elements or membership in the Association.

(ii)     The insurer waives the right to subrogation under the policy against an Owner or member of the household of an Owner.

(iii)     An act or omission by an Owner, unless acting within the scope of the Owner's authority on behalf of the Association, will not void the policy or be a condition of recovery under the policy.

(iv)     If, at the time of a loss under the policy, there is other insurance in the name of an Owner which covers the same risk covered by the policy, the Association's policy provides primary insurance.

(v)     Losses must be adjusted with the Association.

(vi)     Insurance proceeds shall be paid to any insurance trustee designated in the policy for that purpose, and otherwise to the Association, but, in any case, it is to be held in trust for each Owner and the Owner's mortgagee.

(vii)     The insurer may not cancel or refuse to renew the policy until thirty (30) days after notice of the proposed cancellation or nonrenewal has been mailed to the Association, to each Owner and to each holder of a Security Interest to whom a certificate or memorandum of insurance has been issued, at their respective last known addresses.

(viii)     The name of the insured shall be substantially as follows:

Venezia Community Association, for the use and benefit of the individual Owners.

Section 21.3 Liability Insurance: Liability insurance, including medical payments insurance, will be maintained as determined by the Board of Directors. This insurance shall cover

all occurrences commonly insured against for death, bodily injury and property damage arising out of or in connection with the use, ownership or maintenance of the Common Elements and the activities of the Association.

Insurance policies carried pursuant to this Section shall provide that:

(i)     Each Owner is an insured person under the policy with respect to liability arising out of the Owner's interest in the Common Elements or membership in the Association.

(ii)     The insurer waives the right to subrogation under the policy against an Owner or member of the household of an Owner.

(iii)     An act or omission by an Owner, unless acting within the scope of the Owner's authority on behalf of the Association, will not void the policy or be a condition to recovery under the policy.

(iv)     If, at the time of a loss under the policy, there is other insurance in the name of an Owner covering the same risk covered by the policy, the policy of the Association provides primary insurance.

(v)     Losses must be adjusted with the Association.

(vi)     Insurance proceeds shall be paid to any insurance trustee designated in the policy for that purpose, and otherwise to the Association, but, in any case, it is to be held in trust for each Owner and the Owner's mortgagee.

(vii)     The insurer issuing the policy may not cancel or refuse to renew it until thirty (30) days after notice of the proposed cancellation or nonrenewal has been mailed to the Association, each Owner and each holder of a Security Interest to whom a certificate or memorandum of insurance has been issued at their last known addresses.

Section 21.4    Fidelity Bonds: A blanket fidelity bond shall be provided for anyone who either handles or is responsible for funds held or administered by the Association, whether or not they receive compensation for their services. The bond shall name the Association as obligee and shall cover the maximum funds that will be in the custody of the Association or the Manager at any time while the bond is in force. In no event shall the bond be for an amount less than the sum of three (3) months' assessments plus reserve funds. When either: (a) separate bank accounts for working funds and reserves are maintained and monthly checks are sent directly to the Association, (b) a management company maintains separate records and bank accounts for each reserve account of the Association, or (c) two (2) Directors must sign any check written on the reserve account, then the fidelity bond may be in an amount equal to three (3) months Common Expense Assessments on all Units.

Section 21.5    Owner Policies: An insurance policy issued to the Association does not preclude Owners from obtaining insurance for their own benefit.

20020806
01138

Section 21.6   Workers' Compensation Insurance: The Board of Directors shall obtain and maintain Workers' Compensation Insurance to meet the requirements of the laws of the State of Nevada.

Section 21.7   Directors' and Officers' Liability Insurance: The Board of Directors shall obtain and maintain directors' and officers' liability insurance, if available, covering all of the directors and officers (including without limitation the members of the ARC) of the Association. This insurance will have limits determined by the Board of Directors.

Section 21.8   Other Insurance: The Association may carry other insurance which the Board of Directors considers appropriate to protect the Association and/or the Owners.

Section 21.9   Premiums: Insurance premiums for insurance carried or to be carried by the Association shall be a Common Expense.

## ARTICLE XXII
## DAMAGE TO OR DESTRUCTION OF PROPERTY

Section 22.1   Duty to Restore: Any portion of the Project for which insurance is required under the Act (NRS 116.31135) that is damaged or destroyed must be repaired or replaced promptly by the Association unless:

(a)   The Project is terminated; or

(b)   Repair or replacement would be illegal under any state or local statute or ordinance governing health or safety; or

(c)   The Owners of eighty percent (80%) of the total number of Units in the Project, including each owner of a Unit or assigned Limited Common Element that will not be rebuilt, vote not to rebuild.

Section 22.2   Cost: The cost of repair or replacement in excess of insurance proceeds and reserves is a Common Expense.

Section 22.3   Plans: The Real Property must be repaired and restored in accordance with either the original plans and specifications or other plans and specifications which have been approved by the Board of Directors, a Majority of Owners and fifty-one percent (51%) of Eligible Mortgagees.

Section 22.4   Replacement of Less Than Entire Property:

(a)   The insurance proceeds attributable to the damaged Common Elements shall be used to restore the damaged area to a condition compatible with the remainder of the Project.

(b)   Except to the extent that other persons will be distributees:

47

(i)     The insurance proceeds attributable to a Unit and Limited Common Elements that are not rebuilt must be distributed to the owner of the Unit and the owner of the Unit to which the Limited Common Elements were allocated, or to lien holders, as their interests may appear; and

(ii)    The remainder of the proceeds must be distributed to each Owner or lien holder, as their interests may appear, in proportion to the Common Element interests of all the Units.

Section 22.5   Insurance Proceeds: The Trustee, or if there is no Trustee, then the Board of Directors of the Association, acting by the President, shall hold any insurance proceeds in trust for the Association, Owners and lien holders as their interests may appear. Subject to the provisions of Subsection 22.1(a) through Subsection 22.1(c) of this Declaration, the proceeds shall be disbursed first for the repair or restoration of the damaged Property. The Association, Owners and lien holders are not entitled to receive payment of any portion of the proceeds unless there is a surplus after the Real Property has been completely repaired or restored, or unless the Project is terminated.

Section 22.6   Certificates By Board of Directors: The Trustee, if any, may rely on the following certifications in writing made by the Board of Directors:

(a)     Whether or not damaged or destroyed Property is to be repaired or restored; and

(b)     The amount or amounts to be paid for repairs or restoration and the names and addresses of the parties to whom such amounts are to be paid.

Section 22.7   Certificates by Title Insurance Companies: If payments are to be made to Owners or mortgagees, then the Board of Directors and the Trustee, if any, shall obtain and may rely on a title insurance company's certificate or a title insurance policy based on a search of the Records in the Clark County Recorder's Office from the date of the recording of the original Declaration, stating the names of the Owners and the mortgagees.

## ARTICLE XXIII
## NOTICE AND HEARING

Section 23.1   Right to Notice and Comment: Before the Board of Directors amends the Bylaws or the Rules, whenever the Documents require that an action be taken after "Notice and Comment," and at any other time the Board of Directors determines, the Owners have the right to receive notice of the proposed action and the right to comment orally or in writing. Notice of the proposed action either shall be given to each Owner in writing, delivered personally or by mail to all Owners at such address as appears in the records of the Association, or it shall be published in a newsletter or similar publication which is routinely circulated to all Owners. The notice shall be given not less than five (5) days before the proposed action is to be taken. It shall invite comment to the Board of Directors orally or in writing before the scheduled time of the meeting.

Section 23.2   Right to Notice and Hearing: Whenever the Documents require that an action be taken after "Notice and Hearing," the following procedure shall be observed: The party proposing to take the action (e.g., the Board of Directors, a committee, an officer, the Manager, etc.) shall give written notice of the proposed action to all Owners or occupants of Units whose interest would be significantly affected by the proposed action. The notice shall include a general statement of the proposed action and the date, time and place of the hearing. At the hearing, the affected person shall have the right, personally or by a representative, to give testimony orally, in writing or both (as specified in the notice), subject to reasonable rules of procedure established by the party conducting the meeting to assure a prompt and orderly resolution of the issues. Any evidence shall be duly considered, but is not binding in making the decision. The affected person shall be notified of the decision in the same manner in which notice of the meeting was given.

Section 23.3   Appeals: Any person having a right to Notice and Hearing shall have the right to appeal to the Board of Directors from a decision of persons other than the Board of Directors by filing a written notice of appeal with the Board of Directors within ten (10) days after being notified of the decision. The Board of Directors shall conduct a hearing within thirty (30) days, giving the same notice and observing the same procedures as were required for the original meeting.

## ARTICLE XXIV
## BOARD OF DIRECTORS

Section 24.1   Association Records and Minutes of Board of Directors Meetings: The Board of Directors shall maintain and make available, subject to the provisions of the Bylaws and the Act, to any Owner, or holder, insurer or guarantor of a first mortgage secured by a Unit, current copies of this Declaration, the Articles, the Bylaws, the Rules, and all other books, records and other papers of the Association, including, but not limited to, the financial statements, budgets and reserve studies.

Section 24.2   Powers and Duties: The Board of Directors may act in all instances on behalf of the Association, except as provided in this Declaration, the Bylaws or the Act. The Board of Directors shall have, subject to the limitations contained in this Declaration and the Act, the powers and duties necessary for the administration of the affairs of the Association and of the Project, which shall include, but not be limited to, the powers set forth in the Bylaws.

Section 24.3.   Rule Making Authority of the Board of Directors.  Subject to the terms of the Act, this Declaration, the Bylaws, and the duty of the Board of Directors' to exercise business judgment and reasonableness on behalf of the Association and its Members, the Board of Directors may adopt rules which interpret, further define, and expand the restrictions set forth in Article IX hereof and may create, modify, and enforce reasonable Rules governing the use of the Property, consistent with other provisions in the Governing Documents. The Board of Directors shall distribute information concerning any proposed action to the restrictions set forth in Article IX or to the Rules to each Owner with the agenda for each Board meeting at which such action is to be considered.  Owners shall be provided an opportunity to be heard at such Board meeting prior to such action being taken subject to reasonable Board imposed restrictions.

49

Section 24.4   Board of Directors Limitations: The Board of Directors may not act on behalf of the Association to amend this Declaration, to terminate the Project or to elect members of the Board of Directors or determine the qualifications, powers and duties or terms of office of Board of Directors members, but the Board of Directors may fill vacancies in its membership for the unexpired portion of any term subject to the terms of the Bylaws and the provisions of the Act.

## ARTICLE XXV
## CLAIMS AGAINST DECLARANT: RIGHT TO CURE AND ARBITRATION

Section 25.1   Declarant's Right to Cure Alleged Defects: It is Declarant's intent that all Improvements of every type and kind which may be installed by Declarant as part of the Project, including, but not limited to, residences, sidewalks, driveways, streets, roads, parking areas, fences, walls, landscaping, signs, utility pipes, lines or wires, sewer and drainage systems, and grading on all of the Units and Common Elements within said Real Property (collectively, the "Declarant Improvements") be of a quality that is consistent with construction and development practices for production housing of this type.   Nevertheless, due to the complex nature of construction and the subjectivity involved in evaluating such quality, disputes may arise as to whether a defect exists and Declarant's responsibility therefor.  It is Declarant's intent to resolve all disputes and claims regarding "Alleged Defects" (as defined below) amicably, and without the necessity of time consuming and costly litigation.  Accordingly, all Owners and the Association and the Board shall be bound by the following claim resolution procedure:

(a)   Declarant's Right to Cure.  In the event that the Association, the Board, or any Owner or Owners (collectively, "Claimant") claim, contend, or allege that any portion of the Units on said Real Property and/or any Declarant Improvements are defective or incomplete, or that Declarant or its agents, consultants, contractors, or subcontractors (collectively, "Declarant's Agents") were negligent in the planning, design, engineering, grading, construction, or other development thereof (collectively, an "Alleged Defect"), Declarant hereby reserves the right to inspect, cure, repair, and/or replace such Alleged Defect as set forth herein.

(b)   Notice to Declarant.  In the event that a Claimant discovers any Alleged Defect, Claimant shall, within a reasonable time after discovery, notify Declarant, in writing, at 750 Pilot Road, Suite F, Las Vegas, Nevada, 89119, Attention: Leah Bryant, President, or such other address at which Declarant maintains its principal place of business, of the specific nature of such Alleged Defect ("Notice of Alleged Defect").

(c)   Right to Enter, Inspect, Cure, Repair and/or Replace.  Immediately after the receipt by Declarant of a Notice of Alleged Defect or the independent discovery of any Alleged Defect by Declarant or any governmental agency, and for a reasonable time thereafter, as part of Declarant's reservation of right, Declarant shall have the right, upon reasonable notice to Claimant and during normal business hours, to enter onto or into, as applicable, any portion of the Real Property, Unit, Common Element, Annexable Property and/or any Declarant Improvements for the purposes of inspecting and, if deemed necessary by Declarant, curing, repairing, and/or replacing such Alleged Defect.  In conducting such inspection, cure, repairs, and/or replacement,

Declarant shall be entitled to take any actions as it shall deem reasonable and necessary under the circumstances.

(d)     Legal Actions.  No Claimant shall initiate any legal action, cause of action, proceeding or arbitration against Declarant alleging damages (a) for the costs of curing, repairing, or replacing any Alleged Defect, or (b) for the diminution in value of any real or personal property resulting from such Alleged Defect, or (c) for any consequential damages resulting from such Alleged Defect, unless and until Claimant has (i) delivered to Declarant a Notice of Alleged Defect, and (ii) Declarant has, within one hundred twenty (120) days after its receipt of such Notice of Alleged Defect, either (1) failed to cure, repair, or replace such Alleged Defect or (2) if such Alleged Defect can not reasonably be cured, repaired, or replaced within such one hundred twenty (120) day period, failed to commence such cure, repair, or replacement of the Alleged Defect and, thereafter, failed to pursue diligently such cure, repair, or replacement to completion. During any such period while Declarant is diligently pursuing to completion the cure, repair, or replacement of the Alleged Defect, Claimant shall not stop, restrict, hinder, interrupt, or otherwise interfere with any reasonable action or activity taken by Declarant, its employees, agents, or independent contractors, to inspect, cure, repair, or replace any Alleged Defect, whether or not such action or activity is taken, or is proposed to be taken, on property owned by Claimant.

(e)     No Additional Obligations; Irrevocability and Waiver of Right.  Nothing set forth in this Article shall be construed to impose any obligation on Declarant to inspect, cure, repair, or replace any item or Alleged Defect for which Declarant is not otherwise obligated to do under applicable law or any limited warranty provided by Declarant in connection with the sale of the Units and/or the Declarant Improvements constructed thereon, nor shall anything set forth in this Article constitute an express or implied representation, warranty or guarantee by Declarant concerning any Declarant Improvements, the Real Property, the Annexable Property, or the Project.  The right of Declarant to enter, inspect, cure, repair, and/or replace reserved hereby shall be irrevocable and may not be waived and/or terminated except by a writing, in recordable form, executed and recorded by Declarant in the Official Records of the Clark County Recorder.

(f)     NRS Chapter 40.  The terms, conditions and procedures set forth in this Article XXV are in addition to the terms, conditions and procedures set forth in NRS Chapter 40, and shall, to the maximum extent permitted by law, be exercised by any Claimant prior to instituting a claim and/or commencing an action under Chapter 40 for "constructional defects" as defined in Chapter 40; provided, however, the procedures set forth in this Article XXV shall not abrogate any of the requirements of Claimant under Chapter 40, inclusive of the requirement that Claimant, at the end of the foregoing one hundred twenty (120) day period, notify Declarant in writing of any alleged constructional defects which Declarant failed to cure during that one hundred twenty (120) day period at least sixty (60) days prior to bringing an action under Chapter 40 (subject to the limitations contained in Section 25.2 hereof).  Such notification shall be given in a format that substantially complies with the notice requirements set forth in NRS 40.645.  Further, to the extent any provisions of this Article XXV are inconsistent with the provisions of Chapter 40, the provisions of this Article XXV shall apply to the maximum extent permitted by law and shall extend all the time periods set forth in Section 11 of Chapter 40 until expiration of the one hundred twenty (120) day period set forth in this Article XXV.  It is the express intent of Declarant to

provide, by this Article XXV, an initial one hundred twenty (120) day period for Declarant to investigate and cure any constructional defects alleged by Claimant before the provisions of Chapter 40 are implemented and initiated by Claimant including, without limitation, the notice of claim, inspection, offer of settlement, and repair provisions of Chapter 40. Each Owner, by accepting title to any portion of the Real Property, as evidenced by recordation of a deed to Owner describing that land, agrees to be bound by all of the provisions of this Article XXV.

Section 25.2  Arbitration of Disputes: DECLARANT AND EACH CLAIMANT, BY ACCEPTING TITLE TO OR AN INTEREST IN ANY PORTION OF THE REAL PROPERTY OR PROJECT, AGREE AS FOLLOWS:

(a)  Definitions. For purposes of this Section 25.2, the following definitions shall apply:

(i)  "Declarant" shall mean the entity executing this Declaration and its respective predecessors, successors, subsidiaries, and/or affiliated corporations, parent companies, sister companies, divisions, partners, joint venturers, the general contractor for the Project, affiliates, owners, officers, directors, employees, shareholders, agents, and assigns.

(ii)  "Claimant" shall include all Owners, the Association, the Board and their successors, heirs, assigns, subsequent Owners, and any third party claiming any right or interest in the Property through them.

(iii)  "Property" shall mean the land and improvements, which are the subject of this Declaration, including, without limitation, the Property (defined in Section 1.43), Annexable Property (defined in Section 1.3), and the Common Elements (defined in Section 1.16).

(iv)  "Project" shall mean the planned community which is the subject of this Declaration, including the Property, the Common Elements, and any neighboring or adjacent properties.

(b)  Arbitration is Sole Remedy. Subject to Declarant's right to cure any Alleged Defect pursuant to the provisions of this Article, the arbitration procedures described below shall be the sole, exclusive, and final means of resolving any "Dispute" between Declarant and a Claimant and/or between their respective successors-in-interest. As used herein, "Dispute" shall mean any claim, cause of action (whether at law or in equity) or disagreement of any nature whatsoever ("Claim") arising from or in connection with the sale of the Property to Claimant, construction or installation of any improvements on the Property or Project, the grading of the Property or Project, Declarant's New Home Limited Warranty, performance of customer service work by or on behalf of Declarant, or any work or services performed by or on behalf of Declarant on or in connection with the Property or Project, other than a Claim made pursuant to NRS 38.300 to 38.360. Disputes subject to these arbitration procedures shall include, without limitation, Claims for real and personal property damage, construction defects (whether patent or latent), including without limitation any Claims subject to the provisions of NRS 40.600 to 40.695 (the "Construction Defect Act"), bodily injury or wrongful death, nondisclosure, misrepresentation,

fraud, emotional distress, monetary damages, rescission of any agreement, enforceability of this Article XXV, and/or specific performance. As a condition to Declarant's obligation to arbitrate Disputes under this Article XXV, Declarant may require in its sole discretion that any or all third parties, including without limitation, contractors, subcontractors, suppliers, consultants, partners, affiliates, or agents of Declarant (collectively, the "Third Parties") who may have liability in connection with the Dispute, including any right of contribution or indemnity Declarant may have against such Third Party, shall have agreed to be participants in and bound by the arbitration procedure described in this Section 25.2. Notwithstanding the foregoing, Declarant may, in its sole discretion, waive the foregoing condition.

(c)     Applicable Procedures. With respect to any Dispute governed by the Constructions Defect Act, after all prerequisites to initiating a civil action under the Construction Defect Act are satisfied or waived in accordance with the provisions of such Act, and with respect to all other Disputes, at all times, the following procedures shall apply thereto:

(i)     Any dispute between Claimant and Declarant where the claim of damage is seven thousand five hundred dollars ($7,500) or less, including Disputes governed by the provisions of the Construction Defect Act where the estimated cost of repair or replacement of the item(s) in dispute is seven thousand five hundred dollars ($7,500) or less, shall be within the sole jurisdiction of the Justice Court arbitration and (as set forth in this Article XXV) shall not be applicable unless both Claimant and Declarant so agree in writing.

(ii)     Any Dispute between Claimant and Declarant where the claim of damage is more than seven thousand five hundred dollars ($7,500), including disputes governed by the provisions of the Construction Defect Act where the estimated cost of repair or replacement of the item(s) in dispute is more than seven thousand five hundred dollars ($7,500), shall, upon request by either Claimant or Declarant, be submitted to arbitration conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association ("AAA"), as such rules are expressly amended hereby. Arbitration shall be initiated by the filing by either party of a written Demand for Arbitration with the AAA, accompanied by the required filing fee, and concurrently mailing a copy of the demand to the other party. Unless Claimant and Declarant agree otherwise, the Procedures for Large, Complex Construction Cases issued by the AAA shall apply to all cases to the extent such procedures are not in conflict with the Federal Arbitration Act or the Uniform Arbitration Act.

(d)     Notice of Arbitration. Before any Dispute can be submitted to arbitration, the party wishing to submit the Dispute must first, at least sixty (60) days prior to filing a Demand for Arbitration, give the other party written notice of the Dispute describing with reasonable specificity the actions that should be taken by the other party to resolve the Dispute. With respect to any Dispute regulated by NRS 40.600 to 40.695, inclusive, this sixty (60) day notice, if given by Claimant, shall comply with the requirements of NRS 40.645. Each party may, prior to the arbitration hearing, conduct discovery as provided in NRS 40.680, and Nevada Rules of Civil Procedure Section V, Rules 26 to 37, inclusive. This Arbitration of Disputes Provision is intended to be binding upon Claimant and Declarant for all claims regulated by NRS 40.600 to 40.695, inclusive, after all the requirements of NRS 40.645 to 40.675 for resolution of the dispute prior

to commencement of a civil action have been satisfied or waived by Claimant and Declarant in accordance with said statutes and in place and instead of any court action described therein.

(e)    Applicable Rules of Arbitration. The arbitration shall take place in the office of the AAA nearest to the Property, at such time and date selected by the arbitrator. Any dispute regarding the scope of the arbitration or the procedures to be followed in the arbitration shall be resolved by the arbitrator. Only compensatory damages as recognized by Nevada law, in an amount not to exceed the original purchase price of the Unit, are recoverable and the arbitrator chosen for the arbitration shall have no authority to award damages for emotional distress, consequential, punitive, or any other nature of damages. In no event shall one party's liability to the other exceed the original purchase price of the house. The combined cost (fee and expenses) of the AAA and of the arbitrator shall be apportioned equally between Claimant and Declarant. Each party shall bear its own attorneys' fees and other costs. The award rendered by the arbitrator must be accompanied by a written decision of the arbitrator that contains written findings of fact and conclusions of law and, once so rendered, shall be binding, final and non-appealable as to all parties in the arbitration to the fullest extent permitted by Nevada law. Notwithstanding the preceding sentence, an appeal may be taken if any award is based on any deviation by the arbitrator from the terms of this Article XXV. In furtherance thereof, and to the fullest extent permitted by Nevada law, Claimant and Declarant waive the provisions of NRS 38.145. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Except as otherwise expressly set forth in this Section, the arbitrator shall based his decision on the substantive law of Nevada.

To the maximum extent allowed by law, no statute of limitations or repose shall be tolled, or the running thereof otherwise stopped, by any notice, claim, or communication between Claimant and Declarant, whether under any written limited warranty or otherwise. In addition to the Construction Industry Rules of the AAA, the following additional rules shall govern the arbitration: (a) with the exception of contractors, subcontractors, suppliers, consultants, partners, affiliates, and agents added by Declarant as provided herein, the parties to the arbitration shall be limited to Claimant and Declarant, and (b) Claimant and Declarant shall each pay one-half (½) of the initial fee for such arbitration.

(f)    Consolidation. Declarant may, in its sole discretion, consolidate claims of any other person(s) who are buying or have bought Units from Declarant in the Las Vegas metropolitan area with any Dispute, in the event that such Claims are, in Declarant's opinion, similar in nature to a Dispute submitted to arbitration hereunder. Further, if Declarant elects to consolidate such Claims with a Dispute, if the aggregate amount of damage claimed by the Claimant and such person(s) exceeds seven thousand five hundred dollars ($7,500), the procedures governing such consolidated matters will be those governing Disputes where the claim of damage is more than seven thousand five hundred dollars ($7,500) as set forth in paragraph (2)(b) of this Section 25.2(f).

(g)    Severability. If any provision or aspect of this Section 25.2 is determined by a court of competent jurisdiction to be invalid or unenforceable, or if any provision or aspect of this Section 25.2 is superseded or rendered unenforceable by any law which becomes effective after



the date this Declaration is recorded, the remaining provisions of this Section 25.2 shall nevertheless remain in full force and effect and continue to be binding. If there is any conflict between this Section 25.2 and the other provisions of this Declaration, including the other provisions of this Article XXV, the provisions of this Section 25.2 shall control.

(h)     Effect. By accepting a deed conveying an interest in a portion of the Property, each Claimant: (a) for Disputes for which the amount in controversy exceeds seven thousand five hundred dollars ($7,500) (including without limitation Disputes aggregated as provided in Subsection 25.2(g) above), agrees to have any such Dispute decided by neutral, binding arbitration as set forth above and waives any rights such Claimant may possess to have any such Dispute litigated in a court of law, including without limitation in a trial by jury; (b) in connection with any Dispute, waives any rights such Claimant may have to recover: (i) damages for emotional distress, and (ii) any damages other than direct, compensatory damages as recognized by Nevada law in an amount not to exceed the original purchase price of the Unit conveyed as conveyed by Declarant. By way of illustration and not limitation, the damages which each Claimant waives any right to recover include: punitive, exemplary, indirect, or consequential. Furthermore, by accepting a deed conveying an interest in a portion of the Property, each Claimant also waives any rights it may have to discovery and appeal, except as those rights are expressly included in this Section 25.2. If a Claimant fails or refuses to submit to arbitration as set forth herein, such Claimant may be compelled by Nevada law to participate in good faith in such arbitration proceedings or may have an unfavorable and binding decision rendered by the arbitrator, notwithstanding such refusal of failure to participate in arbitration. Each Claimant acknowledges that its agreement to the arbitration provisions set forth herein is voluntary.

## ARTICLE XXVI
## CONDEMNATION

If part or all of the Project is taken by any person or entity having the authority of eminent domain, all compensation and damages for and on account of the taking shall be payable in accordance with the Act (NRS 116.1107).

## ARTICLE XXVII
## MISCELLANEOUS PROVISIONS

### Section 27.1  Enforcement:

(a)     The Association and any Unit Owner shall have the right to enforce by any proceedings at law or in equity, each covenant, condition, restriction and reservation now or hereafter imposed by the provisions of this Declaration. Each Unit Owner shall have a right of action against the Association for any failure by the Association to comply with the provisions of the Documents. Failure by the Association or any Unit Owner to enforce any covenant, condition, restriction or reservation contained herein shall not be deemed a waiver or the right to do so thereafter.



20020806
.01138

(b)     In the event the Association, Declarant, or any Unit Owner shall commence litigation to enforce any of the covenants, conditions, restrictions or reservations herein contained, the prevailing party in such litigation shall be entitled to costs of suit and such attorney's fees as the Court may adjudge reasonable and proper. The "prevailing party" shall be the party in whose favor a final judgment is entered.

Section 27.2   Captions: The captions contained in the Documents are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of the Documents or the intent of any provision thereof.

Section 27.3   Gender: The use of the masculine gender refers to the feminine gender, and vice versa, and the use of the singular includes the plural, and vice versa, whenever the context of the Documents so require.

Section 27.4   Waiver: No provision contained in the Documents is abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

Section 27.5   Invalidity: The invalidity of any provision of the Documents does not impair or affect in any manner the validity, enforceability or effect of the remainder, and if a provision is invalid, all of the other provisions of the Documents shall continue in full force and effect.

Section 27.6   Conflict: The Documents are intended to comply with the requirements of the Act applicable to common interest communities and the Documents shall be interpreted, if at all possible, so as to be consistent with the Act. If there is any conflict between the Documents and the provisions of the foregoing statutes, the provisions of the applicable statutes shall control. In the event of any conflict between this Declaration and any other Document, this Declaration shall control.

Section 27.7   Notices: Any notice permitted or required to be given under the provisions of this Declaration shall be in writing and may be delivered either personally or by mail. If delivery is made by mail, it shall be deemed to have been delivered on the third day (other than a Sunday or a legal holiday) after a copy of the same has been deposited in the United States mail, postage prepaid, addressed to the person at the address given by such person to the Association for the purpose of service of notices, or to the residence of such person if no address has been given to the Association. Such address may be changed from time to time by notice in writing given by such person to the Association.

Section 27.8   Term: This Declaration, including all of the covenants, conditions and restrictions hereof, shall run with and bind the Property for a term of thirty (30) years from the date this Declaration is recorded. After such time, the covenants, conditions and restrictions contained herein, shall be automatically extended for successive periods of ten (10) years, unless an instrument is signed by the Owner of at least two-thirds (2/3) of the total number of Units in the Project and recorded in the Clark County, Nevada Recorder's Office within the year preceding the beginning of each successive period of ten (10) years, agreeing to change the terms of this

20020806
.01138

Declaration, in whole or in part, or to terminate the same, in which case this Declaration shall be modified or terminated as specified herein.

IN WITNESS WHEREOF, Declarant has caused this Declaration to be executed as of this 5 $^{TH}$ day of August, 2002.

"DECLARANT"

KB HOME NEVADA INC., a Nevada corporation

By: _____
Name: _____
Title: _____

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on $AUGUST\ 5^{TH}$, 2002, by VICKI TOWN as SR. VICE PRESIDE of KB HOME NEVADA INC.

_____
Notary Public

My appointment expires: _____7/8/03_____

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
SANDRA MAAS
Appt. No. 99-59749-1
My Appt. Expires July 8, 2003



# EXHIBIT "A"

## ANNEXABLE PROPERTY

## LEGAL DESCRIPTION

All of that certain real property located in the County of Clark, State of Nevada, described as follows:

### Parcel 1:

Lots One Hundred One (101) through One Hundred Twelve (112) inclusive, of Venezia at Rhodes Ranch Unit 1, as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97, in the Office of the County Recorder, Clark County, Nevada; and

Common Element Lot "A" (Garden Pond Street, Argus Reed Avenue, Flying Frog Avenue, Ornate Glade Avenue and Tree Frog Street which constitute the Private Streets of Venezia at Rhodes Ranch Unit 1), as shown on the Final Map of Venezia at Rhodes Ranch Unit 1, A Common Interest Community, recorded August 2, 2002, on file in Book 105, of Plats, page 97, in the Office of the County Recorder, Clark County, Nevada.

### Parcel 2:

Lying in West Half (W 1/2) of the Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section 5, Township 22 South, Range 60 East, M.D.M., Clark County, Nevada, described as follows:

Commencing at the Northwest corner of the Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of said Section 5; thence South 01°44'34" East, a distance of 503.35 feet to the point of beginning; thence North 88°26'07" East, a distance of 540.91 feet; thence South 87°51'09" East, a distance of 37.00 feet to a non tangent curve concave Westerly, of which the radial line bears North 87°51'09" West, and a radius of 1,218.50 feet; thence Northerly along said curve a distance of 15.62 feet, through a central angle of 00°44'04"; thence South 88°35'13" East, a distance of 85.26 feet; thence South 01°33'53" East, a distance of 195.02 feet; thence South 89°06'29" West, a distance of 331.69 feet; thence South 01°39'14" East, a distance of 309.72 feet; thence South 88°20'46" West, a distance of 165.70 feet; thence North 01°41'59" West, a distance of 25.61 feet; thence South 89°02'03" West, a distance of 165.51 feet; thence North 01°44'34" West, a distance of 464.99 feet to the point of beginning.

58

20020806
.01138

## Parcel 3:

A portion of the Southwest Quarter (SW 1/4) of the Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section 5, Township 22 South, Range 60 East, M D.M., Clark County, Nevada, described as follows:

Commencing at the Southwest Corner of the Southeast Quarter (SE 1/4) of said Section 5; thence North 88°57'20" East, a distance of 165.21 feet to the point of beginning; thence North 01°41'59" West, a distance of 369.44 feet; thence North 88°20'46" East, a distance of 165.70 feet; thence South 01°39'14" East, a distance of 371.20 feet; thence South 88°57'20" West, a distance of 165.42 feet to the point of beginning.

CLARK COUNTY, NEVADA
JUDITH A. VANDEVER, RECORDER
RECORDED AT REQUEST OF:

KB HOME NEVADA INC

08-06-2002  OFFICAL RECORDS            67

BOOK: 20020806   INST:   01138

FEE:       80.00   RPTT:         .00